1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4

5   THE HONORABLE STEPHEN V. WILSON, DISTRICT JUDGE PRESIDING

6

    USA,                          )
7                                 )
            Plaintiff,            )
8                                 )
      vs.                         )      No. CR 15-611-SVW
9                                 )
    SEAN DAVID MORTON AND MELISSA )
10  MORTON,                       )
                                  )
11          Defendants.           )
    _____)

12

13

14      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

15              LOS ANGELES, CALIFORNIA

16              TUESDAY, MAY 4, 2017

17

18                  **VOLUME I OF III**

19                  **PAGES 1 – 261**

20

21

22  _____

23              DEBORAH K. GACKLE, CSR, RPR
                United States Courthouse
24            350 W. First Street, 4th Floor
              Los Angeles, California 90012
25                  (213) 894-8913

1  **APPEARANCES OF COUNSEL:**

2

3

4      **For the Plaintiff:**

5

6          EILEEN DECKER
           UNITED STATES ATTORNEY
7          BY:  VALERIE MAKAREWICZ
           BY:  JAMES HUGHES
8          ASSISTANT UNITED STATES ATTORNEYS
           1400 United States Courthouse
9          312 North Spring Street
           Los Angeles, California  90012
10

11         ALSO PRESENT:  JOHN LUCERO, IRS SPECIAL AGENT

12

13     **For the Defendant:**

14

15         LAW OFFICE OF STEVEN BRODY
           350 S. Figueroa, Suite 975
16         Los Angeles, California  90071
           (213) 290 5294
17         WWW.Stevebrodylaw.com

18

19         ALSO PRESENT:   KRISTIN RICHARDS, ESQ.

20

21                    – – – – –

22

23

24

25

# I N D E X

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MORGAN, KRISTY | 127 | 126(B) 189(M) | | |
| JUSTINO, ELVIN | 204 | 220(M) | | |
| JACKSON, JEFFREY | 224 | | | |
| EVERSON, MARK | 237 | 248(B) 251(M) | | |

## E X H I B I T S

| GOVERNMENT'S | RECEIVED |
|---|---|
| 1, 2 and 153 | 131 |
| 4, 5, 7 - 21 | 133 |
| 6 | 145 |
| 146 | 153 |
| 147 | 159 |
| 48 | 162 |
| 31 - 33 | 230 |
| 154 | 232 |
| 22 | 242 |

- - - - -

LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 4, 2017; 9:25 A.M.

- - - - -

THE CLERK:  Calling Item 1, CR 15-611-SVW, USA v. Sean David Morton and Melissa Morton.

Counsel, please state your appearances.

MS. MAKAREWICZ:  Good morning, Your Honor.  Assistant United states attorney Valerie Makarewicz and James Hughes for the government.  Also at counsel table is IRS criminal investigations special agent John Lucero.

MR. BRODY:  And good morning, Your Honor.  Steven Brody on behalf of Melissa Morton, who is present and out of custody.  With me at counsel table is Kristen Richards, an attorney, who will be helping me during the voir dire this morning.

THE COURT:  We're here this morning to select a jury in a criminal case.  I understand there are a few matters that the parties wish to raise before we select the jury.

MS. MAKAREWICZ:  Two very quick housekeeping matters, Your Honor:  The first, counsel for the government provided copies of our opening statement PowerPoint presentation to the defense.  We understand that counsel for defendant Melissa Morton has no objection to our opening statements.

We'd like the court to inquire of Mr. Morton as to whether or not he has any objection.

THE COURT:  Do you have any objection?

DEFENDANT SEAN DAVID MORTON:  Well, I object to their reading the entire indictment because I think it would be prejudicial to the jury that they hear so many lies all at once.

THE COURT:  All right.

MS. MAKAREWICZ:  This isn't with respect --

THE COURT:  Don't respond to each other; you have to communicate through the court.

You can present your opening statement.

MS. MAKAREWICZ:  Thank you, Your Honor.

The second housekeeping matter has to do with counsel -- defendant Melissa Morton's motion in limine No. 3, which the court made -- reserved ruling with respect to the government using the bankruptcy proceeding --

THE COURT:  Yes.  I gave that some further thought, and it may have some relevance.  I understand the government's argument, but I'm going to still reserve a ruling on that until I see how the evidence comes in, and depending upon the progress of the case, I'll reevaluate it.

MS. MAKAREWICZ:  Thank you, Your Honor.

THE COURT:  Don't mention it in opening statement.

MS. MAKAREWICZ:  Understood.

And we have nothing further.

DEFENDANT SEAN DAVID MORTON:  Your Honor, I object to

them using the bankruptcy because it has absolutely no relevance to this particular case.

THE COURT:  So far I've not allowed it.  So we'll revisit it.

MR. BRODY:  Your Honor, I have one very minor issue.

Previously I asked if Ms. Richards could help me at counsel table during voir dire, and I believe Your Honor said she could.

THE COURT:  Yes.

MR. BRODY:  I actually need a minute order to issue to that effect so that she can be paid by the CJA office.

THE COURT:  I'll do that.

MR. BRODY:  Thank you, Your Honor.

THE COURT:  So are you going to get the jury now?

THE CLERK:  Yes, Your Honor.  The panel is ready.

(Recess)

(Open Court - Jury Present)

THE CLERK:  Item 1, CR 15-00611-SVW.  United States of America v. Sean David Morton and Melissa Morton.

Counsel, please state your appearances.

MS. MAKAREWICZ:  Good morning, Your Honor.  Assistant United States Attorneys Valerie Makarewicz and James Hughes for the government.  Also at counsel table is IRS Special Agent John Lucero.

MR. BRODY:  Good morning, Your Honor.  Steven Brody

on behalf of Melissa Morton, who is present here.  As well with me at counsel table is my colleague, Kristen Richards.

DEFENDANT SEAN DAVID MORTON:  Good morning, Your Honor.  I make a special appearance, not general, for the sole purpose of setoff settling and discharging this case.

THE COURT:  Members of the jury panel, we're here this morning to select a jury in a criminal case.  I'm not going to tell you much about the case because I'll give the lawyers that opportunity, but just for the purposes of the jury selection -- can you all hear me?

(Prospective jurors answer in the affirmative.)

THE COURT:  -- I'm going to tell you in the most general way that the charges in this case essentially involve false statements by the defendants to the IRS, and you will hear the indictment shortly that will tell you more about the charges.

Before I begin asking you questions as a panel, would you all stand and be sworn.

(Prospective jurors sworn, and all answer in the affirmative.)

THE CLERK:  Thank you.

THE COURT:  In a criminal case, the case begins with an indictment.  An indictment is just a procedural mechanism.  It has no significance in this case whatsoever except that it describes what the government has to prove to satisfy its

burden of proof in the trial.  As you know, in our system of justice, a defendant is presumed to be innocent, and the burden is always on the government to prove the charges beyond a reasonable doubt.

Having said that, and only to give you some idea of what the charges are, I'm going to invite the government to read the indictment to you.  And I caution you again that it's just the way the case begins and has no significance beyond that.

MS. MAKAREWICZ:  Thank you, Your Honor.

"Count One:  At all times relevant to this indictment, defendants Sean David Morton and Melissa Morton, aka Melissa Thompson Morton, aka Melissa Thompson, aka Melissa Ann Thompson, aka Melissa Ann Morton, hereinafter referred to as Melissa Morton, were married and resided in Hermosa Beach, California, which is located in Los Angeles County, and within the Central District of California.

"The Internal Revenue Service was and is an agency of the United States Department of the Treasury, responsible for administering and enforcing the tax laws of the United States. IRS Forms 1099 were and are used to report, amongst other things, interest income and associated withholdings to the IRS. Original issue discount, otherwise referred to as OID income, typically reported on IRS Form 1099-OID, was and is a form of interest income commonly realized on debt instruments issued at

a discount to or a purchase for less than the ultimate redemption value of the debt instrument.

"Beginning in or about March 2009, and continuing at least until in or about April 2013, in Los Angeles County, within the Central District of California, defendant Sean David Morton and Melissa Morton, together with others known and unknown, knowingly combined, conspired and agreed to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government function of a government agency, namely the IRS, by deceitful and dishonest means.

"The object of the conspiracy was carried out, and to be carried out, in substance as follows:  Defendants, acting together and separately, prepared and aided in the preparation of defendant Sean David Morton's 2005, 2006, 2007 and 2008 income tax returns, tax forms and other documents, and submitted said false returns attached false documents to the IRS.

"Defendants, acting together and separately, prepared and aided in the preparation of defendant Melissa Morton's 2007 income tax return, tax forms and other documents, and submitted said false return with attached false documents to the IRS.

"Defendants caused multiple copies and multiple versions of their income tax returns to be submitted to various IRS service centers throughout the United States in 2009 and 2010.

"Defendants falsely reported their filing status as single, or did not report a filing status, and filed their returns separately.  Defendants attached false IRS Forms 1099-OID to their federal income tax runs.  These Forms 1099-OID falsely reported that the defendants were the recipients of original issue discount income from various payors, and that federal income tax had been withheld on said interest income.

"On several income tax returns, defendants falsely reported to the IRS that they owed no federal income tax but that income tax had been withheld and paid to the IRS on the purported original issue discount income.

"On other income tax returns defendants falsely reported to the IRS that the federal income tax owed on the purported original issue discount income was less than the income tax that had been withheld and paid to the IRS.  In both instances, defendants sought refunds of said purported withholding.

"Defendants submitted to the IRS fictitious financial instruments entitled 'Coupon for Setoff, Settlement and Closure,' which were made payable to the Department of Treasury, Internal Revenue Service, CID.

"Defendants claimed that these fictitious financial instruments were purported bonds in exchange for the refunds they sought from the IRS.  Defendant Sean David Morton

submitted a false IRS Form 843, Claims for Refund and Request for Abatement, in the name of defendant Sean David Morton for 2006, and claimed a refund to which defendant Sean David Morton was not entitled.

Defendant Melissa Morton submitted a false IRS Form 843, Claims for Refund and Request for Abatement, in the name of defendant Melissa Morton for 2007, and claimed a refund to which defendant Melissa Morton was not entitled.

"Defendants submitted to the IRS fictitious financial instruments entitled 'Non-negotiable Discharging Bond and Indemnity,' which purports to be bonds issued by defendants to discharge and set off defendants' liability with the IRS.

"Defendants submitted copious amounts of correspondence, documents, and miscellaneous IRS forms to the IRS in an effort to interfere with the administration of the income tax laws.

"On or about March 13, 2009, defendant Sean David Morton submitted and caused to be submitted to the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2006, which claimed a refund in the amount of $1,560,634. Along with this 2006 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID.

"On or about March 13, 2009, defendant Sean David

Morton submitted and caused to be submitted to the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2007, which claimed a refund in the amount of $1,754,594.

"Along with this 2007 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Form 1099-OID.

"On or about March 13th, 2009, defendant Melissa Morton submitted and caused to be submitted a false and fraudulent income tax return -- Individual Income Tax Return, Form 1040, in the name of defendant Melissa Morton for the calendar year 2007, which claimed a refund in the amount of $12,305.

"Along with this 2007 income tax return, defendant Melissa Morton submitted and caused to be submitted to the IRS a false and fraudulent Form 1099-OID.

"On or about April 14th, 2009, defendant Sean David Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2005, which claimed a refund in the amount of $136,077.

"Along with this 2005 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID.

"On or about April 14, 2009, defendant Sean David

Morton submitted and caused to be submitted a false and
fraudulent U.S. Individual Income Tax Return, Form 1040, in the
name of defendant Sean David Morton, for the calendar year
2008, which claimed a refund in the amount of $479,506.

"On or about" --

THE COURT:  Are you reading Count One still?

MS. MAKAREWICZ:  I am.

THE COURT:  Okay.  Go ahead.

Let me just interrupt for a second.  One of the
prospective jurors seems to be suffering quite a bit with a
severe cough.  If that person is suffering in the way it
sounds, if there's no objection from the parties, I would
excuse that person.

Is it one person?  There seems be a severe cough, and
I don't want that person to be distressed.

DEFENDANT SEAN DAVID MORTON:  I think it's my wife.

MR. BRODY:  I think it might be coming from our
table.

DEFENDANT SEAN DAVID MORTON:  More than happy to be
excused.

DEFENDANT MELISSA MORTON:  I'm very sorry.  I can't
help it.

THE COURT:  Oh, no.  Well, then, I'm sorry about
that.

DEFENDANT SEAN DAVID MORTON:  Do you want my wife

excused?  That would be great.  We have cough drops, tissue --

THE COURT:  I didn't realize where it was coming from, and I apologize, and I --

DEFENDANT SEAN DAVID MORTON:  Thank you for your consideration, Judge.

THE COURT:  Just do the best that you can.  It's understandable.

All right.  Go ahead.

MS. MAKAREWICZ:  "On or about April 14, 2009, defendant Sean David Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2008, which claimed a refund in the amount of $479,506.

"On or about April 17, 2009, the same day, an income tax return refund in the amount of $480,322.55 for defendant Sean David Morton's 2008 income tax return was issued by the IRS and transferred into defendants' joint account at Washington Mutual Bank, account 3324.  Defendants opened two jointly-held bank accounts with Washington Mutual, accounts No. 4249 and 5891.

"On or about April 17, 2009, defendant Melissa Morton transferred $110,467.99 from account No. 3324 into account No. 4249.

"On or about April 17, 2009, defendant Melissa Morton

transferred 250,000 from account 3324 into account 5891.

"On or about April 17, 2009, defendant Sean David Morton withdrew $70,000 in cash from account No. 3324.

"On or about October 29, 2009, defendant Sean David Morton mailed a 52-page packet of documents to the IRS in response to October 26, 2009, levees issued against accounts Nos. 3324 and 4249, and a third account that belonged solely to the defendant Sean David Morton, account 6716.

"On or about November 12, 2009, defendant Sean David Morton mailed a document to the IRS entitled 'Notice of Contest of Lien,' which claimed, in relevant part, that any tax liability he owed to the United States had been satisfied.

"On or about March 3, 2010, defendant Melissa Morton mailed a letter to the IRS asserting that the IRS levied her personal and private accounts, which are not joint accounts with any other party, and illegally removed funds from my personal and private checking accounts.  Defendant Melissa Morton included a copy of correspondence from JPMorgan Chase to defendant Sean David Morton regarding accounts Nos. 3324, 4249 and 6716.

"On or about March 15, 2010, defendant Melissa Morton mailed a second letter to the IRS and reiterated that the IRS levied against her personal and private checking accounts without lawful justification, and that Sean David Morton's name appears nowhere on the checking accounts you've unlawfully

levied.  Defendant Melissa Morton included a copy of
correspondence from JPMorgan Chase to defendant Sean David
Morton regarding at accounts 3324, 4249 and 6716.

"On or about March 17, 2010, defendant Sean David
Morton mailed a 12-page document to the IRS entitled 'First
Notice, Certificate of Nonresponse and Dishonor, Reminder of
Default' falsely claiming, amongst other things, that a
presumption had arisen that the IRS had contested to a lien
against IRS assets in the amount of $900,000.

"On or about March 26, 2010, defendant Melissa Morton
mailed the IRS a 36-page package of documents which included a
entitled 'Default and Dishonor, Certificate of Estoppel,' which
stated that the IRS had personally levied and liened my
personal and private checking accounts when Sean David Morton
is not a party to or a part of, whereby his authenticated
signature appears nowhere therein.  Defendant Melissa Morton
included a copy of correspondence from JPMorgan Chase to
defendant Sean David Morton regarding accounts 3324, 4249, and
6716.

"On or about March 31st, 2010, defendant Sean David
Morton mailed the IRS a multipage document entitled 'Second
Notice, Certificate of Nonresponse and Dishonor, Reminder of
Default,' wherein he reiterated his position that the IRS was
subject to a $900,000 lien for the benefit of defendant Sean
David Morton.

"On or about April 13, 2010, defendant Sean David Morton mailed a multipage document to the IRS entitled 'Third and Final Notice, Certificate of Nonresponse and Dishonor, Reminder of Default,' wherein defendant Sean David Morton stated that he had a lien against the assets of the United States.

"On or about April 14, 2010, defendant Sean David Morton mailed a document to the IRS entitled 'First Notice of Demand,' wherein defendant Sean David Morton stated, among other things, that the IRS had no valid liens upon his property, and demanded that the IRS remove any lien and/or levy filings made against him.

"On or about April 14, 2010, defendant Melissa Morton mailed a document to the IRS entitled 'First Notice of Demand,' wherein defendant Melissa Morton stated, among other things, that the IRS had no valid liens upon her property, and demanded that the IRS remove any lien and/or levy filings made against her.

"On or about April 21st, 2010, defendant Sean David Morton mailed a document to the IRS entitled 'Second Notice of Demand,' wherein defendant Sean David Morton stated, among other things, that the IRS had no valid liens upon his property, and demanded that the IRS remove any lien and/or levy filings made against him.

"On or about April 21st, 2010, defendant Melissa

Morton mailed a document to the IRS entitled 'Second Notice of Demand,' wherein defendant Melissa Morton stated that the IRS had no valid liens upon her property, and demanded that the IRS remove any lien and/or levy filings made against her.

"On or about April 28, 2010, defendant Sean David Morton mailed a document to the IRS entitled 'Third Notice of Demand,' wherein defendant Sean David Morton stated, amongst other things, that the IRS had no valid liens upon his property, and demanded that the IRS remove any lien and/or levy filings made against him.

"On or about May 3rd, 2010, defendant Melissa Morton mailed a document to the IRS entitled 'Third Notice of Demand,' wherein defendant Melissa Morton stated that the IRS had no valid liens upon her property, and demanded that the IRS remove any lien and/or levy filings made against her.

"On or about August 31st, 2010, defendant Sean David Morton submitted and caused to be submitted to the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2005, which claimed a refund in the amount of $180,326.

"Along with this 2005 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID.

"On or about August 31st, 2010, defendant Sean David Morton submitted and caused to be submitted to the IRS a false

and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton for the calendar year 2006, which claimed a refund in the amount of $180,326.

"Along with this 2006 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID.

"On or about August 31st, 2010, defendant Melissa Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Melissa Morton, for the calendar year 2007, which claimed a refund in the amount of $12,305.

"Along with this 2007 income tax return, defendant Melissa Morton submitted and caused to be submitted to the IRS a false and fraudulent Form 1099-OID.

"On or about November 5, 2010, defendant Sean David Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2007.

"Along with this income tax return for defendant Sean David Morton, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID, a letter rogatory and affidavit in support which falsely claimed a refund was due to defendant Sean David Morton in the amount of $1,762,289.25, and a fictitious financial instrument

entitled 'Coupon for Setoff, Settlement and Closure,' in the amount of $5,286,867.75, dated November 5, 2010, made payable to the Department of the Treasury, Internal Revenue Service, CID.

"On or about November 19, 2010, defendant Sean David Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2006, which claimed a refund in the amount of $2,809,921.18.

"Along with this 2006 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID and a frivolous document entitled 'Coupon for Setoff, Settlement and Closure,' in the amount of $8,429,763.54, dated November 19, 2010, made payable to the Department of the Treasury, Internal Revenue Service, CID.

"On or about November 19, 2010, defendant Sean David Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Sean David Morton, for the calendar year 2005, which claimed a refund in the amount of $244,230.

"Along with this 2005 income tax return, defendant Sean David Morton submitted and caused to be submitted to the IRS false and fraudulent Forms 1099-OID.

"On or about December 3, 2010, defendant Melissa

Morton submitted and caused to be submitted a false and fraudulent U.S. Individual Income Tax Return, Form 1040, in the name of defendant Melissa Morton, for the calendar year 2007, which claimed a refund in the amount of $14,816.70.

"Along with this 2007 income tax return for defendant Melissa Morton, defendant Melissa Morton submitted and caused to be submitted to the IRS a false and fraudulent Form 1099-OID and a frivolous document entitled 'Coupon for Setoff, Settlement and Closure,' in the amount of $44,450.10, dated December 3, 2010, and made payable to Department of the Treasury, Internal Revenue Service, CID.

"On or about June 21, 2012, defendant Sean David Morton submitted and caused to be submitted a false and fraudulent Claim for Refund and Request for Abatement, IRS Form 843, in the name of the defendant Sean David Morton, for the calendar year 2006, which claimed to refund in the amount of $1,560,634.

"On or about June 21st, 2012, defendant Melissa Morton submitted and caused to be submitted a false and fraudulent Claim for Refund and Request for Abatement, IRS Form 843, in the name of defendant Melissa Morton, for the calendar year 2007, which claimed a refund in the amount of $12,727.

"On or about April 2, 2013, defendant Sean David Morton submitted a false and fictitious financial instrument to the IRS entitled 'Non-Negotiable Discharging Bond and

Indemnity,' in the amount of $10 million.

"On or about April 2, 2013, defendant Melissa Morton submitted a false and fictitious financial instrument to the IRS entitled 'Non-Negotiable Discharging Bond and Indemnity,' in the amount of $600,000.

"Count Two" --

THE COURT:  With regard to the succeeding counts, are they statements that you allege were submitted to the government?

MS. MAKAREWICZ:  Yes, Your Honor.

THE COURT:  Yeah.  I think we can generally describe them; you don't have to go through all of them.  Maybe read a few of them, and then you can describe to the jury and explain in your opening statement of what they allege and so forth.

MS. MAKAREWICZ:  Very well, Your Honor.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. Is she going to act as a witness now in this case?  I take exception to that.

THE COURT:  Did you make an objection?

DEFENDANT SEAN DAVID MORTON:  Yes.  Objection, sir. I take exception to the fact that she is now going to act as a witness in the case.

THE COURT:  Overruled.

Go ahead.

MS. MAKAREWICZ:  Counts Two and Three relate to

defendant Sean David Morton, and the government alleges that on various dates, Sean David Morton knowingly made and presented and knowingly and willfully caused to be made and presented to the Internal Revenue Service, an agency of the United States Department of Treasury, false, fictitious and fraudulent federal income tax return, U.S. individual income tax return for the year 2006, which constituted a claim for the United States for a federal income refund.  The return was false, fictitious and fraudulent in that, as defendant Sean David Morton well knew, he did not have income tax withholding in the amount of $2,809,921.18, and was not entitled to a tax refund in the amount of $2,809,921.18.

Count Three is similar in that the government alleges that the defendant Sean David Morton submitted to the Internal Revenue Service a false, fictitious and fraudulent IRS Form 843, Claim for Refund and Request for Abatement for 2006, which constituted a claim made against the United States for federal income refund.  The IRS Form 843 was false, fictitious and fraudulent in that, as defendant Sean David Morton well knew --

THE COURT:  It's the same as the other count, correct?

MS. MAKAREWICZ:  The numbers are different, Your Honor.

THE COURT:  But I mean the same general allegation.

MS. MAKAREWICZ:  Yes, Your Honor.

THE COURT:  All right.  What about Counts Four and Five?  Do they relate to tax forms?

MS. MAKAREWICZ:  Yes, Your Honor.

THE COURT:  When do the counts relate to something other than tax forms?

MS. MAKAREWICZ:  Count Six, Your Honor.

THE COURT:  And through the end?

MS. MAKAREWICZ:  Yes.

THE COURT:  Okay.  Then read up to Count Six, and then describe Count Six through the end, generally.

MS. MAKAREWICZ:  Would Your Honor like me to read Count Four with respect to defendant Melissa Morton?

THE COURT:  Is it the same allegation only a different return?

MS. MAKAREWICZ:  Two different returns, Your Honor.

THE COURT:  Then you can tell the jury what those counts allege.  It's the same allegation as the Counts Two and Three, only different forms, correct?

MS. MAKAREWICZ:  Different numbers and different forms, Your Honor.

THE COURT:  Okay.  And then with regard to the allegations regarding submissions of documents other than tax returns, what count does that begin?

MS. MAKAREWICZ:  Six.

THE COURT:  And so generally describe six through the

end to the jury.

MS. MAKAREWICZ:  The government alleges that on various dates, that the defendants, with the intent to defraud, passed, uttered, presented and offered false and fictitious financial instruments in various amounts which appear and purport through scheme or artifice to be an actual security or a financial instrument issued under the authority of the United States and other political subdivisions of the United States.

Counts Six and Seven have to do with defendant Sean David Morton.  Count Eight is with respect to defendant Melissa Morton.  Counts 9 through 32 are different -- the government alleges different false and fictitious instruments, namely documents entitled "Non-Negotiable Discharging Bonds and Indemnity," that the government alleges defendants aided and assisted and prepared for other people, and which were submitted to various recipients in various amounts.

Counts 9 through 32 are with respect to defendant Sean David Morton, but the same clients as Counts 33 through 56, except with respect to defendant Melissa Morton.

THE COURT:  All right.

Again, that's just the way the case begins, and it was only read to you so you can better understand the charges and better respond to the court's questions.

I'm going to ask you some questions as a jury panel first, and then I'll ask more specific questions when we place

12 jurors in the jury box.

            If you have an answer to any of my questions, would you please stand up when you're called upon, give us your name first, clearly, so the lawyers and the parties can hear it, and then the answer to the question.

            Does anyone here work for the IRS or the state taxing authorities?

            PROSPECTIVE JUROR:  Sandra Gatlin, and I work for the Board of Equalization.

            THE COURT:  Thank you, ma'am.

            Has anyone here ever worked for the IRS or the state taxing authorities?  I see no hands.

            Does anyone here have a relative or close friend who works for the IRS or state taxing authority?

            I see one hand.

            PROSPECTIVE JUROR:  Martha Leticia Arevalo, and I have a cousin in Sacramento that worked for the IRS.

            THE COURT:  Thank you.

            Does anyone here belong to -- a member of any organization that expresses dissatisfaction with the administration of the tax laws?

            Does anyone here belong to an organization that expresses the converse, satisfaction with the tax laws?

            Does anyone here have a view about the constitutionality of the tax laws?

Does anyone here work for a law enforcement type of agency?

I see a hand.

PROSPECTIVE JUROR:  My name is Carolyn Nakaki.  I'm employed with the County with the Los Angeles County District Attorney's Office.

THE COURT:  Thank you, ma'am.

Has anyone here had an experience with the IRS that would prevent them from being fair and impartial in this case?

PROSPECTIVE JUROR:  Scarlett Huang.

THE COURT REPORTER:  I didn't hear her name, Your Honor.

Could I have your name again, please?

PROSPECTIVE JUROR:  Scarlett Huang.

THE COURT:  Yes, ma'am.

PROSPECTIVE JUROR:  I was helping a client with a financial audit regards to income tax for Chapter 10 and 11 previously.

THE COURT:  And --

PROSPECTIVE JUROR:  Answering to auditing questions.

THE COURT:  -- was that experience such that it would prevent you from being fair to both sides in this case?

PROSPECTIVE JUROR:  I do not think so.

THE COURT:  Thank you, ma'am.

I should tell you that one of the defendants in the

case, Sean David Morton, has chosen to represent himself.  That is his constitutional right.  And does that prevent anyone from being fair and impartial to him?

PROSPECTIVE JUROR:  Hello.  My name is Anthony Prouzinin, and I'd like to get a sidebar.

THE COURT:  Okay.

When there is a sidebar, the lawyers and the parties can be present.

(Proceedings held at sidebar:)

THE COURT:  I am drawing a blank here.  What was the question?

MS. MAKAREWICZ:  Regarding pro se defendants, Your Honor.

THE COURT:  The defendant, in fact, Sean David Morton, has chosen to represent himself.  He has that right.

PROSPECTIVE JUROR:  Absolutely.

THE COURT:  Does that present a problem to you?

PROSPECTIVE JUROR:  Yeah.  I'm sorry to interrupt you, Judge.  The way I see the case, I just see two wealthy people who were kind of -- just want to look out for their best interest, and I look at evading taxes, whatever the situation may be.  I don't feel like it's -- like he is doing -- like I don't know.  Yes, I know he is entitled to --

THE COURT:  What is your background, sir?  I think -- what is your background?  What do you do for a living?

PROSPECTIVE JUROR:  I go to school.

THE COURT:  Where do you go to school?

PROSPECTIVE JUROR:  Just taking basic education.

THE COURT:  Where?

PROSPECTIVE JUROR:  At CSUN in the Valley.

THE COURT:  What is CSUN?

MS. MAKAREWICZ:  California State University Northridge.

THE COURT:  What year in school are you?

PROSPECTIVE JUROR:  I just started.  Actually, I can't say I'm fully committed to school right now.

THE COURT:  How old are you, 18?

PROSPECTIVE JUROR:  Twenty.

THE COURT:  We'll hear further from you.  You can go back to your seat.

PROSPECTIVE JUROR:  Absolutely, Your Honor.

(Proceedings resumed in open court)

THE COURT:  In this case you may hear testimony from federal agents.  It is important that you judge all witnesses based upon their testimony and how you credit it, and not solely or predominantly because they are federal agents.  In other words, federal agents are just like any other witnesses. You can accept or reject their testimony based upon your view of their candor and the overall evidence.

Does anyone have an issue with that proposition?

I should tell you something about the anticipated schedule.  It's very difficult to predict the length of a trial, and even though I've been at this for some time, it still is a difficult exercise.

My best estimate is that the case will take this week, and we have a full trial day.  It starts at 9:00, and we conclude at 5:00, and we only take an hour for lunch.  And I do my best to avoid interruptions, sidebars, recesses, so forth, unless they're absolutely necessary.  I recognize that you are all here making a sacrifice from your business, professional and personal lives, and without your willingness to serve, we couldn't have the jury system.

So your being here is appreciated, and with that in mind, we'll do all we can to get the evidence to you in the best way we can so you can make a reasoned decision.

In terms of the evidence and the inferences you draw from the evidence, that's solely your job.  The law in this case is something that I will deliver to you, and you must accept the law whether you like it or not.  In other words, you don't have a choice about the law, but you certainly have a choice about how you view the evidence and credibility and inferences and so forth.

Let's call 12 jurors to the jury box.

THE CLERK:  Ladies and gentlemen, please walk past counsel table and enter the jury box from this side here.

We're going to see one through six in the first row, and seven through 12 in the second row.

THE COURT:  I'm going to read the names of the witnesses that may testify at the trial, and I'll read that list to see if any of you know any of these witnesses:  Kristy Morgan, IRS; Elvin Jusino, vice president Chase Bank; Jeffrey Jackson, Bank of America; Mark Everson, Internal Revenue Service; Stephanie Nakata, branch manager Chase Bank; Patricia Ballin, finance manager, Fletcher Jones Motor Cars; Vivian Hinds, American Express; Susan Quackenbush, Capital One; Ted Lepkojus, former employee IRS; Sam Leslie; Jeff Fountain, Internal Revenue Service; Luke Yu, Internal Revenue Service; John Kirsling, Internal Revenue Service, David Corralejo, PennyMac Bank; Nicole Lopez, Citimortgage; Patricia Ciston, Chase Bank; William Kerr; Shelly Clark; Barbara Lavender.

Any of those names ring a bell?

Okay.  Let's call 12 of the jurors.

THE CLERK:  Denielle Renee Hale, H-a-l-e, please take jury seat No. 1 in the first row; Luz Santos, S-a-n-t-o-s, please take jury seat No. 2 in the first row; Kenneth Johnson, J-o-h-n-s-o-n, jury seat No. 3; Steve Canale, C-a-n-a-l-e, jury seat No. 4; Katie Ingebretson, I-n-g-e-b-r-e-t-s-o-n, jury seat No. 5; Scarlet Huang, H-u-a-n-g, jury seat No. 6; Carolyn Nakaki, N-a-k-a-k-i, please take jury seat No. 7 in the second row; Andrea Jayne Tarabek, T-a-r-a-b-e-k, jury seat No. 8;

Justine Guadalupe Niketen, N-i-k-e-t-e-n, jury seat No. 9;

Camille Marella Delgadillo, D-e-l-g-a-d-i-l-l-o, jury seat

No. 10; Kevin Napier, N-a-p-i-e-r, jury seat No. 11; and

Michael John Kelly, K-e-l-l-y, jury seat No. 12.

       THE COURT:  I'll begin the questioning of Ms. Hale.

### DENIELLE RENEE HALE

BY THE COURT:

Q.  Where do you live, ma'am?

A.  I live in Simi Valley.

Q.  For about how long?

A.  Twenty years.

Q.  And what is your occupation?

A.  I'm work in accounting.

Q.  And who is your employer?

A.  Minimum Productions.

Q.  Are you married?

A.  No.

Q.  Have you ever served on a jury?

A.  No.

Q.  What generally is your educational background?

A.  I have a bachelor's degree.

Q.  Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.  No.

       THE COURT:  Thank you.

Ms. Santos.

## **LUZ SANTOS**

BY THE COURT:

Q.    Where do you live, ma'am?

A.    I live in Santa Maria.

Q.    For about how long?

A.    Five years.

Q.    And what is your occupation?

A.    I work in a packaging company.

Q.    And are you married?

A.    Yes.

Q.    What is your husband's job?

A.    He is a truck driver.

Q.    Do you have children?

A.    Yes.

Q.    Are they living at home?

A.    Yes.

Q.    Have you ever served on a jury?

A.    No.

Q.    What generally is your educational background?

A.    I have a bachelor's degree.

Q.    Do you know of any reason that would prevent you from
being fair and impartial to both sides?

A.    No.

THE COURT:  Thank you, ma'am.

## KENNETH JOHNSON

BY THE COURT:

Q.   Mr. Johnson.

A.   Yes.

Q.   Where do you live, sir?

A.   Porter Ranch, California.

Q.   For about how long?

A.   Two years.

Q.   And what is your occupation?

A.   I'm and independent contractor.

Q.   Are you married?

A.   Yes.

Q.   Is your wife employed?

A.   Yes.

Q.   What is her job?

A.   She is a superintendent.

Q.   Do you have children?

A.   Yes.

Q.   Are they living at home?

A.   No.

Q.   Are they employed?

A.   Yes.

Q.   What types of jobs?

A.   Manager at Enterprise; a flight attendant for American

Airlines; and the other one is a minor.

Q.   Have you ever served on a jury?

A.   No.

Q.   What generally is your educational background?

A.   A.A. degree.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:  Thank you, sir.

**<u>STEVE CANALE</u>**

BY THE COURT:

Q.   Mr. Canale, where do you live, sir?

A.   Simi Valley.

Q.   For about how long?

A.   Forty years.

Q.   And what is your job?

A.   Manufacturing process engineer.

Q.   Are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   And what is your educational background?

A.   Some college.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:  Thank you, sir.

### KATIE INGEBRETSON

BY THE COURT:

Q.   Ms. Ingebretson; is that correct?

A.   Yes.

Q.   Thank you.

Where do you live, ma'am?

A.   I live in Los Angeles.

Q.   For about how long?

A.   Four years.

Q.   And what is your occupation?

A.   I'm a consultant.

Q.   And what do you consult with?

A.   Green -- it's in the green energy field.

Q.   I see.

Are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   What generally is your educational background?

A.   I have a bachelor's.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:  Thank you, ma'am.

### SCARLET HUANG

BY THE COURT:

Q.   Ms. Huang, how would I pronounce your name?

A.   Huang.

Q.   Huang, yes.  Oh, yes.

        And where do you live, ma'am?

A.   Hacienda Heights.

Q.   For about how long?

A.   Thirty to 40 minutes.

        THE COURT REPORTER:  I'm sorry?

        PROSPECTIVE JUROR:  Thirty to 40 minutes.

BY THE COURT:

Q.   What was that?  I asked how long have you lived there?

A.   Oh.  Seventeen years.

Q.   I see.

        And what is your occupation?

A.   I'm a business consultant in operation and accounting.

Q.   I see.

        Are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   What generally is your educational background?

A.   Bachelor in finance.

Q.   Do you know of any reason that would prevent you from

being fair and impartial to both sides?

A.   No.

        THE COURT:  Thank you, ma'am.

<u>**CAROLYN NAKAKI**</u>

BY THE COURT:

Q.   I want to get the right pronunciation.

A.   Nakaki.

Q.   Thank you.

        And where do you live, ma'am?

A.   Torrance.

Q.   For about how long?

A.   Over 35 years.

Q.   And what is your occupation?

A.   I'm a deputy district attorney for Los Angeles County.

Q.   And are you married?

A.   Yes.

Q.   What is your husband's occupation?

A.   He is retired from LAPD.

Q.   I see.

        Now, I should mention to you that you're an attorney.
Not only that, but you're a prosecutor, so you have more
familiarity than other jurors with the proceedings.  But if
you're chosen as a juror, you're a coequal.  In other words,
the law is as I deliver it to you, and when you deliberate, you
deliberate as a coequal to the other jurors even though you

have special training.

        If you're chosen as juror, could you do that?

A.   Yes.

Q.   Okay.  Do you have children?

A.   No.

Q.   Have you ever served on a jury?

A.   Yes.

Q.   Was it in this court, which is the federal court, or was
it the state court?

A.   State court.

Q.   Was it a civil or criminal case?

A.   It was a criminal case.

Q.   And did the jury reach a verdict?

A.   Yes.

Q.   We know what your educational background is.

        And do you know of any reason that would prevent you
from being fair and impartial to both sides?

A.   No.

        THE COURT:  Thank you, ma'am.

                    **ANDREA TARABEK**

BY THE COURT:

Q.   Ms. Tarabek, where do you live, ma'am?

A.   Santa Barbara.

Q.   For about how long?

A.   Thirty years.

Q.    And what is your occupation?

A.    I'm a registered nurse.

Q.    Are you married?

A.    No.

Q.    Have you ever served on a jury?

A.    No.

Q.    What generally is your educational background?

A.    Nursing, diploma in nursing.

Q.    I see.

        Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    Your Honor, I'd like a sidebar, please.

        THE COURT:  All right.

            (Proceedings held at sidebar:)

        PROSPECTIVE JUROR:  A year ago in Santa Barbara there was a doctor, his wife and his daughter that I worked with that were murdered, and I've been in the courtroom several times in the past year over it.  I'm having a lot of anxiety, and I'm having trouble listening to what is happening here and going in and out.  So I honestly have to say I don't know that I could fairly hear everything and focus and be present to what's happening right now because I feel very triggered on what's going on in Santa Barbara.  I wanted to share that with everyone.

        DEFENDANT SEAN DAVID MORTON:  That's fine.

THE COURT:  You're excused.

PROSPECTIVE JUROR:  Shall I just leave, Your Honor?

DEFENDANT SEAN DAVID MORTON:  Your Honor.

MR. BRODY:  Two other for-cause issues.  Would you like us to approach?  How would you like?

THE COURT:  For cause you should approach, yes.

MR. BRODY:  I would like to propose a for cause for the D.A. county prosecutor whose husband was LAPD.

THE COURT:  We can turn to that at the next sidebar.

MR. BRODY:  Okay.

THE COURT:  Preserve that.

MR. BRODY:  Thank you.

(Proceedings resumed in open court).

THE CLERK:  Victoria Kevil, K-e-v-i-l, please take jury seat No. 8.

### VICTORIA KEVIL

BY THE COURT:

Q.  Ms. Kevil, where do you live, ma'am?

A.  I live in Pomona.

Q.  For about how long?

A.  Fifteen years.

Q.  And what is your occupation?

A.  As a caregiver.

Q.  And are you married?

A.  Yeah.

Q.   And what is your husband's job?

A.   Retired.

Q.   What did he do when he was working?

A.   In the store.

Q.   I see.

         Do you have children?

A.   None.

Q.   Have you ever served on a jury?

A.   Yeah.

Q.   Was it in this court -- well, this is a new building, but was it in federal court or was it the state court, superior court?

A.   It's in Pomona.

Q.   Pomona.  So a state court?

A.   State court.

Q.   Was it a civil or a criminal case?

A.   It's criminal case also.

Q.   Did the jury reach a verdict?

A.   Pardon?

Q.   Did the jury reach a verdict?  Did they come to a decision?

A.   Yeah.

Q.   Okay.

         And what is your educational background?

A.   I'm graduating college.

Q.   Would you say that again, please.

A.   Graduating college, an accountant.

Q.   I see.

Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:   Thank you, ma'am.

**JUSTINE NIKETEN**

BY THE COURT:

Q.   Ms. Niketen, do I say that correctly?

A.   Niketen.

Q.   Yes, Niketen.

Now, where do you live, ma'am?

A.   West Hollywood.

Q.   For about how long?

A.   One year.

Q.   And what is your occupation?

A.   I work for a software company.

Q.   Are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   What generally is your educational background?

A.   Bachelor's degree.

Q.   Do you know of any reason that would prevent you from

being fair and impartial to both sides?

A.   No.

          THE COURT:  Thank you, ma'am.

                      **CAMILLE DELGADILLO**

BY THE COURT:

Q.   Ms. Delgadilla, where do you live, ma'am?

A.   In Pomona.

Q.   For about how long?

A.   Twenty-five years.

Q.   And what is your occupation?

A.   I am a county social worker in the field of public child

welfare.

Q.   Are you married?

A.   Yes, I am.

Q.   And what is your husband's job?

A.   My husband is both a grocery clerk and a one-on-one

teacher's aide in an autistic classroom.

Q.   Do you have children?

A.   Yes, I do.

Q.   Are they living at home?

A.   I have an infant.

Q.   I see.

          Have you ever served on a jury?

A.   No, I have not.

Q.   And what is your educational background?

A.   Graduate level.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No, I do not.

THE COURT:  Thank you, ma'am.

PROSPECTIVE JUROR:  You're welcome.

**<u>KEVIN NAPIER</u>**

BY THE COURT:

Q.   Mr. Napier, where do you live, sir?

A.   Los Angeles.

Q.   For about how long?

A.   About a year.

Q.   And what is your occupation?

A.   I'm a writer, TV writer.

Q.   And are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   Yeah.

Q.   Was it in the federal or state court?

A.   State court.  It was twice.  State court.

Q.   Was it a civil or criminal case, or was it both?

A.   Yeah, one criminal, one civil, yeah.

Q.   And did the jury in each of those cases reach a verdict?

A.   Yes.

Q.   What generally is your educational background?

A.    Bachelor's.

Q.    Do you know of any reason that would prevent you from

being fair and impartial to both sides?

A.    Nope.

          THE COURT:  Thank you, sir.

<u>**MICHAEL KELLY**</u>

BY THE COURT:

Q.    Mr. Kelly --

A.    Yes.

Q.    -- where do you live, sir?

A.    In Mar Vista.

Q.    For about how long?

A.    Six and a half yours.

Q.    And what is your occupation?

A.    I'm a fine artist.

Q.    And are you married?

A.    Yes.

Q.    What is your husband's -- what is your wife or your

partner, I don't know?

A.    My wife is a clinical research coordinator for cancer

doctors.

Q.    And do you have children?

A.    Yes, I have a daughter.

Q.    Living at home with you and your wife?

A.    Yes.

Q.   Have you ever served on a jury?

A.   No.

Q.   What is your educational background?

A.   I have a master's degree.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   Yeah, I think so.

Q.   I see.  Something you want to tell us?

A.   Sure.  I have problems with the IRS.

Q.   I see.  What kind of problems?

A.   Oh, I mean, not like these guys, but, yeah.

        DEFENDANT SEAN DAVID MORTON:  Yeah, we don't either.
Sorry.

BY THE COURT:

Q.   I mean, the questions are asked to assure both sides that the jury will make a decision based upon the evidence that they hear and the law as I instruct.

        Are you telling me that if you're a juror, you couldn't fairly evaluate the evidence and follow the law?

A.   I'm not sure, for sure.  I guess, yeah.  I could.  I mean, it's an emotional thing for me right now.  So I can do my best.

Q.   Well, is there something -- I don't want to pry too deeply, but is there something going on with you that you can't tell us audibly that is affecting your answer?  I don't want to ask embarrassing questions, but I just can't take, you know, an

answer that I sort of feel, or this way or that way, because we
all come to this courtroom with a lot of feelings, and a lot of
life's experiences, none of us are neuters.

A.    I understand.

Q.    I'm trying for both sides to make sure that they -- that
there's a fair trial.  That you can properly evaluate the
evidence in light of the law and come to a decision based upon
that.

        If you're telling me you can't, that's a problem.  If
you're telling me you can, even though you may have certain
feelings, that doesn't necessarily eliminate you.

        What is your answer?

A.    Yeah, I feel like I would not be -- that I would be --
yeah, I don't know what I'm trying to say.  I think I would be
biased one way or the other.

        THE COURT:  What's the feeling of the parties?

        DEFENDANT SEAN DAVID MORTON:  Us?

        MR. BRODY:  Your Honor, Ms. Morton takes no position
on this juror.

        THE COURT:  You take no position?

        MR. BRODY:  No.

        THE COURT:  What's the government's view?

        MR. HUGHES:  Your Honor, we take no position to this
jury.  I don't think we have enough information.

        THE COURT:  Mr. Morton, is there something you want

to tell me at sidebar or are you --

        DEFENDANT SEAN DAVID MORTON:  Judge, he is fine by me.  I wish we had more people like him.

        THE COURT:  He said that he doesn't think he can be fair and impartial.  So both sides are satisfied with the juror who is telling you that he can't be fair and impartial?

        MR. BRODY:  I apologize, Your Honor.  My understanding of his response was that, in fact, if given the law and properly instructed, he could be.

        THE COURT:  Maybe I was mistaken.

Q.  What is your position?

A.  Yeah.  I mean, I feel like I'm biased against the IRS, but then also -- I don't know.  I guess I don't really want to talk about it, or maybe I could just talk to you on a sidebar.

Q.  Well, is there something you want to tell me beyond what you're telling me now?

A.  No, I guess not.

        THE COURT:  I mean, we have a juror who says he doesn't think he can be fair and impartial.

        MR. HUGHES:  Your Honor, if that is the case, then the government would believe that he should be excused for cause.

        THE COURT:  He is excused.

        THE CLERK:  Sandra A. Gatlin, G-a-t-l-i-n, please take jury seat No. 12.

<u>**SANDRA GATLIN**</u>

BY THE COURT:

Q.   Good morning, Ms. Gatlin.

A.   Good morning.

Q.   Where do you live, ma'am?

A.   In Los Angeles.

Q.   For about how long?

A.   Fifty years at least.

Q.   Oh, be proud of it.

     What is your job?

A.   I am a head cashier for the State Board of Equalization.

Q.   And are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   Yes.

Q.   Was it federal court or state court?

A.   State court.

Q.   Was it a civil or criminal case?

A.   Criminal case.

Q.   And did the jury reach a verdict?

A.   Yes.

Q.   What generally is your educational background?

A.   Bachelor's degree.

Q.   Do you know of any reason that would prevent you from

being fair and impartial to both sides?

A.    No.

Q.    Now, you did mention that you worked with the Franchise
Tax Board, correct?

A.    For the Board of Equalization.

Q.    Board of Equalization.

A.    Yes.

Q.    But they're also involved in tax matters, correct?

A.    Yes.

Q.    And this case, as you heard from the indictment, charges
some matters that involve taxes too.  Notwithstanding your own
experience, can you assure us that you could be fair and
impartial to both sides?

A.    Yes, I can.

            THE COURT:  Okay.

            Let me ask some further questions, though, of
Ms. Nakaki.  I just want to question you a little further about
your experience because you are a professional prosecutor, and
I want to ask you, again, not that I doubted your answers, or
it's for the parties to decide, but can you assure us that you
can be fair and impartial even though, as a part of your daily
life, you're sitting essentially where the government
prosecutors are today?

            PROSPECTIVE JUROR:  Yes.

            THE COURT:  In other words, you feel confident about
that?

PROSPECTIVE JUROR:  I do.

THE COURT:  Yes.

All right.

The first challenge is with the government.

MR. HUGHES:  The government would like to thank and excuse juror No. 4.

THE COURT:  That would be Mr. Canale.

Thank you, sir.

THE CLERK:  Return down to the first floor of the jury room.

PROSPECTIVE JUROR:  Thank you.

THE CLERK:  Lamont Sol Howard, H-o-w-a-r-d, please take jury seat No. 4.

**LAMONT SOL HOWARD**

BY THE COURT:

Q.   Good morning, Mr. Howard.

Where do you live, sir?

A.   Los Angeles.

Q.   For about how long?

A.   All my life.

Q.   And what is your occupation?

A.   Regional sales manager.

Q.   Are you married?

A.   I'm not.

Q.   Have you ever served on a jury?

A.   I have.

Q.   Was it in federal court or the state court?

A.   State.

Q.   And was it a civil or criminal case?

A.   Civil.

Q.   Did the jury reach a verdict?

A.   They did.

Q.   What generally is your educational background?

A.   An A.A. and a bachelor's.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

        THE COURT:  Thank you, sir.

        The next challenge is with the defendant.

        DEFENDANT SEAN DAVID MORTON:  Okay.

        Just say one, sir?  Judge?  So I would object to Carolyn Nakaki.

        THE COURT:  Okay.  That would be juror No. 7.

        Thank you.  You're excused.

        THE CLERK:  Natalie Rachel Benudiz, B-e-n-u-d-i-z, please take jury seat No. 7.

                    **NATALIE BENUDIZ**

BY THE COURT:

Q.   Good morning, Ms. Benudiz.

A.   Good morning.

Q.   Where do you live, ma'am?

A.   Beverly Hills.

Q.   For about how long?

A.   Three years.

Q.   What is your occupation?

A.   I'm a physician assistant.

Q.   Are you married?

A.   Yes.

Q.   What is your husband's job?

A.   He is in construction.

Q.   Do you have children?

A.   Yes.

Q.   Are any of them employed?

A.   No.

Q.   Have you ever served on a jury?

A.   Yes.

Q.   In federal court or the state court?

A.   State.

Q.   Was it a civil or criminal case?

A.   Criminal.

Q.   Did the jury reach a verdict?

A.   Yes.

Q.   What generally is your educational background?

A.   I have two master's degrees.

Q.   Do you know of any reason that would prevent you from

being fair and impartial to both sides?

A.   No.

       THE COURT:  Thank you, ma'am.

       Next challenge is with the government.

       MR. HUGHES:  Government would like to thank and
excuse juror No. 10.

       THE COURT:  Ms. Delgadillo.  Thank you, ma'am.

       THE CLERK:  Fernando Ramirez, R-a-m-i-r-e-z, please
take jury seat No. 10.

### **FERNANDO RAMIREZ**

BY THE COURT:

Q.   Good morning, Mr. Ramirez.

       Where do you live, sir?

A.   Downey.

Q.   For about how long?

A.   Twenty plus years.

Q.   And what is your occupation?

A.   I'm a commercial plumber.

Q.   Are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   Yes.

Q.   Federal court or state court?

A.   State.

Q.   Was it a civil or criminal case?

A.    Criminal.

Q.    Did the jury reach a verdict?

A.    No.

Q.    What generally is your educational background?

A.    College certificate.

Q.    Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    Yes.

Q.    What is that?

A.    I'm not very familiar with the IRS or some of the terms that were talked about earlier.

Q.    Well, that raises a good point, because I think most of the jurors or many of them may not be either.

        So that shouldn't frighten anyone because it's the job of the parties, the government, who has the burden of proof to acquaint you with those terms, and that's -- the trial is sometimes an educational experience.

        So if that's your only concern, that wouldn't disqualify you.

A.    Besides financial stability, yes.

Q.    Financial stability?

A.    Yes, I'm the major income for the household, so ...

Q.    I see.  Are you self-employed?

A.    Well, I work for a company, but my mother or my siblings don't work.  So I'm the only one in the household that does

work.

Q.   I mean, is your company paying your salary this week?

A.   No.

Q.   I see.

         What is the position of the parties?  I mean, in

other words, it would be a reason to excuse this juror for

cause, financial cause.

         Any objection?

         MS. MAKAREWICZ:  No.

         MR. HUGHES:  No objection for the government, Your

Honor.

         MR. BRODY:  No objection to excusing this juror, Your

Honor.

         THE COURT:  All right.

         PROSPECTIVE JUROR:  Thank you.

         DEFENDANT SEAN DAVID MORTON:  No objection.

         THE CLERK:  Just return to the first floor jury room.

         PROSPECTIVE JUROR:  Thank you.

         THE CLERK:  Thank you.

         Saleem Raza, R-a-z-a, please take jury seat No. 10.

                          **SALEEM RAZA**

BY THE COURT:

Q.   Good morning, Mr. Raza.  Where do you live, sir?

A.   In Carson.

Q.   For about how long?

A.    For 40 minutes.

Q.    Forty years?

A.    For 20 years.

Q.    Twenty years.

           And what is your occupation?

A.    I work for air cargo.

Q.    And are you married?

A.    Yes.

Q.    Is your wife employed?

A.    No.  She is in India.

Q.    And do you have children?

A.    Yes.  They are also in India.

Q.    I see.

           Are any of your children employed in India?

A.    Yes.

Q.    What types of jobs?

A.    Through business.

Q.    "Business"?

A.    Yes.

Q.    Have you ever served on a jury?

A.    No, sir.

Q.    What generally is your educational background?

A.    Bachelor's.

Q.    Do you know of any reason that would prevent you from

being fair and impartial to both sides?

```
A.    No.

            THE COURT:  Thank you, sir.

            Next challenge is with the defendant.

            MR. BRODY:  Your Honor, Ms. Morton would like to

thank and excuse juror No. 12.

            THE COURT:  Thank you, ma'am.

            THE CLERK:  Maria Angelica Castillo, C-a-s-t-i-l-l-o.

Please take jury seat No. 12.
```

### **MARIA CASTILLO**

```
BY THE COURT:

Q.    Good morning, Ms. Castillo.

A.    Good morning.

Q.    Where do you live, ma'am?

A.    I live in Sherman Oaks.

Q.    For about how long?

A.    Twenty years.

Q.    What is your occupation?

A.    I'm a housekeeper.

Q.    And are you married?

A.    Yes, I am.

Q.    What is your husband's job?

A.    As a truck driver.

Q.    Do you have children?

A.    I do.

Q.    Are any of your children employed?
```

A.    Yes, they are.

Q.    What types of jobs?

A.    My oldest son works at ADM parking structures building, and the other one is computer specialist.

Q.    I see.

A.    Yes.

Q.    Have you ever served on a jury?

A.    No, never.

Q.    What generally is your educational background?

A.    Just high school.

Q.    Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    No.

        THE COURT:  Thank you, ma'am.

        Next challenge is with the defendant.

        MR. BRODY:  Your Honor, Ms. Morton would like to thank and excuse juror No. 9.

        THE CLERK:  Shoushan Karakashian, please take jury seat No. 8.

**SHOUSHAN KARAKASHIAN**

BY THE COURT:

Q.    Good morning, Ms. Karkashian.

        Where do you live, ma'am?

A.    I live in Pasadena.

Q.    For about how long?

A.   Eighteen years.

Q.   And what is your occupation?

A.   I'm an accountant.

Q.   Are you married?

A.   I'm a widow.

Q.   Do you have children?

A.   Yes.

Q.   Are any of your children employed?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   What generally is your educational background?

A.   Bachelor's.

Q.   Do you know of any reason that would prevent you from
being fair and impartial to both sides?

A.   No.

Q.   Let me ask you, as an accountant, can you -- there are all
varieties of things accountants do -- can you tell us what type
of accounting you're involved with.

A.   I'm -- I work for a company.  I handle all the accounting
in the company, such as payables, receivables, payroll.

Q.   I see.

A.   Which I would like to mention something, like if I serve
for a week or a few days, I would have a financial burden as
well as the company.  They just offered me the full time, that

it's been two months.  I am the only person who handles the

payroll, and it's actually due tomorrow, and they don't have

someone else to take care of the business --

Q.   How many people work in the company?

A.   It's a preschool, teachers in different locations.  I'm in

the main office.  The owner passed away, so we're adjusting.

I'm the person who is handling the accountant department now.

In the future I'm going to teach someone else to help me to do

it.

Q.   So are you saying that if you serve this week, it would be

a crisis?

A.   Exactly.  Both sides, on my side and the company side as

well.

Q.   I see.

          THE COURT:  What's the position of the parties?

          MR. BRODY:  No objection to excusing this witness,

Your Honor.

          DEFENDANT SEAN DAVID MORTON:  No objection, Judge.

          THE COURT:  You're excused.

          PROSPECTIVE JUROR:  Thank you so much.  Thank you.

          THE CLERK:  Carol Linda Lopez, L-o-p-e-z, please take

jury seat No. 8.

                         **Carol Lopez**

BY THE COURT:

Q.   Good morning, Ms. Lopez.

A.    Good morning, Your Honor.

Q.    Where do you live, ma'am?

A.    Monrovia, California.

Q.    And for about how long?

A.    Twenty-three years.

Q.    And what is your occupation?

A.    I'm a library staff assistant for the L.A. County Public
Library.

Q.    Are you married?

A.    Yes.

Q.    What is your husband's job?

A.    Law enforcement.

Q.    And can you give us a little more detail?

A.    He is a commander for Los Angeles Police Department.

Q.    Do you have children?

A.    Yes.

Q.    Are any of your children employed?

A.    Yes.

Q.    What types of jobs?

A.    One is -- works for Wells Fargo, and one works for an
insurance company.

Q.    Have you ever served on a jury?

A.    No.

Q.    What generally is your educational background?

A.    Some college.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:  Thank you, ma'am.

Next challenge is with the government.

MR. HUGHES:  The government would like to thank and excuse juror six.

THE COURT:  Thank you, ma'am.

THE CLERK:  Sang Hoon Ahn, A-h-n, please take jury seat No. 6.

**SANG AHN**

BY THE COURT:

Q.   Is it Dr. Ahn?

A.   Yes.

Q.   And where do you live, sir?

A.   I live in Los Angeles.

Q.   For about how long?

A.   Eight years.

Q.   And your occupation?

A.   Physician, cancer doctor.

Q.   And are you married?

A.   Yes.

Q.   Is your wife employed?

A.   No, she is a housewife.

Q.   You have children?

A.    Yes, I do.

Q.    Are any of your children employed?

A.    No.

Q.    Have you ever served on a jury?

A.    No.

Q.    Your educational background is --

A.    M.D.

Q.    -- medical degree.

        Do you know of any reason that will prevent you from being fair and impartial to both sides?

A.    No.

        THE COURT:  Thank you, Doctor.

        Next challenge is with the defendant.

        MR. BRODY:  Your Honor, Ms. Morton would like to thank and excuse juror No. 2.

        THE CLERK:  James Mitchell Cooke, C-o-o-k-e, please take jury seat No. 2.

                          **JAMES COOKE**

BY THE COURT:

Q.    Good morning, Mr. Cooke.

        Where do you live, sir?

A.    I'm retired.

Q.    Do you live in Los Angeles?

A.    Yes.

Q.    And you said you were retired.  What type of work did you

do when you were working?

A.    I was a building inspector.

Q.    For the County?

A.    Yes.

Q.    Are you married?

A.    No.

Q.    Have you ever served on a jury?

A.    Yes.

Q.    Was it federal court or state court?

A.    Federal.

Q.    That means it was a court like this?

A.    Yes.

Q.    Was it a civil or criminal case?

A.    Criminal.

Q.    Did the jury reach a verdict?

A.    Yes.

Q.    What generally is your educational background?

A.    I beg your pardon?

Q.    What is your educational background, just generally?

A.    Some college.

Q.    Do you know of any reason that would prevent you from
being fair and impartial to both sides?

A.    No.

            THE COURT:  Thank you, sir.

            Next challenge is with the defendant.

DEFENDANT SEAN DAVID MORTON:  I would like to thank and excuse Maria Castillo, please.

THE COURT:  Okay.

Thank you, Ms. Castillo.

PROSPECTIVE JUROR:  Thank you.

THE CLERK:  Henrietta Yuen, Y-u-e-n, please take jury seat No. 12.

**HENRIETTA YUEN**

BY THE COURT:

Q.   Good morning, Ms. Yuen.

Where do you live, ma'am?

A.   Diamond Bar.

Q.   For about how long?

A.   Five years.

Q.   And what is your occupation?

A.   I am intermediate typist clerk.

Q.   Say that again, please.

A.   Intermediate typist clerk.

Q.   I see.

Who do you work for?

A.   L.A. County Department of Mental Health.

Q.   I see.

Are you married?

A.   No.

Q.   Have you ever served on a jury?

A.   Yes.

Q.   Was it in the federal court --

A.   The state.

Q.   Was it a civil or criminal case?

A.   Domestic violence.

Q.   And did the jury reach a verdict?

A.   Huh-uh.

Q.   No verdict was reached?  No verdict?

A.   Yeah, because we cannot decide -- no conclusion, yeah.

Q.   What is your educational background?

A.   College.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

          THE COURT:  Thank you, ma'am.

          Next challenge is with the government.

          MR. HUGHES:  Your Honor, the government would like to thank and excuse juror No. 4.

          THE COURT:  Thank you, Mr. Howard.

          THE CLERK:  Maryann Nguyen, N-g-u-y-e-n, please take jury seat No. 4.

**<u>Maryann Nguyen</u>**

BY THE COURT:

Q.   Good morning, Ms. Nguyen.

          Where do you live, ma'am?

A.    Torrance.

Q.    For about how long?

A.    Fifteen years.

Q.    What is your occupation?

A.    I'm an administrator at a university.

Q.    At a university.

        And are you married?

A.    No.

Q.    Have you ever served on a jury?

A.    No.

Q.    What generally is your educational background?

A.    Bachelor's.

Q.    Do you know of any reason that would prevent you from
being fair and impartial to both sides?

A.    No.

        THE COURT:  Thank you, ma'am.

        The next challenge is with the defendant.

        DEFENDANT SEAN DAVID MORTON:  I would like to thank
and excuse juror No. 8, please.

        Thank you, Judge.

        THE COURT:  Thank you, ma'am.

        THE CLERK:  Jesus Aguilar, A-g-u-i-l-a-r, please take
jury seat No. 8.

### JESUS AGUILAR

        PROSPECTIVE JUROR:  Can I get a sidebar?

THE COURT:  Yes.

(Proceedings held at sidebar:)

PROSPECTIVE JUROR:  There's a couple reasons that I don't think I'll be adequate to be fair, and also there will be some potential hardship since my family, I'm the only breadwinner, potential financial hardship, and I would like to be excused.  I'm also Jehovah's Witness, God is ultimately the one that judges everyone.

THE COURT:  You don't make any judgments in your life?

PROSPECTIVE JUROR:  Well, a lot of imperfection because imperfect humans make the law.  So the ultimate judgment comes from God.

THE COURT:  Who is your employer?

PROSPECTIVE JUROR:  I work for Iowa Electric; I'm an electrician.

THE COURT:  Do they pay your salary on jury duty?

PROSPECTIVE JUROR:  I don't even know.

THE COURT:  How large is the company?

PROSPECTIVE JUROR:  Only about 100 employees.

THE COURT:  Probably do pay your salary.  Large companies, again, usually pay your salary for a limited period of time, and I'm not familiar with all the tenets of your faith, but imperfection is common to all of us, isn't it?

PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  So why can't you do what jurors are required to do:  Listen to the evidence, follow the law, and make a fair determination based upon that and not any bias or prejudice?

PROSPECTIVE JUROR:  It's true the scripture said don't judge, not so be judged, which you're the judge, but you're doing a judgment against your fellow man.

THE COURT:  What's the position of the parties?

DEFENDANT SEAN DAVID MORTON:  I'd like to keep him. The argument is spiritual.  I understand it.

THE COURT:  Government?

MS. MAKAREWICZ:  We don't believe that the juror can --

THE COURT:  He is telling us he can't because he doesn't feel he can judge anyone.

Is that it?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  You go through life not judging people?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.

MR. BRODY:  Judging the jury -- if he was instructed to follow the law and to attempt to reach a verdict, would he refuse to try to do so?

PROSPECTIVE JUROR:  The law is the law.  So you have to follow the law; otherwise, there would be chaos.

THE COURT:  You seem to be saying that you could follow the law and you could be a juror.

PROSPECTIVE JUROR:  I come here respectfully to -- because I've been asked by the court.

THE COURT:  You've been -- it wasn't an invitation, you're required to be here.

PROSPECTIVE JUROR:  Right.

THE COURT:  So the question is at the end of the trial, you'll be given a verdict form, and the defendants will undoubtedly ask in that verdict form that you vote for acquittal.  The government will undoubtedly ask that you vote for conviction, and the question is can you make that vote based upon what you heard at the trial and the law, or would you just be unable to make that decision?

PROSPECTIVE JUROR:  Well, I guess I could go against greedy people.

THE COURT:  You can do what?

PROSPECTIVE JUROR:  You can tell when somebody is greedy.

THE COURT:  It's not greed, the case is not about greed.  It's very specific.  The government has made some very specific charges the government has the burden of proving.

PROSPECTIVE JUROR:  I can reach a verdict.

DEFENDANT SEAN DAVID MORTON:  I don't have problems letting him go if he wants go.

THE COURT:  You want to let him go?

DEFENDANT SEAN DAVID MORTON:  What about you?

MR. BRODY:  I would be in favor of letting him be excused.

THE COURT:  You're excused.

PROSPECTIVE JUROR:  Thank you.

THE CLERK:  Anthony Prouzinin, P-r-o-u-z-i-n-i-n, please take jury seat No. 8.

### ANTHONY PROUZININ

PROSPECTIVE JUROR:  Can I get a sidebar?

          (Proceedings held at sidebar:)

THE COURT:  Well, we had a previous sidebar with this witness.  Any positions of the parties?

Mr. Brody?

Mr. Morton?  We had a sidebar.  Do you have a position?

MR. BRODY:  I'm happy to have this juror excused, Your Honor.

THE COURT:  I see.

Mr. Morton?

DEFENDANT SEAN DAVID MORTON:  No problems, Judge.

THE COURT:  All right.  Then you're excused.

PROSPECTIVE JUROR:  Thank you, sir.

THE CLERK:  Martha Leticia Arevalo, A-r-e-v-a-l-o, please take jury seat No. 8.

## MARTHA LETICIA AREVALO

BY THE COURT:

Q.   Good morning, Ms. Arevalo.

A.   Good morning.

Q.   Where do you live, ma'am?

A.   I live in Whittier.

Q.   For about how long?

A.   Thirty plus years.

Q.   And what is your occupation?

A.   I'm in food service.

Q.   Are you married?

A.   Yes.

Q.   What is your husband's job?

A.   He's disabled.

Q.   Do you have children?

A.   Yes.

Q.   Are any of your children employed?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   What just generally is your educational background?

A.   Some college.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:  Thank you, ma'am.

Next challenge is with the defendant.

MR. BRODY:  Your Honor, Ms. Morton would like to thank and excuse juror No. 1.  Thank you.

THE COURT:  Thank you, ma'am.

THE CLERK:  Leticia Perez, P-e-r-e-z, please take jury seat No. 1.

<u>**LETICIA PEREZ**</u>

BY THE COURT:

Q.   Good morning, Ms. Perez.

A.   Good morning.

I live in Norwalk.

Q.   Oh, good.

And for about how long?

A.   Seventeen years.

Q.   And what is your occupation?

A.   Accounting.

Q.   Accounting?

A.   Uh-huh.

Q.   And who is your employer?

A.   Newcomb Spring of California, manufacturing plant.

Q.   Can you give us a little more information about the type of accounting you do.

A.   Okay.  I manage the accounting department, accounts payables, receivables, payroll.

Q.    I see.

A.    Cost accounting also.

Q.    Are you married?

A.    No, divorced.

Q.    And do you have children?

A.    Yes, I have three.

Q.    Are they employed?

A.    Yes.

Q.    What types of jobs?

A.    Teachers.

Q.    Have you ever served on a jury?

A.    I have.

Q.    Was it in this court, federal court, or was it state
court?

A.    State court.

Q.    Was it a civil or criminal case?

A.    Criminal.

Q.    Did the jury reach a verdict?

A.    Yes.

Q.    In all three cases?

A.    No, I have three children.  I have three children.  I
served once.

Q.    I see.  I got that confused, and I apologize.

        In the case that you did serve, the jury did reach a
verdict?

A.    They did.

Q.    Yes.

What generally is your educational background?

A.    Bachelor in business.

Q.    Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    No.

THE COURT:  Thank you, ma'am.

Next challenge is with the government.

MR. HUGHES:  Your Honor, the government is satisfied with the jury as currently impaneled.

THE COURT:  The government accepts the jury panel.

Defendant.

DEFENDANT SEAN DAVID MORTON:  Yeah.  We'll dismiss juror No. 8, please.

THE COURT:  Okay.

Thank you, ma'am.

THE CLERK:  David Liu, L-i-u, please take jury seat No. 8.

**DAVID LIU**

BY THE COURT:

Q.    Good morning, Mr. Liu.

A.    Good morning.

Q.    Where do you live, sir?

A.    Signal Hill.

Q.    For about how long?

A.    Five years.

Q.    And what is your occupation?

A.    I'm in visual effects.

Q.    And who is your employer?

A.    Digital Domain.

Q.    Are you married?

A.    Yes.

Q.    Is your wife employed?

A.    No.

Q.    Do you have children?

A.    Yes.

Q.    Are they living at home?

A.    Yes.

Q.    Have you ever served on a jury?

A.    No.

Q.    What generally is your educational background?

A.    Some college.

Q.    Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    No.

          THE COURT:  Thank you, sir.

          The next challenge is with the defendant.

          DEFENDANT SEAN DAVID MORTON:  I'd like to dismiss -- I don't know the number -- Dr. Sang Ahn, please.

Thank you so much for being here.  It's a long drive.

THE CLERK:  Katherine Moore, M-o-o-r-e, please take jury seat No. 6.

### KATHERINE MOORE

BY THE COURT:

Q.   Good morning, Ms. Moore.

Where do you live, ma'am?

A.   Los Angeles.

Q.   For about how long?

A.   Three years.

Q.   And what is your occupation?

A.   I'm a retail sales associate.

Q.   Are you married?

A.   Yes.

Q.   And what is your husband's job?

A.   He is a Ph.D student.

Q.   Do you have children?

A.   No.

Q.   Have you ever served on a jury?

A.   No.

Q.   What generally is your educational background?

A.   Bachelor's.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

THE COURT:  Thank you, ma'am.

The next challenge, and last challenge, is with the government.

MR. HUGHES:  Your Honor, the government is satisfied with the jury --

THE COURT:  Accept the jury as constituted, the government accepts the jury.

Defendant.

MR. BRODY:  Your Honor, Melissa Morton accepts the jury as presently constituted.

THE COURT:  Mr. Morton.

DEFENDANT SEAN DAVID MORTON:  I'll accept the jury, Your Honor.

THE COURT:  I'm sorry.  I didn't hear you.

DEFENDANT SEAN DAVID MORTON:  I accept the jury as is, Judge.

THE COURT:  Then we have a jury.

I'm going to select two alternates, and I'll give each side an additional challenge to the alternate.

THE CLERK:  Travis Weber, W-e-b-e-r, please take alternate seat No. 1 in the first row.

And Emelyn Cayabyabborja, C-a-y-a-b-y-a-b-b-o-r-j-a, please take alternate seat No. 2 in the second row.

THE COURT:  I'll begin with Mr. Weber.

///

### TRAVIS WEBER

BY THE COURT:

Q.    Good morning.

      Where do you live, sir?

A.    Los Angeles.

Q.    For about how long?

A.    About six years.

Q.    What is your occupation?

A.    I work for nonprofit that promotes morals, education, drug and criminal rehabilitation.

Q.    I see.

      Are you married?

A.    Yes, I am.

Q.    What is your wife's job?

A.    She is a religious worker.

Q.    And do you have children?

A.    No.

Q.    Have you ever served on a jury?

A.    No, Your Honor.

Q.    What generally is your educational background?

A.    Post high school.

Q.    I see.

      Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    I do.

Q.    Can you tell us?

A.    Could I do it on sidebar?

Q.    Yes.

A.    Sure.

         (Proceedings held at sidebar:)

     PROSPECTIVE JUROR:  My father was convicted and incarcerated for financial fraud; so I wanted to make that known as a thing.  I'm not on speaking terms with him.

     THE COURT:  I understand why you mentioned that privately, but the question really is can you give the Mortons a fair trial?  Can you give the government a fair trial, even though your father suffered that conviction?  Can you do that?

     PROSPECTIVE JUROR:  Yeah, I'm willing to look at the evidence and objectively.  I wanted to communicate it --

     THE COURT:  All sides appreciate you're making that known, but ultimately the question is can you give both sides a fair trial even though your father had this conviction?

     PROSPECTIVE JUROR:  I believe so.

     THE COURT:  Okay.  Thank you.

     (Proceedings resumed in open court).

     THE COURT:  And then I'll ask some questions of the second alternate before we get to the challenge.

### EMELYN CAYABYABBORJA

BY THE COURT:

Q.    I understand you allowed us to call you Ms. Borja; is that

correct?

A.    Yes, that's right.

Q.    Thank you, because --

A.    I know it's hard.

Q.    And what is your occupation?

A.    I'm not currently working right now.

Q.    Where do you live?

A.    I live in West Covina.

Q.    When you do work, what type of work do you do?

A.    I used to do licensed vocational nurse.

Q.    I see.

        Are you married?

A.    Yes.

Q.    What is your husband's job?

A.    He owns a small business.

Q.    I see.

        What type of business?

A.    A photo booth business.

Q.    What?

A.    A photo booth.

Q.    What is that?

A.    A photo booth.

Q.    Oh, photo booth.  Oh, I'm sorry.

        And do you have children?

A.    Yes.

Q.    Are your children living at home?

A.    Yes.

Q.    Have you ever served on a jury?

A.    No.

Q.    What is your educational background?

A.    I have a certificate in licensed vocational nurse.

Q.    Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.    No.

      THE COURT:  Thank you, ma'am.

      I'll give the government the first challenge.

      MR. HUGHES:  Your Honor, the government would like to thank and excuse alternate juror one.

      THE COURT:  Okay.

      Thank you, sir.

      THE CLERK:  Alexander Urman, U-r-m-a-n, please take alternate seat No. 1 in the first row.

### ALEXANDER URMAN

BY THE COURT:

Q.    Good morning, Mr. Urman.

A.    Good morning.

Q.    Where do you live, sir?

A.    Los Angeles.

Q.    For about how long?

A.    Thirty-four years.

Q.   And what is your occupation?

A.   I'm a teacher assistant for the Los Angeles Unified School District.

Q.   Are you married?

A.   No.  Divorced, to be exact.

Q.   I see.

        Do you have children?

A.   Yes, but they reside with their mom.

Q.   I see.

        Are they employed in any way?

A.   No, they're not.

Q.   Have you ever served on a jury?

A.   No.

Q.   What just generally is your educational background?

A.   I have a Bachelor of Science in parks and recreation from Cal State Northridge.

Q.   Do you know of any reason that would prevent you from being fair and impartial to both sides?

A.   No.

        THE COURT:  Thank you, sir.

        PROSPECTIVE JUROR:  You're welcome.

        THE COURT:  Next challenge is the defendant.

        MR. BRODY:  Your Honor, Ms. Morton accepts the jury and the alternates as presently constituted.  Thank you.

        THE COURT:  Mr. Morton, do you also?

DEFENDANT SEAN DAVID MORTON:  Yes, Judge.

THE COURT:  Yeah.

Okay.  Then we have a jury.

With regard to those in the spectator part of the courtroom who weren't called upon, please accept the court's thanks and appreciation for your willingness to serve.  You should report back to the jury clerk.  Thank you.

Would the jury please stand and be sworn.

THE CLERK:  Please raise your right hands.

(Jury panel sworn, and all answer in the affirmative.)

THE CLERK:  Thank you.

THE COURT:  Okay.  We've reached a convenient point -- you may be seated if you wish -- for the lunch hour.  I told you that we take a one-hour break for lunch from 12:00 to 1:00, and then go on to 5:00.  I try to have as complete a trial day as possible because I realize that you're all inconvenienced and I want to have the case proceed as efficiently as justice will allow.  So we'll all cooperate in that regard.

One cautionary note at the outset:  Don't talk about the case to each other until the case is in your hands for decision, and don't access any Internet device or other media device about the case.  I don't know that there is anything there, but the evidence that you are to consider is only what

is presented in this courtroom room.  So it would be a

violation of your oath to access any other source.

        And so we'll see you at one o'clock.

        Thank you.

    (Proceedings held outside the presence of the jury:)

        THE COURT:  You may be seated.

        Just a cautionary note about the opening statements:

They're statements, not arguments, and, of course, what I say

goes for both parties.  The government's not to argue the case.

That can be done at the appropriate time in the summation.

Just an outline, or sometimes the lawyers refer to it as a road

map to help the jury understand what is going to be presented.

        Similarly, for the defendant, it's not a time to

argue to the jury, it's a time to tell the jury what evidence,

what testimony, they can expect in a nonargumentative style.

        So try and adhere to that.  I view that

as particularly important.  So keep that in mind.

        One o'clock.

        MR. BRODY:  I'm sorry, Your Honor.  Could I raise one

matter?

        THE COURT:  Yes.

        MR. BRODY:  I do have an objection to one of the

government's witnesses.  I don't know when they're calling this

person, but I would ask for an offer of proof.

        THE COURT:  Who is that?

MR. BRODY:  There's a witness coming from a place called Fletcher Jones Motor Cars, who I believe is going to testify that at some point Melissa Morton put a down payment on a Mercedes.  I'm sorry to raise it so late, but I don't see any evidentiary value, I don't see any probative value of this testimony at all, and I'd like to ask for an offer of proof.

THE COURT:  All right.  Can the government give us an offer of proof?

MS. MAKAREWICZ:  Yes, Your Honor.  The government would offer that when Ms. Ballin would testify, she would indeed talk about a vehicle purchased by defendant Melissa Morton on May 9, 2009, only two weeks after the erroneous refund was deposited into Mrs. Morton's account, and it would be for the verification that the purchase was made by that down payment, with a check from that account, and it was the account that the erroneous refund was deposited into.

THE COURT:  What is the evidentiary value?

MS. MAKAREWICZ:  It shows -- it goes to the defendant's state of mind, Your Honor, because the quick disbursement of the bank funds indicate that the defendants did not have a good-faith belief in what they were doing.

THE COURT:  Can you connect that for me?  I don't readily see that.

MS. MAKAREWICZ:  The defendants argue that there is a good-faith basis for what they did.  The government intends to

argue and show proof that what their actions are, are
different.  That if they truly believed in their process, that
they would have not disbursed the funds as quickly as they did.
One example is the car.

THE COURT:  Well, let me hear from Mr. Brody.

MR. BRODY:  Your Honor, I mean, first of all, if they
believed in the legitimacy of these funds, why wouldn't they
spend them?  I think, you know, so she put a down payment on a
car.  I don't see what that has to do with anything.  I think
it's trying to make them look sort of avaricious in front of
the jury.  The fact that they spent the funds speaks to
nothing --

THE COURT:  It's the contention from the defendants,
at least as you understand it, is not that money isn't money,
is it?

MR. BRODY:  I'm not sure I understand the court.

THE COURT:  Well, in other words, there is something
that was mentioned pretrial about the creation of some of the
instruments in the case by the defendants or others in
relationship to the United States going off the gold standard
in the '30s, and some concept that in replacing gold as
collateral for currency, each citizen became collateral.

MR. BRODY:  That is true, Your Honor, but that's
actually not really the argument -- that's not the theory
behind the 1099-OID documents.  The gold standard relates to

the bonds, not to the OID.  The OID argument is effectively --
and, of course, it's very convoluted -- but it's effectively
that by transacting with money through your bank, through your
credit card, you are actually creating a substantial amount of
wealth for the bank which has the capacity to fractionalize
deposits or expenditures that you made from the account.

        Now, of course, I can't -- and certainly I don't want
to try to convince Your Honor that this makes sense, but that's
the theory.  The theory is that as wealth is generated, and
then after the fact an individual can claim it before it's
abandoned to the bank.

        THE COURT:  So that gets to my question, the way I
understood the government's offer was that by using the refund
to buy something tangible, mainly an expensive car, that's
contrary to their defense, their concept about money, and
you're saying that it isn't.

        MR. BRODY:  It is not, Your Honor.  It is not.

        THE COURT:  Doesn't seem that way to me.

        So before you -- do you have something to say,
Mr. Morton?

        DEFENDANT SEAN DAVID MORTON:  Well, yes, Judge.

        We did what we absolutely believed was a legitimate
process.  We sent -- and in that legitimate process there was a
legitimate refund from the government that nobody had any idea
was unlawful or illegal.

THE COURT:  But you considered it money when you got it back.  It was real money?

DEFENDANT SEAN DAVID MORTON:  In the terms of being able to purchase things, yes.  But again, my wife just put a down payment on a car, which, by the way, was eventually repossessed, which is what they're not going to say.

THE COURT:  Well, let's not get too deep into that.

My inclination is that it isn't sufficiently relevant, but I'll have to see how the evidence comes in.  So for opening statement purposes, don't mention it.

MS. MAKAREWICZ:  Yes.

THE COURT:  Okay.

(Noon recess)

///

///

**LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 4, 2017; 1:10 P.M.**

- - - - -

(Open Court – Jury Present)

THE COURT:  The parties and counsel are present.
We'll now hear from the government in its opening statement.

MR. HUGHES:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen.

The case you're about to hear centers around fraud,
fraud against the government, fraud against others.

Now, you're going to hear two central aspects to the
government's case:  Tax returns and financial instruments.  I'm
going to speak with you about the tax return aspect first and
then move into the financial instruments, but before I get
started, I'd just like to get a chance to introduce myself.

My name is James Hughes.  I'm an assistant United
States attorney.  With me at counsel's table is Valerie
Makarewicz.  She is also an assistant United States attorney.
Together we'll be representing the government in this case.
And with us is John Lucero.  He's a special agent with the
Internal Revenue Service, criminal investigations division.

Now, the first witness you're going to hear from
today is a woman named Kristy Morgan, and she's going to tell
you that when you file your tax returns, the amount of the fund

you receive or the amount of the bill you end up owing to the IRS, it really comes down to three numbers:  What you earned, what you owe, and what you paid.

Here's how it works:  Suppose that I earn a thousand dollars from my employer, and that 300 of that amount is withheld and paid to the IRS.  Now, supposing that I owe a tax rate of 20 percent, I'm going to have a tax bill of $200.  And based on my $300 of withholdings, I'm entitled to a $100 refund.  $300 withholdings, $200 in taxes, $100 refund.

But suppose that when I file the tax return, I report instead that I earn $10,000, and I report that I earn 3,000 in withholdings that was paid over to the IRS.  Now, assuming that I'm reporting the same tax rate of 20 percent, my tax bill is going to look like it's $2,000, and it's going to appear on my tax return that I'm entitled to a refund of $1,000.  $3,000 in withholdings, $2,000 in taxes, $1,000 in refund.

Now, the problem with this situation is that I only earned a thousand, and that only $300 was withheld, not 3,000.  So I'm not entitled to that $1,000 refund.  This simple idea is the heart of the case.

Now, when Ms. Morton comes to testify, she will tell you that in March of 2009, the defendant Melissa Morton filed a tax return for her 2007 tax for the year.  Now, on the return she reported that she earned $14,817 in interest, that it had all come from an account held with Providian National Bank that

had paid her the interest income.  It included a 1099 with her return that purported to show she had earned $14,816 in income, and that $13,335 of this amount had been withheld and paid over to the IRS.

So with her return, Melissa Morton reported that she was entitled to a refund.  $14,000 in income, withholdings of $13,335.  She reported a tax of $1,030, and claimed a refund of the difference, 13,000, minus 1,030, $12,000 refund.

You're going to hear and see documents showing that at roughly the same time that this return was filed the defendant Sean David Morton filed returns for his 2005, 2006, 2007 and 2008 taxable years, only the numbers Mr. Morton reported were a little bit bigger.

On Mr. Morton's return for the 2005 year, he reported that he'd earned income of $244,230, $219,807 had been withheld, for a tax liability of $83,730, claimed a refund of $136,000.

For the 2006 year, Mr. Morton reported that he had earned income of $2,809,921.  He reported that he had withholdings of $2,528,000, reported a tax of $968,000, and claimed a refund for the difference, $1,560,000.

2007 Mr. Morton reports income of $3,161,000, reports withholdings, majority of that amount, $2,845,000, reports a tax of $1,090,000, and claims a refund of the difference, $1,754,000.  Difference between these two amounts.

For 2008 Mr. Morton reports that he earned $842,000 in income.  He reports withholdings of $758,000, a tax of $278,000, and a refund of the difference, $479,506.

On these returns Mr. Morton reported the same type of income that was reported on Mrs. Morton's returns.  For example, his 2006 return.  On this return Mr. Morton reported that he'd earned -- that he earned $2,809,000 in income.  He reported that all of this amount had come from accounts held with financial institutions like Bank of America and Chase.  He showed these institutions all paid him large amounts of income.

Mr. Morton also included with his return 1099s that purported to justify that amount.  You're going to hear from Ms. Morton, from the IRS, that the 1099s are similar to the W-2 you get from your employer only it comes from the bank and it shows how much interest income you've received and how much withholdings have been paid to the government.

With Mr. Morton's 2006 return he included 1099s which showed that he'd earned all the income reported on his return.  This is one of them showing $826,000 in income, $744,243 in withholdings.  So these returns are reporting that the vast majority of the income being earned is being withheld and paid over to the IRS.

Now, on Mr. Morton's return, he claimed $2,528,000 in income, reported the tax of $968,000, and the refund of $1,560,000.

Now, you're going to hear from someone from the IRS and from the representatives of the various banks that there's a problem with this.  The banks are going to tell you they never issued those 1099s to the defendants.  They never earned any interest from the banks, and that the banks never paid any withholdings on their behalves to the IRS.  You're going to hear from a representative of the IRS that they never received any payments from the banks, that these withholdings and the income reported on those returns didn't exist.

Now, fortunately, most of the refund claims the defendants submitted were caught by the IRS, and that no refunds were paid.  The 2007 return filed by Melissa, stopped by the IRS.  Sean David Morton's 2005, 2006, 2007 returns, they were all stopped by the IRS, no refunds were processed.  But you're going to hear that one of those refund requests slipped through, and that in April of 2009, the IRS paid Mr. Morton a refund of $480,322.  You're going to see bank records showing this refund deposited into a joint account held by the Mortons at Washington Mutual Bank.  Right there, April 17, a deposit of $480,322.

You're going to see additional bank records showing just how fast the Mortons moved to get these funds out of that account.  Specifically, you will see bank records showing that the day this refund was put into this account, the Mortons withdrew $70,000 in cash.  The Mortons set up a new account,

and moved $110,000 into it.  Then they set up another new

account, and moved $250,000 into that one.  So that the day

this refund was received by the Mortons, out of that $480,000,

430,000, plus, was moved out of that account.

You will hear that by the time the IRS actually was

able to levy the defendants' accounts to claw those funds back,

what had once been $480,000 was now less than 7.

Now, you're going to hear from Kristy Morgan from the

IRS that when taxpayers issue returns to the IRS that it deems

frivolous, they are sent a warning letter.  You will see a copy

of this letter, and in it it tells defendants, in no uncertain

terms, we've determined with the information you filed as a

return of tax, or purported return of tax, on May 6, 2009, is

frivolous, and there is no basis in the law for your position.

You will hear that after this notice was sent out to

the defendants, after they had been told that the returns were

frivolous, and that after they had their bank accounts levied

to claw back the returns, they filed new returns with the

government, and these new returns claimed the same type of

refunds based on the same claimed withholdings.

You will hear that after this, the IRS sent them a

follow-up letter using even stronger language.  You will see a

copy of that letter.  And in the letter it explains to the

defendants again, "We have determined that the purported tax

return you sent is frivolous, and your position has no basis in

the law.  Any tax refunds associated with this frivolous claim
will not be issued."

     The notice then went on to inform the defendants,
"Please be advised that the people who violate the tax laws may
be subject to federal criminal prosecution," and then it gave
them publications that provide insight into common tax schemes.

     You will hear that after this defendants filed again,
and you will see the return that they filed.  And you will see
that based on everything else, they changed the refunds they
requested.  They made them larger.  For 2005, Mr. Morton now
requested $244,320 from the IRS.  2006 went from $180,000 to
$2,809,000.  2007 stayed the same, and for the 2007 return of
Melissa Morton, she claimed just over an extra $2,000.

     Now, you will see that these returns submitted in or
around November 2010, there was something different about them,
because with the returns defendants submitted documents that
purported payment or exchange for their claimed refunds.  This
is one of them.

     It's a coupon for set-off, settlement, and closure.
It was included with the 2007 return of Sean David Morton filed
in November of 2010.  You will see that it contains many
features common to financial instruments, like a routing
number, account number, a memo line, even a payment amount.
It's purporting to pay $5,286,000 to the United States
Treasury.

You will hear that the IRS actually tried to process this check, and that it bounced.  And you will hear from William Kerr, who is a former bank examiner, why.  Because the routing number and accounting number listed here, they don't correspond to an account held by Sean David Morton, they correspond to an account with the Atlanta federal reserve.  Accounts that individual taxpayers have no access to.

Now, fortunately, the IRS did not issue a refund in response to this instrument or the tax return that it was associated with, but you will hear that in June of 2012, defendants, using a different tax form, again tried to claim large refund amounts.  Mr. Morton submitted one claiming a refund of $1,560,000, Mrs. Morton submitted one claiming $12,727.

You will hear that after this, defendants attempted to pay off any liabilities they might have accrued to the IRS using these, non-negotiable discharging bonds and indemnities.  There's one issued by Mr. Morton in the amount of $10 million, one issued by Mrs. Morton was in the amount of $600,000.  You will hear again from William Kerr, the former bank examiner, that these documents are worthless.  They purport to draw on accounts with the Treasury that individual taxpayers have no access to.

Now, to recap, you will hear that in March of 2009, defendants submitted returns claiming large refunds based on

large alleged withholdings.  You will hear that most of these returns were not paid out by the IRS, but that one of them was, and defendants received $480,322.  And you will hear that the day this refund hit, they moved out over 90 percent, $430,000.  You will hear that after they were warned that their returns were frivolous, they filed again claiming the same type of refunds based on the same type of withholdings.

You will hear that after they were warned again, they filed again.  This time claiming larger refunds and including instruments that purported to be financial instruments.  After this, they tried submitting a claim using a different tax form, also claiming the same type of withholdings, same type of refunds.  And after this they attempted to pay off any liabilities they might have had to the IRS using their discharging bonds and indemnities.

Now, based on the return submitted in November and December of 2010, the IRS -- the government has charged the defendants with two counts of 19 U.S.C. 287, which is submitting a false claim to the government.  Based on the purported coupon for set-off, settlement, and exchange included with Mr. Morton's 2007 return, the government has charged Mr. Morton with an additional count of 514, which is presenting a fictitious financial instrument to the United States.

Based on the Form 843 refund claims for the year in June of 2012, the government has charged the defendants with

two additional counts of 287, submitting false claims to the defendant.  And based on the discharging bonds and indemnity document submitted, they have charged them with two additional counts of 514, which is presenting a fictitious financial instrument.

There's more.

You will hear that pursuant to the investigation of the government over the totality of this period between March 2009 and April 2013, the government has charged them with conspiring to defraud the United States.

You will also hear that pursuant to the government's investigation, on September 23rd, 2015, it executed a search warrant on the defendants' residence, and that during that search, one of the rooms that was searched was a home office. You will hear from Special Agent Luke Yu, he works for the Internal Revenue Service criminal investigations division.  He will tell you that when he was searching this area, he was confronted by Melissa Morton and told, You can't search here. This is my area.  I had nothing to do with this.

You will hear that the IRS did search this area, and when they did, the government found payment bonds very similar to the ones that were submitted by the defendants to the IRS, these were in the names of others.  Over a dozen of them.

You will hear from one of those individuals, her name is Barbara Lavender.  She will testify that she paid the

defendants over $2500 for this document right here, a purported payment bonds for a student loan company that Melissa -- that Barbara Lavender owed money to.  She will tell you that this bond did not work, it didn't pay off her loan, and that when she confronted the defendants about it, they did not provide her with a refund.

You also hear from Ms. Lavender that she was instructed by the defendants to make her check out to an entity called "Heaven & Earth."  She will tell you that that is why she issued this check to that company.  You will hear that this check was deposited into a bank account controlled by that entity, Heaven & Earth, and that the defendants are the ones that control that bank account.

You will hear that Barbara Lavender was not alone in this regard, specifically because many of the same individuals who were on these payment bonds found during the search of the defendants' residence were the same individuals who were writing checks to this entity, Heaven & Earth, all for $2500.

Lastly, you will hear that this account that was held in the name of Heaven & Earth was the same account that the defendants virtually emptied approximately 30 minutes after the government completed searching their residence.

Now, at the end of these proceedings, my co-counsel, Valerie Makarewicz, is going to have a chance to talk with you again about all of the evidence in this case, and when she

does, she going to ask you to return the only verdict that comports with the evidence in this case, which is a verdict of guilty on all counts.  Thank you.

THE COURT:  Mr. Brody, do you wish to make an opening statement?

MR. BRODY:  Yes.  Thank you, Your Honor.

Good morning, everyone.  My name is Steve Brody.  I'm representing Melissa Morton in this case.  As you have already heard, Mr. Sean Morton is representing himself.

First of all, thank you in advance for your time and attention to this case.  I known when people are called for jury duty they're probably not thinking I hope it's a tax case, but I think this will be an interesting case.

There is, though, going to be a lot of evidence, as you've just heard, you're going to see a lot of stuff from the government.  They're going to be tax filings, letters of correspondence, bonds, paperwork.  You're going to hear testimony from IRS agents.  You're going to hear about files and documents that were seized from the Mortons' house.  You're going to be told about the meaning of 1099-OID forms, 1099 forms, 1040 forms, and on and on.

So it's going to be a lot to keep track of, but what I'm asking from you in this case is to look closely at what the government shows you, but also ask what's missing from their case.  Ask what they're not showing you.  Because in spite of

all of that evidence, no witness is going to come in here and tell you that Melissa Morton ever set out to try to defraud the government.  No witness is going to come in here and tell you that Melissa Morton didn't believe 100 percent in the legitimacy of every document that she filed with the IRS and with anybody else.

And in spite of the fact that the government searched the Mortons' house and seized their computers, you're going to see all of that, they're not going to produce one email, one text message, one voice mail, one chat, one document, one letter, nothing that so much as suggests that Melissa Morton was trying to defraud somebody.

Now, that's really important.  It's critical in this case because it is not enough for the government to show you that the Mortons filed these things.  That's only part of the case.  They also have to prove to you beyond a reasonable doubt that they acted in bad faith.  They have to prove to you that they set out to cheat, lie and steal.  They have to prove that beyond a reasonable doubt, but you're not going to see that evidence.  You're not going to see any evidence of that.

What you will see in this case, in fact, is evidence that Melissa Morton believed 100 percent in the legitimacy and the validity of all of these documents.  You're going to hear that the Mortons were students -- for lack of a better word -- of a guy by the name of Brandon Adams.  Brandon Adams was a

kind of self-styled tax and financial guru, and the Mortons met Brandon Adams at a place called "The Living Temple."  The Living Temple is sort of like a new-agey store that sells herbs and medicines and also puts on lectures at night.

In fact, Sean Morton had lectured there periodically, and you're going to hear that Mr. Morton is rather a colorful character.  He has a long history of doing radio programs, of being an investigative reporter, and a lecturer on conspiracy theories and things like UFOs, Area 51, and that kind of thing.

He occasionally gave lectures on those subjects, and he did give them at the Living Temple.  And that's where they met this guy, Brandon Adams, who approached Mr. Morton and was interested in giving his own lectures at the Living Temple, and that's exactly what he did.  He started giving many, many lectures on the history of finance, on just about everything you can imagine connected with finance.  On the IRS, on this 1099-OID process, according to which he believed that if you file the right documents, that you could claim money that you had sort of created for the banks.

You'll hear some very odd theories in this case, some very odd theories that came from Brandon Adams, and that the Mortons ultimately subscribed to because they attended so many of his lectures, and they were sort of brought under his influence.  One of those theories, for example, is this theory that -- and again, these things, you know, may strike you as a

little bit strange, but what is at issue here is going to be what the Mortons believed.

One of the theories was that when you transact with a bank, when you write checks, when you use a credit card, you're actually creating wealth for the bank.  They have this capacity to do what's called fractionalizing your income, fractionalizing your documents, and they can produce all this wealth for themselves.  And Brandon Adams taught that if you know the right steps, if you know the right language, if you know the right legal things to do, if you know the right things to put in your tax documents, you can actually access this money, you're entitled to it, and you can get it back.

He also taught about the bonds that you heard in this case.  You heard that the government's going to show that the Mortons sent bonds, for example, to the IRS to pay off their debts to the IRS.  Now, Brandon Adams taught -- and again, this may sound a little strange to you, but he taught that in 1933 the United States went off the gold standard, and at that time, instead of backing the United States currency with gold, it was backed by United States citizens.  United States citizens became the collateral for our debts, for the debts of the United States government.

And again, Adams -- not only Adams, but a lot of other people that the Mortons were exposed to, taught that if you knew the right steps, if you knew the right language, if

you had the right instruments, if you had the right laws, you could actually use these sort of secret accounts of collateral to pay off your debts to the public.

Now, during the course of this trial, you're going to see some clips of Brandon Adams.  You'll hear some of his audio, you'll see some of his video.  He had a website called "Creditors in Commerce," and he and a bunch of other people operated this website.  And available on that website were videos of him, audio of him, templates to make these bonds, just about everything you can imagine.

And you'll hear that the Mortons -- you'll hear that Melissa Morton listened to possibly hundreds of hours of Brandon Adams lecturing, of Brandon Adams audio, and she was so impressed with him, so taken with him, that both she and Sean Morton actually went to him to prepare their taxes, the very taxes that are at issue in this case.  They went to his house. He helped them put the numbers in there.  They took their receipts there, and he gave them the explanation of why this was possible, and they absolutely bought it.

Now, you might ask, well, why would they buy such a thing?  You're going to see, and the government, I think, has already suggested to you, that the IRS actually issued a lot of refunds based on this 1099-OID process.  Not only did it issue an incredibly large refund to Sean Morton, it issued refunds to many people that they knew, many of the people that were

involve in these lectures, people that were going to these classes.  It was almost a movement of people.

And they saw these checks, and that absolutely bolstered their belief that this was a legitimate process.  Here was the IRS paying out the very claims that they were making according to exactly the logic that Brandon Adams proposed to them.

So the evidence is going to show that they believed in Brandon Adams, they believed in his methods, and that he wasn't the only one.  You'll hear also about some of the other people that lectured, some of the other classes that were given, some of the other audio and video that they watched, listened to and believed in.

And, in fact, it reached a point where Sean Morton was such a believer in this process, he started talking about it himself on his radio show, and I expect you'll probably hear some of that during the course of this trial as well.  And people started coming to Mr. Morton and asking him to help prepare these bonds, because he was on the radio saying, Look, this works.  It was, you know, he was under the impression that, in fact, it had worked.  So at least one person worked perfectly to pay off her mortgage.  And he thought, again, that this process was working exactly as it had been advertised, and he started preparing bonds for people and Melissa Morton was helping him with that.

So that's what this case is really about.  I think you'll see by the end of the evidence that between Sean Morton, Brandon Adams, and this whole community of kind of finance gurus, just you'll get a feel for the sheer volume of rhetoric of lectures that Melissa Morton was exposed to over the course of several years, and the evidence will show that she truly believed in what she was doing.

So again, while you're listening to the government's case, looking at the documents, the filings, the bonds, the 1040s, the e1099 forms, ask yourself where is the evidence that she ever set out to defraud anybody?  Where is the evidence that she didn't believe in the validity of these documents?  You're not going to see it because it isn't there.

So at the end of this trial, when the dust is settled and the evidence is in, I will have one more chance to talk to you, and at that time we'll go over the evidence, and the judge will give you the law, we'll talk about the law, and I believe that you'll see at that point, very clearly, that Melissa Morton is not guilty on all counts.

Thank you.

THE COURT:  Mr. Morton, do you wish to make an opening statement?

DEFENDANT SEAN DAVID MORTON:  Yes.

Good morning, good people of the jury, fellow citizens of California.  It is nice to see you all.  Thank you

so much for all your time and effort.  I know how hard it is to get down here and how difficult it is to come to downtown.  I thought it was very interesting that instead of years you've lived here, we talk about minutes of how long it takes to actually get here during the course of the day.

So right now I need to reserve my rights, and the fancy law books the judge was reading informed me of certain procedures to not give up those rights in court.  So I will take the advice to heart.  So I begin in proper persona, special appearance, for the sole purpose of objecting to dishonoring and challenging jurisdiction and the false claim that I ever did anything wrong, that I ever had a culpable state of mind, that I knowingly did anything wrong other than follow the advice of people I respected, people that I felt were gurus, who had a deep understanding of the financial system, and I knew virtually nothing about this whole process and about the IRS.

I'm a film producer and investigative reporter.  I started out as the No. 1 guest on the Art Bell Radio Show.  We had 26 million people.  I produced programs like *Sightings*.  I'm the person that exposed Area 51, put it on the front page of the *L.A. Times*.  I did a lot of investigations into the government, which is another reason why they hate my guts, and you'll see a lot of really bad feelings from them because -- I'll keep it short, but again, I claim my rights, and it can

only be done through silence; and I ask that when I follow the Supreme Court's advice after this speech, that you take it not as something to hide, but instead as a last-ditch attempt to challenge the plaintiff's jurisdiction, which they must prove, which is my right and part of due process.

And I shall just quote:  "The privilege against self-incrimination, Fifth Amendment, is neither accorded to the passive resistant, nor the person who is ignorant of their rights, nor to one who is indifferent thereto.  It is a fighting clause.  Its benefits can be retained only by sustained combat.  It cannot be claimed by an attorney or solicitor.  It is valid only when insisted upon by a belligerent claimant in person, *U.S. v. Johnson.*

Now, with that information, while -- the silence out of the way, let me tell you a story.  It won't be too long, but it's my story, and there once was a fiery passion in the heart of a good and honorable man, and the passion was borne out of a natural instinct of wanting justice and fairness; and people wished to self-govern or live free from the burdens of the crown that weighed them down, oppressed the little people, and only the king -- it gave the king more power.  But people already escaped oppression and the utilitarian king decided to make a bold move:  They canceled all contracts of the king, and as a result of canceling the contracts, the people ceased being called subjects to a higher authority.

So the people came to America and wrote the most brilliant treaty between man and their representatives called the Constitution, and this may give us a document -- it's the law of the land -- and that document is brilliant in that every court and judge has an oath to be bound by its provisions and be bound by the common law.

And if even the -- by the way, even the header on the Department of Justice website that says -- that says, "In the Common Law We Trust."  But the book analysis and interpretation of the Constitution is issued by the senate and is very clear on why the common law is so important.  So let me share their great wisdom.

Those who immigrated to this country from England brought with them this great privilege as their birthright and inheritance as a part of that admirable --

THE COURT REPORTER:  Please slow down.

DEFENDANT SEAN DAVID MORTON:  Okay.

-- common law which had fenced around it interposed barriers on every side, the four corners, against the approaches of arbitrary power, which is what I believe you're seeing exercised here.

Now, there's some very shocking situations going on in this case that Valerie and James have concocted and opened with hearsay, conjectures, and bold-faced lies.  The huge fabricated story of the plaintiff, the United States of

America -- which is paying all of them, which is actually paying my wife's attorney, which pays all the people in this court -- is that -- it begins with this fundamental background that I was doing all sorts of illegal things, and that they can prove that I intended to defraud the IRS because I filed separate statements than my wife, Melissa.  Well, doesn't that make me look like a terrible guy?

Problem with the whole concocted story is pretty fundamental to the plaintiff's lack of real facts, lies, conjectures and assumptions.  I'm not married, honestly I'm not.  Who says I'm married and swore under oath on a true bill -- and these lies were created to frame my lawful activity as somehow I had an intent to defraud.  Now, I had a -- I guess a kind of hippy ceremony and made a spiritual certificate on a printer and kept it at home as a private contract between two people, and the definition of married that the IRS required to file joint taxes is "legally married."  So the license issued by the State of California, which we do not have because that puts one more person in bed with you, it's really like polygamy with a government-issued license.

Now, in common law, in common law where there's an actual injured party, if one thing is false and it's claimed, then you're considered untrustworthy, and the whole claim is false and impeachable because the accuser isn't really trustworthy; and you'll find all kinds of untrustworthy things

about the accuser in this case.

        As a matter of fact, there is no accuser because the
United States of America has to appear, and I don't see them
anywhere in the courtroom.  But this story is just warming up,
my friends.  The DOJ has a policy to guide U.S. attorneys that
in order to be fair, charges should be minimal and be combined
into a maximum of 15 charges.  Well, there may be some sort of
personal vendetta by Valerie and James because I'm now being
charged with, I think -- my wife and I, we're being charged
with 65 counts.  They said it's an unusual case because they
keep claiming that they believe I don't buy into the legitimacy
of government, or that I don't think that money exists, which
is completely absurd.  I talk about the public and the private
on either side and that -- how money kind of went out the
window, and in 1933 it got changed.

        But I have a radio show, and that radio show goes out
to about two-and-a-half million people every day.  And, as I
said, I've produced for Unsolved Mysteries, Sightings,
Paranormal, Borderline.  Oh, my gosh.  I had a program in the
'90s called Strange Universe, but -- I worked with Hard Copy as
a producer in which I exposed all kinds of government
conspiracies, including Area 51 -- you've heard about that --
because I found the hilltop that looked down on the base.

        I talk a lot of nonsense about Hillary and Donald and
so what?  I've never harmed anybody.  I'm not a rapist, a thug,

a war criminal.  I didn't run a Nazi concentration camp and murder millions of children and people or any type of criminal at all.

The story gets better, but let's just stop for a second to put things in perspective.  We're facing 1300 years for filing paperwork that the government said didn't cost them any money.  They're not asking for any monetary return in this case, which, again, in order to bring a case in common law, you have to have at least 20 bucks, at least $20 in damages, and the government is not even claiming that.  What they want to do is throw the two of us in jail for 1300 years, 650 years apiece.  At the end of this -- you're going to be asked, is filing the paperwork that all the government had to do was send back?  Really, seriously, do you want to put us in jail for the rest of our lives?  So -- but I face more time than ten war criminals, nuclear genocide, Charles Manson, Jeffrey Dahmer, the Unabomber, Al Capone, and O.J. Simpson.

MR. HUGHES:  Objection, Your Honor.

DEFENDANT SEAN DAVID MORTON:  Speaking of criminal activity --

THE COURT:  Just one moment.

DEFENDANT SEAN DAVID MORTON:  -- let's get back to the story.

THE COURT:  Just one second, please.  There was an objection.

DEFENDANT SEAN DAVID MORTON:  -- I sort of bring the story --

THE COURT:  Objection?

MR. HUGHES:  Argumentative and raising the irrelevant issue of --

THE COURT:  Sustained.  Sustained.

DEFENDANT SEAN DAVID MORTON:  Thank you, Your Honor.

It started with the charging instrument, which is required to be signed by the foreman of a grand jury, but the signature is redacted and blank; we don't know who that person is.  That's illegal and vague, by the way.  There's no information on the record to support the indictment.  One paper says "Information and Indictment."  Later there was magically only an indictment.  There is a lot going on contrary to law here.  The warrants are totally void, in my opinion.  So my Fourth Amendment rights were trespassed at violent gunpoint when they kicked in the door to our house.

The warrants, just like the indictment, are not signed, have no valid information.  And get this:  The warrants to search my home is entirely blank where "probable cause" is supposed to be written.  So to be more scandalous, the typewritten line says, "Based on the foregoing probable cause, the items to be seized are," and it's crossed out, and someone just wrote a little capital "T" to start the sentence:  Items to be seized.

Now, when I was a kid, we saw pictures in the history books of the Redcoats coming into people's houses and tossing the entire house, which is what the Fourth Amendment was basically made to stop, and that is exactly what they did, turning over beds, tearing apart closets.  So it's scandalous.  And the void, unlawful warrants are on the record, but there's an order that says you, the good jury, will only be allowed to see evidence that paints me as guilty.  So the plot thickens.

The warrants were sealed for a while and then ordered to be corrected.  The same acts are used against me in multiple charges, which is multiplicity, which is not okay.  Witnesses have mere third-party, unsworn testimony, not one shred of admissible evidence in that mountain of rubbish called exhibits.

By the way, I was -- the prosecution and I put this on the record so I would say it -- they sent me blank disks of discovery.  I've walked in here completely -- as a matter of fact, if you see all this here, see all this?  This was dumped on my doorstep Saturday, Saturday.  Now, that's Mr. Brody's copy.  There was a similar set of those on Saturday.  I've been begging the court for discovery.  So I'm walking into this entire thing blind because they sent me disks that were blank.

And I had affidavits from a computer expert that said there's nothing on these disks that they're sending you, and I put in two notices for the court for that you will see.

Now, even the judge noticed that evidence is prejudicial and irrelevant, but that's the plaintiff's ploy, was quantity and mountains of stuff.  They are the biggest law firm in the world fighting myself and my wife, who -- I talk on the radio and she raises kittens, Norwegian Forest cats.

So they act like it's legit, even though the witnesses have no firsthand knowledge and are testifying to the lawful activity to frame me as a criminal, and the people who signed the affidavits keep changing names.  I'm not even kidding.  It's like dealing with the mafia.  Whenever you're dealing with the IRS, they don't even use their real names.  And you see the personal demon Ted Hansen, who is operating under an assumed name the entire time.

So you're dealing with a rogue's gallery here, and the motions to dismiss for plaintiff's lack of jurisdiction that I sent in, by the way, are not even on the record.  So how do I get heard?

It gets so much worse, my friends.  An order has been made that I can't have my witnesses here about how they knew I was acting in good faith, and they too saw the laws and believed it was legal, as I did.  And the plaintiff appears to me to be out of control and isn't happy with the 55 counts and 650 years in jail -- to get more charges against me.  An unsigned order came last week saying that the date of the last overt act was actually 2009, but the government is changing it

to prevent you, the jury, new data.

You're going to also see -- why did they take seven years to get around to this?  They are going to say that we somehow interfered with the process of government because we wrote them letters asking what is going on.

When I was a kid -- and many of you have had these -- I had this dream about fighting some giant, implacable monster. It was kind of weird, too, that my dad was an alcoholic and used to beat my mom up quite a bit, and I'd try to stop him. And it's just if you've ever had the power of a child, or if you were ever a child that was in a situation where you're trying to stop some massive beast from devouring you, this is what it's like dealing with the Internal Revenue Service.  They don't -- and the banks as well.  They don't respond to questions, and the bank -- the aspect with the bonds, nobody sent the bonds back even though we said, Here's a legal letter of advice.  If there's anything going on with this that you don't like, please return it.  We sent them four notices begging them to return it, and they never did.  We've even gone to court against the banks to say, Where did you put these bonds?  Are they on deposit?  Are they making money?  Where are they?  They won't produce them, and I doubt the government will be able to produce any originals as well.

So the plaintiff will attempt to tell you that the last overt act was November 4th of 2010.  Why?  Because they

need to be a five-year statute of limitations, and the indictment was issued on November 4th, five years from the day. Huh?  That is odd.  So I guess I'm thrown under the bus as the plaintiff makes up the storyline as they go, and they're allowed to.

"Arbitrary power enforcing those edicts to the jury of the persons and property of its subject is not law.  A well-known maxim is 'The law shall cause no injury.'"

So what plaintiff, the United States of America, who is not here in this courtroom, and cannot appear because it doesn't exist, it's an artificial entity, have the burden to prove to show that they actually have a real case.

Let's see.  I think this case speaks volumes if we grasp what it means, and here it is:  It is not enough that respondent will be gratified by seeing the petitioner punished for its infractions and that the punishment will deter the risk of future harm.  Obviously, such a principle made for redressability requirements vanished.  By the mere bringing of this suit, every plaintiff demonstrates his belief that a favorable judgment will make them happy.  It's going to make, apparently, the United States of America happy to throw Melissa and I in jail for 1300 years.

"But although a suiter may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets what he deserves, or that the

nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress recognizable Article III injury.

"Belief it does not remedy the injury suffered cannot bootstrap a plaintiff into federal court, and that is the very action for redressability requirements."  I'm almost done here.

So I have a Seventh Amendment right to face my accuser.  I don't think that accuser is going to appear because it's the United States of America.  So the Supreme Court says eye to eye, shoulder to shoulder.  This is common -- this is a common-law land, according to the DOJ's website, and I'm proud to have a government by, of and for the people.  The Department of Justice's website says, "Common law is the rule of mankind, issuing from the life of the people."  Congress says common law is due process and my birthright.

So the plaintiff says no evidence in this case until someone with firsthand knowledge -- they're going to present to you all kinds of experts and all kinds of opinions, and I will be objecting to this.  The government's firsthand knowledge of the case.  They have no original documents; they can't tell who put what in; they don't even know if it's my autograph or signature; and it comes and it sits in the witness chair.  Let them come and sit in the witness chair, sworn under oath, stating a claim out loud in open court that the evidence is true and have jurisdiction to even get that far.

In the common-law land, the plaintiff needs to face me face to face and explain what I did wrong to them, that they will have -- that they have a personal interest in stating a claim against me for which relief can be granted.  And, by the way, they don't want any money; the United States doesn't want any money, which should show you that whatever we put in --

MR. HUGHES:  Objection, Your Honor.

DEFENDANT SEAN DAVID MORTON:  -- we're not asking --

THE COURT:  What was that?

MR. HUGHES:  Argumentative, again.

THE COURT:  Just one second.

What is the objection?

MR. HUGHES:  Argumentative based on the fact that we don't want any --

THE COURT:  Sustained.

DEFENDANT SEAN DAVID MORTON:  Well, okay.  Once again, they're claiming these are financial crimes, but they didn't cost the government any money.

Now, stating a claim out loud in open court, if the evidence is true, and have jurisdiction to even get that far, in this common-law land, the plaintiff needs to face me, once again, face-to-face, which will leave him granted, and they will be happy, and the injury will be remedied if they throw us in jail for 650 years for filing paperwork.

So I end my story with the underdog against arbitrary

power, turning to his accuser, handing in.  I'll have three
motions to dismiss for lack of subject matter jurisdiction
stating firmly.  I'm staying silent, challenging jurisdiction
until someone shows up with claim and talks to me about why I
should be condemned for ten lifetimes for simply filing
paperwork.

In common law there are no statutes, and common law
is due process.  So I require my due process rights today from
the plaintiff, and remind them of the Department of Justice's
website's banner, and their promise of common law.  So I need
justice right now today.

So I ask:  Where is my accuser?  Who wishes to verify
that I've done them wrong?  Please verify your claim is true.
Lawyers are not witnesses.  So just remember that, that lawyers
are not witnesses.  So who has a claim that they want to state
for the record?  And if no one has a claim today that they wish
to press on the record in open court, face to face, then I move
by special appearance to dismiss for failure to state a claim
upon which relief can be granted.  That is my wish as one of
the people.

So thank you, good people, for enforcing real
justice.  So thank you for protecting my right to due process
by a common law court of record.  As Congress says, it is my
birthright, and that the judge has an oath to protect for the
benefit of the people, and I need to make sure there is a claim

here that is legitimate and common law, and the burden of proof is now on the plaintiff to prove that they have standing to commence this trial.

Now, I think you, you folks, are the people of California; you folks have the real power, and you're the wise protectors of our liberties, common law and due process, which requires the right to face your accuser face to face to prove standing; and you know in your hearts what the plaintiff needs to prove to you to meet the burden of proof.

Now, I require -- just on and for the record, I require the use of this venue as a court of record in which to have my claim heard. I have a claim, and I'd like to talk about it, because I am harmed, and I have a claim here that I will either submit to the court now, because I'm harmed under the Ninth Amendment where my property and my life and my liberties are being threatened. So with that, I'd like to once again open a court of record as I have a claim. I am harmed under the Ninth Amendment.

And I can present this claim to the court now, or I'm going to -- I have to go get a file stamp for another case to actually open a claim here under, once again, common law. Thank you.

Anything else, Your Honor?  Open a claim?

THE COURT:  Call the first witness.

MR. HUGHES:  Your Honor, the government would call

Kristy Morgan.

THE CLERK:  The witness would please step forward, stand behind the court reporter.

Raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE COURT:  Please be seated.

MR. HUGHES:  Your Honor, I'm sorry to interrupt.  If I may -- and if I haven't previously moved its admission -- could I move to exclude any witnesses?  I'm not sure if there are witnesses here --

THE COURT:  All right.  There is a motion to exclude.

If there are any potential witnesses in the courtroom, they should go to the witness room until called.

THE CLERK:  Please state your name and spell it for the record.

THE WITNESS:  Kristy Morgan, K-r-i-s-t-y, M-o-r-g-a-n.

DEFENDANT SEAN DAVID MORTON:  I object to this witness, Your Honor, and take exception.  Unless she has a claim or firsthand knowledge of this particular case, I object to her testimony.

THE COURT:  Objection is overruled.  Okay.

///

///

**KRISTY MORGAN; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:**

**DIRECT EXAMINATION**

BY MR. HUGHES:

Q.   Ms. Morgan, what do you do for a living?

A.   I work for the Internal Revenue Service in Ogden, Utah.

Q.   And what position do you hold with the Internal Revenue Service?

A.   I'm the court witness coordinator in Ogden.

Q.   And what are your responsibilities as a court witness coordinator?

A.   My main responsibility is to assist the special agents and the attorneys in preparation for trial.  I secure tax returns and documents that are maintained in the normal course of business.  I certify those returns, then testify on behalf of the Commissioner as a custodian of record regarding those specific documents.

Q.   And before working as a court witness coordinator, did you hold another position with the IRS?

A.   Yes.

Q.   What was that position?

A.   Before coming to criminal investigations, I -- for 18 years I worked in the examination function.  That's where audits are conducted.  The first eight years I was a report writing technician; the following ten years I was the civil penalty coordinator in the frivolous return program.

Q.   And have you previously held positions with the IRS that IRS involved reading IRS transcripts?

A.   Yes.

Q.   Have you worked -- as part of your work at the IRS, have you had any experience reviewing federal income tax returns?

A.   Yes.

Q.   Through all of your roles at the IRS, have you become familiar with the IRS recordkeeping system?

A.   Yes, I have.

Q.   Are you familiar with the different tax forms that are submitted to the IRS by taxpayers?

A.   Yes.

Q.   Does this include the Form 1040 and the Form 843?

A.   It does.

Q.   And does this include the various information returns like the Form 1099-INT and 1099-OID?

A.   Yes, it does.

Q.   Now, could you tell us, what is an information return?

A.   An information return is required to be filed as far as from, for instance, an employer or a financial institution. They report that information to the IRS where the IRS will keep that information for comparison on a tax return for compliance situations.

Q.   Does the IRS maintain a computer system that tracks and stores records and tax returns pertaining to each taxpayer as

part of its regularly conducted activities?

A.   Yes.

Q.   Thank you.

         And does the system go by the acronym IDRS?

A.   Yes, it does.

Q.   And are the entries made into the IDRS system made at or near the time of submission of the various returns by the individuals?

A.   Yes.

Q.   Can you retrieve information contained in IDRS about a particular taxpayer?

A.   Yes, I can.

Q.   What type of information do you need to enter into IDRS to retrieve that data?

A.   The data is all kept by Social Security number or Employee Identification Number and year.  So I would need a Social Security number and a year to do a search.

Q.   Apart from retrieving information from the database, can you also secure copies or originals of any paper tax returns filed by a taxpayer?

A.   Yes.

Q.   How are you able to retrieve actual original tax returns?

A.   The original tax returns all have what's called a "document locator number."  That's a unique number assigned just to that return.  I would order that document locator

number to receive from files or electronically the data file.

Q.   Now, does the IRS sometimes send items of correspondence out to taxpayers?

A.   Yes.

Q.   Does the IRS sometimes receive correspondence from taxpayers?

A.   Yes.

Q.   Does the IRS keep a record of that information?

A.   Yes, we do.

Q.   How is that information stored?

A.   The correspondence would be actually stored by scanning in that information, and it's kept in account management system where it can be retrieved.

Q.   You should have a set of binders in front of you.

         Would you please take the binders, including Exhibits 1, 2 and 153, and review those exhibits, and let me know when you've had a chance to review them.

         MR. HUGHES:  Just one moment, Your Honor.

         THE WITNESS:  Also 153?

         MR. HUGHES:  Yes, that's correct.

         THE WITNESS:  Yes.

BY MR. HUGHES:

Q.   Now, what are those documents?

A.   Exhibit 1 is actually a printout from the IDRS computer; two is also printouts; and 3 -- or 153 is also printouts of

accounts.

Q.   Do these IDRS printouts relate to the defendants, Sean David Morton and Melissa Morton?

A.   That's correct.

Q.   Have you verified that the information contained in these transcript printouts are a true and accurate copy of the records contained on the IDRS system regarding Sean David Morton and Melissa Morton?

A.   That is correct, yes.

            DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor.

            Did she actually see original documents?

            THE COURT:  What is the --

            DEFENDANT SEAN DAVID MORTON:  The objection:  I take exception to her answer because she never saw original documents or original signatures or anything actually original.

            THE COURT:  Objection is overruled.

            You may continue.

            MR. HUGHES:  Your Honor, at this time I would like to move to admit Exhibits 1, 2 and 153.

            MR. BRODY:  I would object, Your Honor.

            THE COURT:  On what ground?

            MR. BRODY:  Foundation and hearsay.

            THE COURT:  Overruled.

            Received.

            (Government's Exhibits 1, 2 and 153 received in

evidence.)

BY MR. HUGHES:

Q.   Ms. Morton, prior to coming here today, have you reviewed the documents labeled Exhibits 4, 5, and Exhibits 7 through 21?

A.   Yes.

Q.   In your review, do those documents contain certified IRS records related to some of the types of evidence we were just talking about?

A.   Yes, they are.

Q.   Does this include income tax returns?

A.   Yes.

Q.   Form 843 refund requests?

A.   Correct.

Q.   And correspondence between the defendants and the United States?

A.   Yes.

Q.   Are all of these documents, documents that the IRS keeps in the ordinary course of its operations?

A.   Yes, we do.

Q.   Do all of these exhibits have a blue cover sheet with a gold seal indicating that they are certified records or some certifying seal on the front page of the document?

A.   Yes, they are.

Q.   And is it a regular practice of the IRS to make certified records like these?

A.   Yes, it is.

          MR. HUGHES:  Your Honor, at this time I'd like to move to admit Exhibits 1, 2, 4, 5, 7 through 21, and -- excuse me, Your Honor -- Exhibits 1, 2 and 153 have already been admitted but Exhibits 4, 5 and 7 through 21.

          THE COURT:  Received.

          (Government's Exhibits 4, 5 and 7 through 21 received in evidence.)

          DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. take exception.  They're not original documents.

          THE COURT:  Objection is overruled.

BY MR. HUGHES:

Q.   Now, Ms. Morgan, before we look at those documents, for those of us don't regularly prepare income tax returns, would you tell us in the most basic terms how it is our income tax is determined for any given year?

A.   Basically, on the 1040, you're going to enter your income, which usually you have a W-2, that income amount.  You also would have your standard deduction and exemptions that you can subtract out to come up with your taxable income.  There is a chart where you would use that to actually compute your tax.

          You would enter any payments that have been made on the tax return.  That would include withholding or estimated tax payments.  And then the difference between what you paid and what your tax is would either revise -- get you a refund or

you would have a tax owed, depending on how much you paid in to
the IRS.

Q.   Let's take a very simple example and say I make a thousand
dollars from my employer, and leaving aside deductions and
credits and all that, what is my tax liability going to be if
my tax rate is, say, 20 percent?

A.   Your liability would be $200.

Q.   And how would the IRS usually get that $200?

A.   If you have an employer, they're going to take withholding
to apply to your tax.  If you're your own boss, then you would
be paying in estimated payments to cover that tax.

          DEFENDANT SEAN DAVID MORTON:  Objection.  Take
exception, Your Honor, because, again, it does not relate to
this case.

          THE COURT:  Overruled.

BY MR. HUGHES:

Q.   Now, how would the IRS usually get the $200 tax bill?
Would I pay it at the end of the year, write a check, or is
there another method that I'm usually -- that you should pay to
the IRS?

A.   The withholding is taken out either monthly or every time
you get paid.  The quarterly payments, estimated payments, are
made every four months.  So there would be a time or the year
where you were actually paying for that tax debt.

Q.   Now, we previously discussed a scenario in which I earned

a thousand dollars in income and $200 in withholdings.  What if I earned $10,000 in income and had $2,000 in withholdings, and the tax rate is 20 percent?

Do I need to write another check or no?

A.   No.  It would be that your bill would be satisfied; you paid just exactly enough.

MR. BRODY:  Your Honor, I'd like to object that this is expert testimony, and it wasn't noticed.

DEFENDANT SEAN DAVID MORTON:  I agree.

THE COURT:  I don't think it's -- objection is overruled.

DEFENDANT SEAN DAVID MORTON:  I object also because it was not -- discovery was not provided to me, and, of course, that would mean that she was not on that list.

THE COURT:  Objection is overruled.

She can continue.

MR. HUGHES:  Thank you, Your Honor.

Q.   At the end of year I'm actually doing my taxes or having someone else prepare my taxes, how do I know how much my employer actually paid me and how much they withheld on my behalf?

A.   That would be from your employer, would be the W-2 that they issue to you.  Also sending that to the Internal Revenue Service.

Q.   The employer actually sends a copy of this form to me?

A.   No.  They sends you a copy and the -- actual, another copy
is sent to Social Security, so you get actual credit for that,
and Social Security shares that information with the IRS.  So
all parties know about the income.

Q.   And what information is contained on the W-2?

A.   That would be your gross wages; your federal withholding;
Social Security and Medicare tax would also be included in
that.

Q.   And what if I earn money beyond just my salary?  What if I
earn money from interest from bank accounts, is that taxable
too?

A.   That would be, yes.

Q.   And is that interest income reported to me on a different
form?

A.   Yes.  The bank and financial institutions use a 1099-INT,
stands for interest.

Q.   And what information is contained on that form?

A.   That would be the amount of interest that was paid on your
savings and checking account or your investment.  And there
could be withholding, but usually in -- the banks do not
withhold on interest income.

Q.   And besides to the individual taxpayers, who does the bank
send those forms to?

A.   They're required to send a copy to you so that you're
aware of how much interest you made so you can report that on

your tax return.

Q.   Are you familiar with the term "original issue discount,"
or OID?

A.   Yes, I am.

Q.   And what does that mean?

A.   That basically is another form of a 1099 that the
financial institution will issue to you.  An example would be
if you buy a bond at a reduced price, say the bond is worth
$100, you only pay 80, then the original issue amount is
reduced.  As the income is earned over a period of time until
they're mature, you would be required to pay interest, report
that on your income tax return, for the 1099-OID information.

Q.   Ms. Morgan, could you please turn in the binders in front
of you to Exhibit 7, and let me know when you've got there.

A.   I have that.

Q.   Okay.  And what is this document?

A.   This is a certified copy of a Form 1040, 2005 tax period,
for Sean D. Morton.

Q.   And let's go ahead and publish page three.

        Now, Ms. Morgan, could you please point out where, on
this document, the income is reported.

A.   All the income is reported in this area.  And according to
this document, the income is on line 8a, which is taxable
interest.

        MR. HUGHES:  Let's go ahead and blow that up.

Q.   The line 21 -- or line 22, I'm sorry, what information is shown here?

A.   That would be the total amount of income that you received in the year.

Q.   All right.

     MR. HUGHES:  Let's bring this down and go to the next page.

     If you could please blow up the section marked "Payments."

Q.   Ms. Morgan, where in this section is the total amount of federal income tax withheld recorded?

A.   The total amount of federal income tax is on line 64.  The amount on this return shows $219,807.

Q.   The refund section, and what information is shown in this section?

A.   This on line 73a is showing the amount that's being requested as a refund, which is $136,077.  It also shows the account where a deposit is being requested to be made of that $136,000.  They're identifying it's a checking account, giving us the routing and the bank account number for the deposit.

     MR. HUGHES:  Let's go ahead and publish page five.

Q.   Ms. Morgan, what information is shown on this schedule?

A.   This Schedule B is giving us some idea of where the interest income was paid from.  So it's identifying the Bank of America, the account number, and the amount of interest that

was reported to them.  In turn, you can match that up on line

8a with the entry there, if you can see that they are the same.

Q.  Now, was a Form 1099 included with this return as a

supplement to the return?

A.  Yes, there was.

       MR. HUGHES:  Let's go ahead and publish page two.

Q.  Is this that 1099?

A.  Yes, it is.

Q.  And does this form identify the amount of OID income paid?

A.  Yes.  That's in box 1, showing $244,230.29.

Q.  And does it identify the amount of withholdings?

A.  Box 4 is showing the withholding amount $219,800.

Q.  And does it identify the specific account number to which

this relates?

A.  Yes, it does.  In the bottom left-hand side there's

account number listed.

Q.  Go ahead and circle that number.

       Was this the same number listed on Mr. Morton's

return for the payment of any refund?

A.  That is correct.  It's the same account number.

Q.  Can a taxpayer earn OID income on a checking account?

A.  No.

Q.  And are individuals permitted to prepare 1099s on behalf

of the banks?

A.  No, absolutely not.

Q.   Now, Ms. Morgan --

        MR. HUGHES:  You can bring this down and bring back
page three.  Scroll down.  Front page.

Q.   Ms. Morgan, were you able to check the amount of
withholdings reported here against the information included in
the IDRS database?

A.   Yes.

Q.   And based on your review of the IDRS database, did
Mr. Morton have any income tax withholdings for the 2005 year?

A.   There was no withholding for this account, no.

Q.   Did Mr. Morton make any estimated tax payments for 2005?

A.   No, there was no estimated tax payments made either.

        MR. HUGHES:  Bring this down here.  Let's bring up
Exhibit 4, page eight.

Q.   Ms. Morton, what is this document?

A.   This was the Form 1040, 2006 tax period, for Sean David
Morton.

Q.   And approximately when was this submitted to the IRS?

A.   Actually received at the IRS in Fresno March 18th, 2009.

Q.   And how do you know that?

A.   There is a date stamp at the bottom of the return that
identifies when a tax return is received.

Q.   And how much income is being reported on this tax return?

A.   Line 8a is showing interest, taxable interest, of
$2,809,921.

MR. HUGHES:  And let's go to the next page.

Q.   Did this return report whether any payments were made to the government for this tax year?

A.   There is information in the payment section, yes.

Q.   What does that information show?

A.   It shows on line 64, there was federal income tax withheld of $2,528,929.

Q.   Does the tax return provide any information as to whether this amount was paid by the defendant Sean David Morton or withheld by third parties?

A.   It's showing that it was entered as withholding on line 64.

Q.   And does this return request a refund?

A.   It does.

MR. HUGHES:  Let's go to the refund section.

THE WITNESS:  The refund is listed on line 74a.  The request is for $1,560,634.

BY MR. HUGHES:

Q.   And does this refund request that the refund be deposited into a specific bank account?

A.   Yes, it does.

Q.   Is that this account number right here?

A.   Yes, account number, and it is a checking account.

Q.   Is this a different account number than what was submitted with Mr. Morton's 2005 return?

A.   Yes, it is a different account.

          MR. HUGHES:  Take that down.

Q.   Now, Ms. Morgan, prior to coming here today, did you

attempt to verify using the IDRS database whether there were

any withholdings on behalf of Mr. Morton for the 2006 tax year?

A.   Yes, I did.

Q.   And were there any income tax withholdings for Mr. Morton

for 2006?

A.   No withholding in 2006 for Mr. Morton.

Q.   Did Mr. Morton -- is there any record of any estimated tax

payments made by Mr. Morton for 2006?

A.   There were no estimated tax payments made either.

          MR. HUGHES:  Let's go ahead and bring up Exhibit 5,

page three.

Q.   Ms. Morgan, what is this document?

A.   This is a 2007 Form 1040 for Sean David Morton.

Q.   And when was this return submitted to the IRS?

A.   This one was also received in Fresno, California,

March 18, 2009.

Q.   How much income is reported on this return?

A.   Total income on line 22 is $3,161,533.

          MR. HUGHES:  Go to the next page.

Q.   Line 63, what tax liability is reported on this return?

A.   This is showing a total tax owed of $1,090,767.

Q.   Does it show whether any payments were made against this

liability?

A.    Yes, there is entries in the payment section, line 64,

showing federal withholding of $2,845,361.

Q.    Does this return request a refund?

A.    It does.

Q.    What amount?

A.    The requested refund shows on line 74a, $1,754,594.

Q.    Does this return -- actually, let's go to page four,

please.

            Now, what information is being shown here?

A.    This is the Schedule B that is supporting the interest

income.  It's listing several accounts from Bank of America,

couple of accounts from Chase Bank, and an additional at the

bottom, another Bank of America account, totaling the same

amount that is on line 8a.

Q.    Was a Form 1099 included with this return for each of

these accounts?

A.    Yes, there was a 1099 included.

Q.    Do these 1099s report withholdings to the Internal Revenue

Service?

A.    Yes, they do.

Q.    Have you compared the withholdings reported on these 1099s

to the withholdings reported on this tax return?

A.    Yes.

Q.    Are they the same?

A.   No.

Q.   They're not?  I believe they are.  I believe -- are these not the same withholdings reported on the second page of the tax return?

A.   The 1099s that are attached match what the entry is, but reported to the Internal Revenue Service does not match.

Q.   Okay.  So let me rephrase my question, because there may have been a little bit of confusion.

Do the withholdings reported on those 1099s match this number right here, line 64 of federal income tax withheld?

A.   Yes, they match the entry on the tax return.

Q.   Okay.  Now, have you had the opportunity to review the IDRS database for information regarding Mr. Morton's 2007 tax year?

A.   Yes.

Q.   And based on that review, is there any record of the withholdings reported on this return being made on Mr. Morton's behalf?

A.   No, there's no record of any withholding.

Q.   Is there any record of any payments made by Mr. Morton or any other individual on his behalf for this tax year?

A.   No, no payments at all.

Q.   Now, let's turn to Exhibit 6, please -- actually don't bring that up yet.

Would you please turn to Exhibit 6, and let me know

when you've had chance to review it.

A.    Yes.

Q.    What is this document?

A.    This is a copy of the 2007 individual income return for Melissa A. Morton.

Q.    Have you verified that this is a true and correct copy of the 2000 return -- 2007 return submitted by Mrs. Morton for the 2007 tax return?

A.    Yes.

Q.    How did you verify that this is a copy of that return?

A.    Verified it by the information that is in our IDRS system, receive dates, document locator number.

Q.    And where is the document locator number?

A.    This is at the top of the page, starts with 89.  That's the number that uniquely identifies this tax return.

        MR. HUGHES:  Your Honor at this time I'd like to move to admit Exhibit 6 into evidence.

        THE COURT:  Received.

        (Government's Exhibit 6 received in evidence.)

        DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. Not the original again.  Hearsay.

        THE COURT:  Overruled.

        MR. HUGHES:  Let's go ahead and publish page one of Exhibit 6.

Q.    When was this return submitted to the IRS?

A.   It shows a received date, bottom left-hand corner of the return, of March 18, 2009, Fresno Service Center.

Q.   How much income is reported on this return?

A.   The total amount of income is $14,817.

       MR. HUGHES:  Let's go to the second page.

Q.   How much of a tax liability is being reported?

A.   Your tax liability is on line 63, showing $1,030.

Q.   Federal income tax withholdings?

A.   That was on line 64, withholding reported on this return is $13,335.

Q.   And can you please just identify where the amount of the refund is shown.

A.   Refunds amount request is on line 74a, the request is for $12,305.

Q.   And did Melissa Morton include an information return with this tax return supporting the interest and withholding amounts included there?

A.   There is the 1099-OID and the supporting Schedule B, yes.

Q.   Have you checked that the withholdings reported on that 1099 match the withholdings reported right here on line 64 of the return?

A.   Yes, they do match.

       THE COURT:  Keep your voice up a little bit.

       MR. HUGHES:  Yes, Your Honor.  Excuse me.

Q.   Now, prior to coming here today, did you review the IDRS

records regarding Melissa Morton?

A.    Yes, I did.

Q.    And does the IRS have any record of receiving the

withholdings listed on this return?

A.    No, there's no record of any withholdings in 2007.

Q.    Is there any records on estimated tax payments made by

Melissa Morton?

A.    There is no record of any payments.

Q.    Let's go to Exhibit 10, please.

       Now, Ms. Morton, based on your review of the IRS

records, did Mr. Morton file a return for his 2008 taxable

year?

A.    There is a return that was submitted to the IRS.

Q.    And were you able to secure a copy of this return?

A.    No, we were not able to receive that.

Q.    So does the IRS have any record of what was reported on

Mr. Morton's 2008 federal tax return?

A.    Yes, we do.

Q.    What is that record?

A.    The record again on our IDRS system, and it showed line

items that were actually entered into the system and account

transcripts.

Q.    And what is the document here labeled as Exhibit 10 on the

screen?

A.    This is a copy of the 2008 tax return, 1040, for Sean

David Morton.

Q.   When was this version submitted?

A.   This actually was received February 26, 2010, according to the tax return.

Q.   And have you compared the information on this return to the information included in the IDRS database to confirm that the numbers reported here are the same numbers reported on Mr. Morton's original 2008 tax return?

A.   Yes, I did.

          MR. HUGHES:  Would you go to the next page, please.

Q.   Have you identified any other features of this return that lead you to believe that this is the same return submitted by Mr. Morton in or around sometime in April 2009?

A.   The total tax amount was verified, the entry on the withholding amount was verified, and the amount of requested refund also verified.

          DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. She already testified that they lost the original form.

          THE COURT:  Objection is overruled.

BY MR. HUGHES:

Q.   How about this area right here?

A.   This is the signature for this tax return under penalties of perjury that this tax return is true and correct.

Q.   What is the date of this return?

A.   The date of the signature is March 13, 2009.

Q.   Okay.

        MR. HUGHES:  Let's go back to page one.

Q.   How much income is reported on this return?

A.   The income amount, total income, on line 22 is actually showing at $842,520.

        MR. HUGHES:  Take it down.  Let's go to the next page.

Q.   What is the total tax liability being reported on this document?

A.   Tax computed on line 61 is $278,762.

Q.   And what are the total withholdings reported on this document?

A.   Line 62 is showing the federal income tax withheld, $758,268.

Q.   And is a refund requested on this return?

A.   Yes.

Q.   What is the amount of the refund?

A.   Line 73a is showing the requested refund, $479,506.

Q.   Now, prior to coming here today, did you review the IDRS records for any record of any withholdings made on behalf of Sean David Morton for the 2008 taxable year?

A.   Yes, I did.

Q.   And in the IDRS records, are there any withholding -- or any record of any withholdings on behalf of Sean David Morton from the 2008 -- let me finish.  I talk softly.

Are there any records of any withholdings made on behalf of Sean David Morton for the 2008 tax year?

A.   There's no withholding for 2008.

Q.   Are there any records of any estimated tax payments made for the 2008 tax year?

A.   No estimated tax payments were made.

Q.   Now, did the IRS actually issue a refund in response to this return?

A.   Yes.

MR. HUGHES:  Let's pull up Exhibit 153, please.

Q.   Ms. Morgan, what is this document?

A.   This is what we refer to as an IMFOLT.  It's an individual master file transcript.  This is for the account of Sean David Morton.  It's for the 2008 tax period.

Q.   And does this transcript identify the refund issued to Mr. Morton?

A.   Yes.  Towards the bottom of the page, the transaction code is an 846.

Q.   Just go ahead and circle that.

A.   This is the amount of the refund that was issued, $480,322.55.

Q.   And why was this refund issued?

A.   There was a request made by the tax return, the return was filed, requested refund was made -- was actually sent to the IRS, return was processed.

Q.   What type of IRS employee would have reviewed this return?

A.   Basically, the first line employees that come in -- where tax returns come into the center where they are just reviewing the face of the document.  They have no computer to look at. They're looking to make sure that the simple entries on the return mathematically verify, and it's sent to processing.

Q.   Now, would that employee have any means of verifying the accuracy of the withholdings reported on the return?

A.   Not at that point, no.

Q.   Now, did the IRS issue a refund for Mr. Morton's 2005, 2006 or 2007 tax returns?

A.   No.  No refunds were issued.

Q.   Did it issue a refund for Ms. Morton's 2007 tax year?

A.   No.

Q.   Why not?

A.   They were returns that were pulled out of the system because of the face of the document was basically incorrect.

Q.   If a tax return is determined to be frivolous by the IRS, does that trigger a particular action by the IRS?

A.   Yes.  That's where the system will actually pull those returns out, send them to the area to be reviewed, it's called a second look, and those people that work in the frivolous filer department would look at these returns to see if they should be processed or not.

Q.   If the IRS determines that a return is frivolous, will it

assess a frivolous filing penalty?

A.    Yes, there is a penalty for filing a frivolous tax return.

Q.    And prior to issuing the frivolous filing penalty, will the IRS issue a taxpayer a written warning of any kind?

A.    Yes.  There are letters that go out specifically stating the return is frivolous, gives them an opportunity to correct that filing and avoid the penalty, also gives them information on how to file and where to file.

Q.    Now, were frivolous filing penalties assessed against Sean David Morton for the years 2005 through 2007?

A.    Yes, there were penalties assessed.

Q.    And were frivolous filing penalties assessed against Melissa Morton for her 2007 tax year?

A.    Yes.

Q.    Prior to assessing these penalties, would the IRS have issued a written warning to the taxpayers?

A.    Yes, absolutely.

Q.    Would you please turn to Exhibit 146, and let me know when you've had a chance to review that document.

A.    I have that.

Q.    And what is this document?

A.    This is the letter 3176C.  It's a letter that, in turn, informs the taxpayer of the consequences of filing a frivolous tax return.

Q.    Who is this letter issued to?

A.   This was issued to Sean Morton.

Q.   For what tax period?

A.   The tax period is for 2005.

Q.   And when was it issued?

A.   The letter date is March 17th, 2010.

         MR. HUGHES:  Your Honor, at this time I'd like to
move into evidence Exhibit 146.

         THE COURT:  Received.

         (Government's Exhibit 146 received in evidence.)

         MR. HUGHES:  Let's go ahead and publish Exhibit 146.

Q.   You mentioned, Ms. Morgan, that on this letter, it
identifies the consequences of any frivolous filing.  Could you
please just circle the passage to which you're referring to.

A.   The very first part of the letter basically identifies
that it's to inform them of the potential consequence of the
position they've taken and offers them the opportunity to
correct that.

         MR. HUGHES:  Take this down, please.

Q.   Does it include any information as to why the IRS is
issuing the letter?

A.   Yes, it does.

Q.   Could you please identify that section.

A.   Section -- next section where it says, "Based on Internal
Revenue Code Section 6702, the argument is frivolous," and
they've determined that they could be having a penalty assessed

based on 6702.

        MR. HUGHES:  Take it down.

Q.    Based on your review of the IDRS system, did the

defendants file a return after this letter was issued?

A.    Yes, they did.

Q.    If you could please turn to Exhibit 11.

A.    I have that.

Q.    And what is this document?

A.    This is a certified copy of the Form 1040 for 2005, filed

by Sean D. Morton.

        MR. HUGHES:  And let's turn to Exhibit 11, page --

perfect.

Q.    Was this return submitted subsequent to the letter that we

just looked at?

A.    Yes, it was.

Q.    And is the income amount reported on this return any

different from the income amount recorded on the previous 2005

return we've seen?

A.    As far as the income amount, and if you'll tell me the

exhibit, I'll compare them real quick.

Q.    Sure.  Let's put -- be Exhibit 7.

A.    Exhibit 7.  The initial filing?

Q.    Let's put them on the split screen.

A.    The income has increased on line 8a.

Q.    So how much income is being reported on this new version

of the return?

A.   The new version of the return is showing $324,684.

     MR. HUGHES:  Let's go to -- scroll down one page.

Q.   Did Mr. Morton change the withholdings reported on this new return submitted to the IRS?

A.   Yes, there's a different amount of withholding.

Q.   Did he increase the amount of his claimed withholdings?

A.   Yes, he did.

Q.   What is the new amount of withholdings reported?

A.   The federal income tax withheld on the second filing is $292,215.

     MR. HUGHES:  Take it down.

Q.   And did Mr. Morton increase the amount of the claimed refund submitted with this return?

A.   Yes, he did.

Q.   What was the amount of that refund?

A.   The amount of refund now is $180,326.

Q.   Did the IRS issue a refund in response to this return?

A.   No.

     MR. HUGHES:  Let's go to Exhibit 12.

     THE WITNESS:  I have that.

BY MR. HUGHES:

Q.   Is the same amount of income reported on this return as the previous version in Mr. Morton's 2006 return submitted in 2009?

A.   The first page of the document shows the same amount of income.

          MR. HUGHES:  Let's go to the second page, please.

Q.   What about the withholdings tax and claimed refunds in these amounts -- or on this return?

A.   These amounts are different.  What Mr. Morton did is attach the 2005 second page to the 2006 filing.

Q.   Thank you.

          Now, did the IRS issue a refund in response to this return?

A.   No.

          MR. HUGHES:  Let's go to Exhibit 9, please.

          THE WITNESS:  Exhibit 9, I have that.

BY MR. HUGHES:

Q.   What is this document?

A.   This was the 2007 Form 1040 for Sean David Morton.

Q.   When was this document submitted?

A.   This document shows a receipt date of September 7, 2010.

Q.   Are the income withholdings and claimed refund amount in this return identical to the amounts listed in the previous version of Mr. Morton's 2007 return?

A.   Yes, they are.

          MR. HUGHES:  Let's go to the second page.

Q.   What about the method of refund payment?  Is this the same as what was listed in his initial returns?

A.    No.   Initially there was a bank account listed for a direct deposit.   This shows no bank account.

Q.    So what would the consequence of that be?

A.    The IRS, if processing and issuing a refund, it would go directly to the address of record as a paper check and not a direct deposit.

Q.    Did the IRS actually issue a refund in response to this return?

A.    No.

        MR. HUGHES:  Let's go to Exhibit 13, please.  Publish page four.

Q.    What is this document?

A.    This is the 2007 1040 for Melissa A. Morton.

Q.    And have you compared the income withholdings and tax refund amount listed in this return to the income withholdings and refund amount listed with the initial refund submitted by Mrs. Morton?

A.    Yes, I did.

Q.    Do those numbers match?

A.    They are the same, yes.

Q.    Did the IRS issue a refund in response to this return?

A.    No.

Q.    Now, Ms. Morgan, when a taxpayer does not respond to the initial notice of frivolous filing submitted by the IRS, do they submit any other type of notice or any other notice?

A.    They do.  If there's no response and additional filings, the IRS will send another notice stating their position.

Q.    Does that notice have a different name?

A.    It is a CP72.

Q.    What is the difference between that notice and the initial notice sent out by the IRS?

A.    The second notice has stronger language, more explaining the possibilities of criminal prosecution in that notice.

Q.    Would you please turn to -- actually, based on your review of the IDRS system, did the IRS issue a CP72 notice to defendant Sean David Morton for his 2007 taxable year?

A.    Yes.

Q.    And did it issue one to Sean David Morton for his 2006 taxable year?

A.    Yes.

Q.    Did it issue a CP72 notice to Melissa Morton for her 2007 taxable year?

A.    Yes.

Q.    Would you please turn to Exhibit 147, and let me know when you've had a chance to review that document.

A.    I have that.

Q.    What is this document?

A.    This is a copy of the CP72 sent to Sean David Morton.

Q.    And what tax period does it relate to?

A.    It covers the actual tax period -- let me see here --

Form 1040 for 2007.

Q.   And when was it issued?

A.   The date of the notice is November 1st, 2010.

        MR. HUGHES:  Your Honor, at this time I'd like to move Exhibit 147 into evidence.

        THE COURT:  Received.

        (Government's Exhibit 147 received in evidence.)

        MR. HUGHES:  And let's publish page one of Exhibit 147.

Q.   Ms. Morgan, you mentioned that this notice provides notice regarding potential criminal prosecution.  Would you please go ahead and just outline where in this notice that passage is.

A.   It's contained in the third paragraph.

Q.   Just go ahead and read that first line of that.

A.   "Please be advised that people who violate the tax laws may be subject to federal criminal prosecution and imprisonment."

        Then it gives information of where you can do research on the Internet regarding the letter that you just received.

Q.   In this final entry, *The Truth About Frivolous Tax Arguments*.  Are you familiar with that publication?

A.   I am.

Q.   Are you familiar with the information contained on that publication on the date this letter was issued?

A.   Yes.

Q.   What is it -- what is the nature of *The Truth About*
*Frivolous Tax Arguments?*

A.   It lists different tax arguments.  It also gives the IRS's
position why they're frivolous, and why you should not be
filing tax returns with those types of positions.

Q.   Does this include the 1099-OID refund program?

A.   It does.

          THE COURT:  I don't know what that means, "1099-OID
program"?  What is what?  I'm not asking you to explain, but I
don't know what that means as far as the evidence is concerned
so far.

BY MR. HUGHES:

Q.   Ms. Morgan, does the -- does it include information on the
program that promotes the use of the 1099-OID form to claim
refunds?

A.   Yes, it does.

Q.   Thank you.

          Would you please take a look at Exhibit 148.

          THE COURT:  I still don't understand.  I mean, are
you saying that 1099-OIDs can never be used to claim refunds?

          THE WITNESS:  I can basically explain --

          THE COURT:  I don't want you to explain more than is
relevant to the question, but when the question relates to "OID
program," is it that an OID 1099 cannot be used for a payment

or is it something -- or is it the nature of the OID?

        THE WITNESS:  It's what's on the face of that document, how it's actually submitted to the IRS.

        THE COURT:  When you say the face of the document --

        THE WITNESS:  Right.  The information is incorrect --

        THE COURT:  I see.  So when you say "OID program," you're not saying that an OID 1099 can't be used as a form of payment on taxes, you're saying that the OID 1099 has to be correct in its content.

        THE WITNESS:  Correct, yes.

        THE COURT:  I see.  Okay.

        DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor.  So the witness -- okay.  The witness is saying that she has no information as to whether or not the information on the face of the document was true or not.  Speculation.  All of this is hearsay.  She's looking at other documents.  She had no direct interaction with the documents when they came in.  This whole thing should be thrown out.

        THE COURT:  Let me make it clear that this witness is called by the government.  It seems to just describe documents and procedures of the IRS.  She's not here to tell the jury about the correctness of the information.

        Correct?

        MR. HUGHES:  That is correct, Your Honor.

        THE COURT:  She's not saying that.  There may be

other witnesses who may attempt to do that, and you can reserve your objection to them.

DEFENDANT SEAN DAVID MORTON:  Okay.  Again, I object. She has no firsthand knowledge.

THE COURT:  On that basis, the objection is overruled.

DEFENDANT SEAN DAVID MORTON:  It's hearsay.

THE COURT:  Proceed.

BY MR. HUGHES:

Q.  Would you please look at Exhibit 148, and let me know when you've had a chance to review that exhibit.

A.  Yes.

Q.  What is this exhibit?

A.  This is a CP72 issued to Melissa A. Morton for the 2007 tax period.

Q.  And what is the date of that notice?

A.  The notice issue date is November 29, 2010.

MR. HUGHES:  Your Honor, I'd like to move to admit Exhibit 48.

THE COURT:  Received.

(Government's Exhibit 48 received in evidence.)

MR. HUGHES:  Let's put up Exhibit 148 and 147 next to each other.

Q.  Now, could you go ahead and circle the date that was listed there on the notice listed to Melissa Morton.

A.   That date is November 29, 2010.

Q.   Based on your review of the IDRS system, did the defendants file tax returns with the IRS after these notices were issued?

A.   Yes.

Q.   Can you please turn to Exhibit 16.

A.   I have that.

Q.   What is this document?

A.   This is the 2005 individual income tax return for Sean D. Morton.

     MR. HUGHES:  Let's go ahead and publish.  Page four.

Q.   Now, did you compare this document to the previous version of Mr. Morton's 2005 return submitted to the IRS?

A.   I did.

Q.   And is there any change to the income reported on this return?

A.   Yes.  This return is showing zero income.

     MR. HUGHES:  Could you please go to the next page.

Q.   And did Mr. Morton also eliminate his claimed withholdings?

A.   No.  No, the withholdings are still on the tax return.

     MR. HUGHES:  Could you go ahead and blow up the refund part.

Q.   So how much of a refund is being requested now on this return?

A.   The requested refund is $244,230.

          MR. HUGHES:  Take that down.

Q.   So is there any tax liability reported on this return?

A.   No.  They are showing liability as zero.

Q.   But there's still withholdings?

A.   Correct.

          MR. HUGHES:  Now, let's go to page eight, please.

Q.   What is this document?

A.   This shows as a coupon for set-off, settlement, and closure.

Q.   Was this document included with Mr. Morton's 2005 return?

A.   Yes, part of the attachments.

Q.   Did the IRS process this document as a payment, or attempt to process it?

A.   No.

          MR. HUGHES:  Now, let's go to page 16, please.

          And blow up that first part of the paragraph.

Q.   And could you just read the first sentence of this paragraph, please.

A.   "The undersigned humbly requests that the IRS return the overpayment amount of $234,230.29 to Sean David Morton based on the updated and enclosed 2005 tax year 1040 records."

Q.   And just the next sentence as well, please.

A.   "The undersigned humbly requests the IRS forward the full amount of the overpayment based on the updated records with all

speed to the address of record."

Q.    And the third?

A.    "The total amount of asset funds tendered to the IRS on the enclosed security from the asset account of the undersigned is $732,230, which greatly exceeds by three times the amount of the funds the IRS is liable to return to Sean David Morton for the overpayment of 2005."

Q.    Is this document included with Mr. Morton's 2005 return?

A.    Yes.

Q.    And could you please turn to Exhibit 15.

A.    I have that.

Q.    What is this document?

A.    This is the 2006 1040 for Sean David Morton.

Q.    And do we have any record of when it was received by the IRS?

A.    There is a stamp on the tax return showing it's received November 26, 2010.

Q.    And did Mr. Morton make any changes to the reported income on this return --

A.    Yes.

Q.    -- from his previously filed returns?

A.    Yes, he did.

Q.    What was that change?

A.    The income amount is now zero.

Q.    And could you go to the next page, please.

Did Mr. Morton make any changes to the reported tax amount?

A.   The tax on the return is also at zero; that is a change.

Q.   And did Mr. Morton also eliminate his withholdings?

A.   No.

Q.   Did he request a refund?

A.   He did.

Q.   What amount?

A.   Refund request on this return is $2,809,921.18.

Q.   Is this amount larger than the refund requested in his previous returns?

A.   Yes.

Q.   Let's turn to page eight, please.

And is this document included with the 2006 return -- I'm sorry -- the 2007 return submitted -- or the 2006 return submitted by Sean David Morton?

A.   Yes, it's included with the 2006.

Q.   And was it processed as a payment by the IRS?

A.   No.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. The last two documents they put in aren't even signed, and they say "Void" all the way across the face of the document, so ...

THE COURT:  You can ask her about that if you wish.

DEFENDANT SEAN DAVID MORTON:  All right.

Okay.  The document --

THE COURT:  Not now.  When you have a chance to examine her.

Go ahead.

MR. HUGHES:  Let me take this down.

Q.   Can you please turn to page 28.

Is this document marked "Letter of Rogatory and Affidavit in Support" included with the 2006 return submitted by Mr. Morton in November 2010?

A.   Yes, it was.

Q.   And did the IRS actually issue a refund in response to this return?

A.   They did not.

MR. HUGHES:  Let's turn to Exhibit 14, please.

THE COURT:  Are you coming to a head here, or do you have much more to go?

MR. HUGHES:  I have a few more exhibits, Your Honor.

THE COURT:  How many more?

MR. HUGHES:  I would say probably about six more.

THE COURT:  May be a good time to take the afternoon recess.  We've been at it for a couple hours.  So let's take ten minutes or so, and then we'll go on to five o'clock.

(Recess)

MR. BRODY:  Your Honor, before Mr. Hughes resumes, could I just put something on the record?

THE COURT:  Yes.

MR. BRODY:  I had previously objected to the Government's Exhibit 1, the IDRS document, under hearsay and foundation grounds.  I'd also like to object to confrontation grounds.

THE COURT:  Okay.

MR. BRODY:  Thank you.

BY MR. HUGHES:

Q.   Ms. Morgan, what is this document?

A.   This is the 2007 individual income tax return for Sean David Morton.

Q.   And when was this document received by the IRS?

A.   It shows a received date of November 9, 2010.

Q.   Have you compared this document to the previous versions of Mr. Morton's 2007 tax return?

A.   Yes.

Q.   Is the income withholdings and refund amount reported on this return identical to the previous version of Mr. Morton's return submitted for the 2007 tax year?

A.   Yes.

MR. HUGHES:  Let's go ahead and publish page 20.

Q.   Ms. Morgan, was this document included with Mr. Morton's 2007 tax returns submitted in November of 2010?

A.   Yes, it was.

Q.   Did the IRS attempt to process this document as a payment for the 2007 tax year?

A.   It did.

Q.   What was the result of that?

A.   The bank returned this check.  It was a bad check, and it was reversed off the account.

        MR. HUGHES:  Let's go to page 30.

        THE COURT:  In terms of that last part of your testimony, was that based upon what you -- you saw on the IRS records?

        THE WITNESS:  Yes.  My review of the account.

        THE COURT:  I see.

        DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. She's saying it's a check.  It doesn't say check anywhere on it.

        Do you see the check anywhere on that, ma'am?

        That's cross-examination.  I'm sorry.  Anyway, objection.  She is making an observation that is not in evidence and -- there you go.

        THE COURT:  Thank you.

        DEFENDANT SEAN DAVID MORTON:  As you can see.

        THE COURT:  Overruled.

BY MR. HUGHES:

Q.   Was this document submitted in with included with the 2007 return filed by Sean David Morton?

A.   Yes, it was.

Q.   Let's turn to Exhibit 17, please.

A.    I have that.

Q.    What is this document?

A.    This is the 2007 1040 for Melissa A. Thompson Morton.

Q.    And does this return report any income?

A.    No, it does not.

Q.    Let's go to the second page, please.

        Does this return report any tax due for the 2007 tax year?

A.    No, it does not.

Q.    Does it report any withholdings?

A.    Yes, it does show the withholding.

Q.    In what amount?

A.    The withholding entered on the return, line 64, is $14,816.70.

Q.    Does the return request a refund?

A.    Yes, it does.

Q.    In what amount?

A.    Also in $14,816.70.

        MR. HUGHES:  Let's publish page six, please.

Q.    Was this document included with the 2007 return of Melissa Morton?

A.    Yes, it was included.

Q.    And was it processed by the IRS?

A.    No, it was not.

Q.    Was a refund issued for this return?

A.    No.

Q.    Was a refund issued in the previous return we just

discussed, the 2007 return of Sean David Morton?

A.    No.

        MR. HUGHES:  Let's go to page 13, please.

Q.    Was this document included with the 2007 return of

Melissa A. Morton?

A.    Yes, it was.

        MR. HUGHES:  Let's go to Exhibit 18.

        And page six.

Q.    What is this document?

A.    This is a Form 843, Claim for Refund and Request for

Abatement, filed by Sean David Morton.

Q.    For what tax period?

A.    The tax period on this is for 2006.

Q.    And when was this filed with the IRS?

A.    The actual signature date on this form is June 21st, 2012.

Q.    And how much of a refund is requested?

A.    The refund amount is $1,560,634.

Q.    Did the IRS issue a refund in response to this claim?

A.    No.

        MR. HUGHES:  Let's turn to Exhibit 19.

Q.    What is this document?

A.    This is also a Form 843, Claim for Refund and Request for

Abatement, Melissa A. Morton is the filer.

Q.   And what is the amount of the refund requested?

A.   Refund amount is $12,727.

Q.   And to what tax period does this relate?

A.   This is for 2007 tax period.

Q.   When was this filed with the Internal Revenue Service?

A.   The signature date is June 21st, 2012.  It's received June -- July 2nd -- excuse me -- 2012.

Q.   Based on your review of the IDRS records, between 2009 and 2013, were any frivolous filing penalties assessed against Sean David Morton?

A.   Yes.

Q.   What was the total volume of those penalties?

A.   There were 19 frivolous penalties assessed, for a total amount of $90,000.

Q.   And were any frivolous filing penalties assessed against Melissa A. Morton for that period?

A.   Yes.

Q.   What was the total amount of those penalties?

A.   Total penalties were 14 frivolous return penalties, for a total amount of $70,000.

        MR. HUGHES:  Let's go to Exhibit 20, please.

Q.   What is this document?

A.   This is correspondence that's received at the Internal Revenue Service from Sean David Morton.

Q.   Does it include any indications to when it was mailed?

A.   The actual date of the -- where it was placed in the
United States mail is on the 2nd day of April 2013.

        MR. BRODY:  Objection, foundation, Your Honor.

        THE COURT:  Well, their hasn't been a specific
foundation for this document.

        You did inquire of this witness at the outset how she
retrieved documents, correct?

        MR. HUGHES:  Correct, Your Honor.

        THE COURT:  You went through a question and answer
with her process.  You haven't repeated that with each
document, but let me ask the witness:  Is the process by which
these documents had been produced the same procedure
throughout, that is, you looked at that -- what was that form
again, the basic form?  The -- what was the name of that?

        MR. HUGHES:  IDRS statement.

        THE COURT:  IDRS statement.  And was it from that
statement that you keyed into the -- these forms, these
documents, these filings?

        THE WITNESS:  Yes.  The basis of all my research is
through IDRS.

        THE COURT:  Review again with us how you did that.

        THE WITNESS:  That would be with the Social Security
number of the document of the individual filing this.  Then I
would go to my sources as far as there is other databases that
store correspondence, store tax returns, but --

THE COURT:  But you would go to the what's called
IDRS?  That's the summary document?

THE WITNESS:  That's the master computer for the IRS.

THE COURT:  Is the Social Security number part of
that document?

THE WITNESS:  Yes.

THE COURT:  But you would use that document to access
notes of the filings related to what, that document or the tax
returns?

THE WITNESS:  For that tax period.

THE COURT:  For that tax period.

THE WITNESS:  And correspondence would be identified,
and then withhold the correspondence.

THE COURT:  I see.

Are those documents, the hard copies created from
that?

THE WITNESS:  Yes.

THE COURT:  I see.

And that's purported to be one of those hard copies;
is that right?

THE WITNESS:  Correct.

THE COURT:  And you produced that?

THE WITNESS:  I personally accessed and pulled these
prints.

THE COURT:  I see.  Okay.

Objection --

MR. BRODY:  The objection is overruled?

THE COURT:  Yes, objection is overruled.

MR. BRODY:  Thank you, Your Honor.

BY MR. HUGHES:

Q.  Please turn to page 16 of this document.

Was this document included with the packet of

documents submitted to the Internal Revenue Service?

A.  Yes.

Q.  The IRS attempted to process this document as a form of

payment?

A.  No.

Q.  And let's turn -- please turn to Exhibit 21.

A.  Yes.

Q.  What is this document?

A.  This is correspondence received at the Internal Revenue

Service from Melissa Ann Thompson.

Q.  Did you receive this document from the IDRS system based

on your review of the records of correspondence between the IRS

and the taxpayers?

A.  That's correct.

Q.  And does this document include any indication as to the

date it was mailed to the IRS?

A.  Yes.  The cover letter states a mailing date of the 2nd

day of April 2013.

Q.   Let's go to page 27 of the document.

          Was this document included with the packet of correspondence sent to the IRS?

A.   Yes, it was.

Q.   Was it processed as a payment by the IRS?

A.   No.

Q.   Now, prior to coming here today, did you search the IDRS databases for any record of any payments received by Sean David Morton over the last 20-year period?

A.   Yes, I did.

Q.   Based on your review of the IDRS system, has Mr. Morton made any voluntary payments to the IRS over this time period?

A.   Yes.

Q.   What was the amount of that payment?

A.   There was one payment made, and it was for $1.

          MR. HUGHES:  No further questions.

          THE COURT:  Okay.  Cross-examination, Mr. Brody.

### CROSS-EXAMINATION

BY MR. BRODY:

Q.   Good afternoon, Ms. Morgan.

A.   Good afternoon.

Q.   This is not the first time you've testified, right?

A.   That's correct.

Q.   About how many times have you testified?

A.   Over 140 times.

Q.   Now, you've been with the IRS for a long time; is that
right?

A.   Around three years.

Q.   Okay.  That's certainly a long time.

        And during that time, you've been working with the
tax code in one form or another, correct?

A.   Working at the IRS with specific jobs, yes.

Q.   Okay.  So you're familiar with the tax code?

A.   That's not one of my responsibilities, no.

Q.   Have you had any training in the tax code at all?

A.   No.

Q.   Okay.  Now, we talked about some of the 1040 forms that
were submitted supposedly by Melissa Morton and Sean Morton.

        Some people do their own taxes, correct?

A.   Yes.

Q.   And some people receive assistance from other people with
their taxes, right?

A.   Correct.

Q.   In part because sometimes it can be very complicated for
the average ordinary citizen to manage their taxes, right?

A.   Basically it's the taxpayer's choice of whether they use
someone or file their own.

Q.   If there's a problem with an individual's taxes, so, for
example, if there's claim of withheld interest on a 1099-OID
form, but there is no actual withheld interest, you can audit

the taxpayer, right?

A.   That could cause an audit, yes.

Q.   Okay.  And you can contact the taxpayer to address the problem, correct?

A.   Yes.

Q.   And there are various ways of contacting the taxpayer.

A.   The Internal Revenue Service uses notices to contact the taxpayer.

Q.   So the IRS sends letters, is what you're saying?

A.   Yes.

Q.   But the 1040 documents that were filed in this case -- well, 1040 documents in general, they have a place for the taxpayer to put their address, correct?

A.   Correct.

Q.   And they have a place for the taxpayer to put their phone number, right?

A.   I believe so, yes.

Q.   And, in fact, in the exhibits that we've been discussing in this particular case, for example, Government's Exhibit 6, Melissa Morton's 2007 1040, there was a phone number on that form; is that correct?

A.   I can check.

Q.   Would you have a look.  Thank you.

A.   Yes, there is a phone number.

Q.   Okay.  But it's not the custom and practice of the IRS to

actually call that phone number.

A.    That's correct, we do not call.

Q.    Even if there is a problem with the return.

A.    Correct.  It will be a letter or notice that's sent.

Q.    And that's true even if the person is claiming millions of dollars that they're not entitled to, correct?

A.    Correct.

Q.    Until the taxpayer receives a notice, that's the only way they have to know that there is a problem with the return, right?

A.    That would mean they're put on notice with that receipt of that notice, yes.

Q.    Okay.  And it may be an individual person at the IRS who finds a problem with a return, correct?

A.    Yes, people that work in processing.

Q.    And that might be, for example, one of those first line people, I think you referred to them as, who first review the document, correct?

A.    Yes, they receive training.

Q.    Okay.  And if they see a problem, they might pass the document on to someone else to ask for some kind of confirmation?

A.    That's correct.

Q.    So, for example, if, as we've seen in these particular terms, somebody claims a refund based on a withholding, is that

document going to be checked by a human being to make sure that
there was no withholding or that there was actually a
withholding?

A.   I'm not following your question.

Q.   I'm sorry.  That was bad.  I'll rephrase the question.

         If the document, if the 1040 claims a refund based on
a 1099-OID document, will somebody go and check to see if a
bank filed a 1099-OID document?

A.   That could be part of the process, yes.

Q.   But not always, right?

A.   Depends on the amount of the withholding compared to the
amount of income.

Q.   And is that a check that has to be done manually or is
there some sort of automated system that will automatically
tell you there is a discrepancy?

A.   That would be something that would be looked at by actual
human eyes.  That would be a referral to the frivolous return
program.

Q.   Okay.  So there's no actual computer system in place that
automatically checks a return for a problem like that?

A.   Not at the beginning of processing, no.

Q.   Okay.

         Now, we've seen the, in this particular case, a
request for a refund by Sean David Morton was actually issued,
right?

A.   Correct.

Q.   And that is true in spite of the fact that there was no federal tax withheld for his particular -- in that particular year for him?

A.   That's correct.

Q.   And that's something that presumably is quite common, correct?

A.   No, not necessarily, no.  Sometimes refunds do get paid out that shouldn't get paid out.

Q.   How often would you say refunds get paid out that shouldn't be?

A.   I don't know have any facts on how that happens or when that happens.

Q.   You couldn't say what percentage of the time or how many times in 2007?

A.   No.

Q.   Could you say how many times 1099-OID-based returns were submitted in 2007?

A.   How many were received?

Q.   How many were received.

A.   No, I don't have those stats.

Q.   Now, you talked about the so-called frivolous filing letters that were sent out to both Melissa and Sean Morton, right?

A.   Correct.

Q.   And your conclusion that they were sent out is based on your review of the IRS records right?

A.   Yes, it is documented that they're mailed.

Q.   You have no personal knowledge of whether or not they were received, correct?

A.   Correct.

Q.   Okay.

     Now, the word "frivolous" has a technical meaning at the IRS, right?

A.   Yes.

Q.   It doesn't just mean funny or silly or something like that, right?

A.   That's correct.

Q.   It doesn't mean that we might necessarily think of as the lay definition for frivolous?

A.   That's correct.

Q.   You also refer to a document called "*The Truth About Frivolous Tax Filings*"?

A.   Yes.

Q.   And that's a document that's referenced in the letters that were sent to the Mortons, correct?

A.   Correct.

Q.   In effect, the letters said here's a place to look to do some research on frivolous tax filings.

A.   Correct.

Q.   And that's a document that's pretty substantial, isn't it?

A.   Yes.  It's on IRS.gov, and it's available to anyone that wants to look at it.

Q.   And it's some 70 pages long, correct?

A.   Correct.

Q.   And it can include case law, right?

A.   Yes.

Q.   And by "case law," I mean actual references to cases like *United States v. Cheek* or *United States v. Schiff* or something like that, right?

A.   Correct.

Q.   And it includes cases at the district court level?

A.   That, I don't know.

Q.   And cases at the appellate court level?

A.   I know there is case law that is in that frivolous return program referral, and that's all I know.

Q.   You're not familiar with the difference between district court case law and appellate court case law?

A.   That's correct, I'm not.

Q.   And this document includes analysis of conflicting case law, right?

A.   That, I wouldn't know.

Q.   So you don't know whether or not it includes some cases which say one thing and some cases which contradict them?

A.   No.

Q.   And you haven't read those cases, correct?

A.   That's correct.

Q.   You haven't actually gone and downloaded the entire case and read the entire opinion of the court, right?

A.   That's correct.

Q.   You haven't analyzed the holdings in any of those cases?

A.   That's correct.

Q.   You're not a lawyer; is that right?

A.   That's correct.

Q.   Okay.

       So you probably don't read case law in your spare time?

A.   That's correct.  We have attorneys at the IRS that handle that for us.

Q.   Okay.

       And presumably the same is true, you don't read case law when you're preparing your own taxes right?

A.   I follow the instructions from the 1040.

Q.   Okay.

       Now, have you had any training by the IRS as to what constitutes a frivolous filing or is your training -- I'm sorry, I'll stop there.

       Have you had any training from the IRS?

A.   Yes.

Q.   Okay.  And what did that training consist of?

A.   That was a course that went in and showed the different identified arguments that are identified by our area counsel, which is IRS.  Give us examples of those types of tax returns, and instructions on if we found one of those in processing, or in our work, what we would do with it.

Q.   And so there are attorneys at the IRS who, for example, give you trainings, correct?

A.   The attorneys write the opinions on whether the return is frivolous or not.  The training is done by our training people that actually create different training manuals for employees.

Q.   If you had a question about what -- anything that's in the document, you can consult with those people, right?

A.   Correct.

Q.   You could go and ask them a question?

A.   Yes.

Q.   And if you had a very complex legal question, you would probably then have access to an IRS attorney, correct?

A.   Yes, you could write for an opinion.

Q.   Okay.

        Now, have you ever had a disagreement with the IRS about what constitutes a frivolous argument?

A.   Personally?  Me?

Q.   Yes.

A.   No.  That is a determination made by our counsel.

Q.   Okay.  So you've never said to the IRS or one of their

trainers, Hey, I understand you think this is frivolous, but based on what I'm seeing, I don't think it is, correct?

A.   That's correct.

Q.   Okay.  And you agree, however, it's possible the IRS can be wrong about the law, right?

A.   I don't know.

Q.   You don't know if the IRS could ever be wrong about the law?

A.   I don't actually research that.  That's not what I'm here for.

Q.   So you're not familiar with any cases in which a court has ruled against the IRS, for example?

A.   That's correct, I am not.

Q.   I understand.

        The frivolous filing letters don't tell the taxpayer exactly what's wrong with their return, right?

A.   They state that it's a frivolous position, gives the date of the filing.

Q.   Understood.

        But it doesn't say, for example, The problem with this return is that you claimed a refund on an OID document, but there is no corresponding document from the bank, right?

A.   That's correct, it doesn't go into that detail.

Q.   It just directs you to one of these publications from the IRS, right?

A.   It gives you that information.  It also gives you a phone number to call if you have questions.

Q.   Okay.

You personally have never met Melissa Morton, correct?

A.   That's right.

Q.   You've never met Sean Morton?

A.   That's correct.

Q.   You have no personal knowledge of who may have helped them prepare their taxes; isn't that right?

A.   That's correct.

Q.   And you have no personal knowledge of where they may have obtained the 1099-OID forms that we've seen from the government?

A.   The forms are available on IRS.gov.  So anyone can pull those.

Q.   Anybody can download those forms?

A.   Correct.

Q.   It's not just available to banking institutions?

A.   That's correct.

Q.   Even though, I think you said, am I correct, that banking institutions are the ones that can file them?

A.   That's their responsibility, yes.

Q.   Individuals aren't supposed to file 1099-OIDs?

A.   Correct.  They would not have the information that the

bank has.

Q.   Okay.  But that document is available on the web,

nonetheless?

A.   It is.

Q.   Okay.

        Obviously, when you look at the returns that were

filed by Melissa Morton, you can't tell on what theory that

she's claiming the refund, right?

A.   Oh, I would look at the face of the document as far as is

it correct or not.  That's all I can look at.

Q.   As to the coupon for settlement, set-off and closure,

there were a couple of coupons for settlement, set-off and

closure that we looked at, you can't tell from the face of that

document who may have actually printed it out, right?

A.   That's correct.

Q.   You don't know if somebody assisted Melissa Morton in

preparing that document?

A.   I just know it's included in the filing.

Q.   Okay.

        And as to the Discharging Bond and Indemnity, I think

that was Government's Exhibit 21, you said that the IRS didn't

try to cash that bond; is that correct?

A.   The record shows that it was not attempted to post to the

account.

Q.   And do we know why it wasn't?

A.   I don't know why, no.

    MR. BRODY:  No further questions.

    Thank you, Your Honor.

    THE COURT:  Mr. Morton.

### CROSS-EXAMINATION

BY DEFENDANT SEAN DAVID MORTON:

Q.   Good afternoon, Ms. Morgan.

A.   Good afternoon.

Q.   Are you familiar with Maureen Green at the Ogden, Utah
IRS?

A.   Maureen Green?

Q.   Yes.

A.   Yes.

Q.   Is that you?

A.   No.

Q.   Does the IRS use aliases in their work with the public?

A.   No.

Q.   Are you familiar with IRS Agent Ted Hansen?

A.   No, I don't know.

Q.   Are you familiar that he is using an assumed name and is
now appearing in this court; so you have no familiarity with
Ted Hansen?

    MR. HUGHES:  Objection, Your Honor.

    THE COURT:  Give me a legal ground for the objection.

    MR. HUGHES:  Facts not in evidence.

THE COURT:  I can't hear what you're saying.

MR. HUGHES:  Outside the scope of direct.

THE COURT:  Overruled.

BY DEFENDANT SEAN DAVID MORTON:

Q.   What's the statute of limitations on all this stuff?  Does it just go on forever?

A.   I'm not here to discuss that.  I'm as a custodian bringing the records in and explaining them for you.

Q.   Okay.

     So one of the records that you brought in, you brought in a coupon for set-off, settlement and discharge, that said "Void" all the way across from it.  What made you assume it was a check?

A.   It's part of the return information that was submitted to the IRS.

Q.   That said it was a check?

A.   That's the information that I have.

Q.   Okay.  So you claim the IRS tried to cash the check.  What bank did they cash the check at?  If it's a coupon, what bank did this get cashed at?

A.   I have no information about which one you're speaking to.

Q.   You saw a series of coupons that they produced as evidence that you said the IRS tried to cash, but you have -- do you have any evidence of that?

A.   There was one that they attempted to post.  Yes, I seen

that on the account.

Q.   Even though there's nowhere the word "check" was on the coupon?

A.   There was an attempt to post that, and it rejected.

Q.   Where?

A.   When you say "Where," I don't know --

Q.   What bank did they try to cash it at?  These were questions the judge asked actually in the preliminary way back when, and we said -- the judge himself said it, looked like a prank.

        THE COURT:  I didn't say anything like that.

        DEFENDANT SEAN DAVID MORTON:  Don't mean to misquote me.

        THE COURT:  Don't misquote me, Mr. Morton.  Please be mindful of that as you proceed.

        DEFENDANT SEAN DAVID MORTON:  Okay.

Q.   What is the difference between -- you say the IRS issues liens.  What's the difference between a notice of lien and a lien?

A.   I'm not understanding the question.

Q.   They issue what you claimed were fines or public exactions for frivolous filings?

A.   Well, there's penalties assessed.

Q.   Okay.  But they're called -- what is the difference between a lien, and is actually processed by a court and signed

by a judge, and enforced by court actions under the
Constitution, and what you issue or -- I'm sorry -- what the
IRS issues which is called a notice of lien?  What is the
difference between a notice and a lien?  You should know
this -- I'm sorry.

A.   I don't know that.  As a custodian, I only bring in the
records of what they show.

Q.   Okay.

         You claim that the 1099-OIDs are available on the IRS
website?

A.   That's right.

Q.   Okay.

         Have you looked recently?

A.   Yes, I have.

Q.   To see that the 1099-OIDs are available to the public?

A.   I have pulled them, yes.

Q.   When was the last time that you saw, available to the
public, when was the last time you saw a 1099-OID on the IRS
website?

A.   I pulled a 1099-OID from IRS.gov before I came here.

Q.   Okay.  Was this your special code or whatever, because
they do not seem to be -- are they still available to the
public, as you claim?

A.   That, I don't know.  I can tell you what I pulled from
IRS.gov.

Q.   But with your special clearances as an IRS, somebody paid by the United States of America, our imaginary plaintiff that pays everybody else in this courtroom, but with your codes, to be able to do that as an expert for the United States of America?

A.   We access IRS.gov just through the Internet.

Q.   Okay.

So you don't know the difference between a lien by a court and a notice of lien that the IRS hands out to people?

A.   That's correct.  That's not what my reasonable responsibility is here.

Q.   Okay.

When you said the IRS tried to cash the check or the coupon, were you aware that then, after supposedly cashing that check or coupon, is it in your evidence that that shows that the IRS then fined me $5 million, as now I owe them that which was the value of the coupon that was submitted?

A.   That record you'd have to show me.

Q.   Okay.

What happened to the -- if there are bonds submitted to the IRS, what happened to them, if you -- what happens to the bonds?  Are they sent back?  Do they dishonor them if the U.S. Treasury says they're supposed to be, are they returned so the people can know that the bonds were no good or couldn't be actually monetized by them?

A.   You're talking specifically to the actual check that was --

Q.   No.  It's nowhere on this it says check.  Does it say anywhere on here it says check?

A.   You're asking me regarding the posting of the account to the $5 million that was returned by the bank; is that correct?

Q.   Which bank?  Do you have any evidence it was actually sent to a bank?

A.   There was an attempting to post, and it was rejected back.

Q.   To whom?

A.   To the IRS as a bad payment.

Q.   But the IRS is not a bank, so I'm asking you about a bank if it's a coupon that was never meant to be cashed at a bank, and you're saying it was cashed by a bank and returned, like it bounced or something?

A.   I'm telling you what the record shows.  The record shows there was an attempt to post and it was rejected.

Q.   Post to who and where?  What bank?

A.   Posting to your account, not necessarily does it show the bank.

Q.   Do you know or not, ma'am?

A.   The record shows that there was a posting attempted and it rejected.

Q.   To who?  We have no evidence as to who, or to how, or to what bank, yes?

A.   The account wouldn't have shown that.  It would show it was a bad check.

Q.   Thank you.

     Again, using the word "check."  Is the word "check" anywhere on that piece of evidence that you saw, anywhere?

A.   That is my termination for posting money to the account.

Q.   Okay.  All right.

     Now, is there a difference in the tax liability to religious organizations?  Are they liable to pay taxes to the IRS as religious educational organizations?

A.   I wouldn't know that.

Q.   You wouldn't.  Okay.  Because you were saying that -- well, you made the statement that I had paid $1 in taxes over the course of the, what, last 20 years, I guess?

A.   The records show there was a dollar payment made, yes.

Q.   Okay.

     Does the record also show that I ran the Prophecy Research Institute which is a religious education organization for 20-plus years?

A.   That was not information that I was researching, no.

Q.   Okay.

     So would somebody who's running a religious education organization, 501(c)(3), be liable for the taxes that a regular person would pay that doesn't have such an organization?

A.   Again, I don't know.

Q.   Okay.

In the evidence that they presented, again, the one other thing that I was interested of, the Marlea Ramsey who was the notary on the packet that was sent by myself.  As an example, Marlea Ramsey was a third party to this that was presenting this to an IRS agent, showing that there was -- but not showing that there was any response from them.  That was her as a third-party intervener -- strike that.  Withdraw that question.

Does it appear to be that the '05, '06, '07 and '08 1099-OIDs -- by the way, you did not mention that in your research is there something called a 1099-A that goes along with the 1099-OID?

A.   There is a Form 1099-A.

Q.   What does the "A" stand for?

A.   Aquisition.

Q.   Or?

A.   Abandonment of property.

Q.   Thank you.  Okay.

So which one is it?  Is it abandonment or acquisition?

A.   That would be -- the person filing that document would be needing to know that.

Q.   So what is being abandoned in this case?

A.   I don't remember any 1099-A's that we spoke to.

Q.   So the essential document is the 1099-A that was submitted with a 1099-OID, you didn't see, you can't remember?

A.   That's correct.

Q.   Oh.

     What's abandoned in the 1099-A as far as the banks are concerned?

A.   That, I don't know.

Q.   Wow.  Okay.

     All right.  Just a few more questions here.

     I'm not sure how to put this in a question other than -- what would your opinion, in your expert opinion, if you received a -- if you received a letter from the Internal Revenue Service that said, We're processing your refund, but we would like -- you did not do the mathematics correctly, and we would like to give you $500 more as part of your refund.  What would your response be?

A.   That you should read the entire notice.

Q.   Okay.

     But the notice said -- if the notice was to say, You did the math wrong, we'd like to give you another $500, and we'll give it to you if you don't respond, what would your response be?  Would you acquiesce to that, say that's fine?

A.   The notice also states if you owe no other liability.

Q.   Okay.  All right.

     Now, if the Internal Revenue Service says you --

again, says, We'd like to give you $500 more, you say fine, and
then they give you a refund, doesn't that show that the
Internal Revenue Service has actually audited the refund
somehow, or does something with it to say you've done the math
at least, to be able to put this together that would give you
the impression that your 1099, whatever the IRS refund, would
be legitimate?

A.    That, all I can tell you is that refunds sometimes go out
erroneously.  That does not tell me -- I don't know what any
taxpayer thinks when they get their refund.

Q.    Is the erroneous refund the fault of the taxpayer?

A.    For filing a claim to the IRS?

Q.    No, that isn't my question.

        Is an erroneous refund, a result of a computer error,
the fault of the taxpayer?

A.    When we receive a tax return --

Q.    You're not answering my question.

        Is it the fault of the taxpayer, an erroneous refund?

A.    Let me finish my answer, please.

        When we receive a tax return, we trust that the
filing is true and correct, and we process those tax returns
based on the filing of the tax return.

Q.    And if they say, We'd like to give you more money, doesn't
that point that they've audited it somehow, or at least done
the math?

A.   There's not an audit.  They have been reviewed based on the face of the document that's filed, the information that is at hand.

Q.   Is there anyone at the IRS in these documents that you've gone through that has a claim against myself?

A.   That, I wouldn't know.

Q.   Okay.  And let me see if I can wrap this up here.

         So last but not least here, the -- did you notice that the '05, '06, '07, '08, that all those returns were done in a very brief period of time, that they were all done within a few days of each other in March of 2009?

A.   Yes.

Q.   Did you notice that on the dates?

A.   We noticed the received -- I noticed the received dates.

Q.   So they were all basically processed pretty much at the same time?

A.   Not necessarily, no.  They were received the same time.

Q.   Okay.

         Would these -- would documents which you're all processing at the same time, do they go out to different -- even though they're submitted to one IRS office, say, in Fresno, aren't they then transported to other IRS offices like Austin and Philadelphia for them to be double-checked somehow?

A.   Not necessarily, no.

Q.   But it's -- you say "Not necessarily," and I'm asking you

does it happen?

A.   If Fresno receives a document that they're suspecting is frivolous, it goes to Ogden.  But based on the fact that it's frivolous, the Ogden frivolous filer department --

Q.   If they're saying it's good, and they want it double-checked, would it -- or can it go to Austin and Philadelphia?

A.   No.

Q.   Okay.  All right.

        If three offices then say to a taxpayer that We owe you "X" amount of money, and they send that to the taxpayer, and then at the same day they a get a frivolous notice from Mean Mo Green, or Maureen Green, who you say you know or don't know as a real person --

A.   I do.

Q.   Is she a real person?

A.   Yes, she is.

Q.   Is that her real name?

A.   It is.

Q.   Okay.

        Maureen Green in Ogden, Utah, then says, All of this is frivolous, ha, ha, ha.

        Is that something else that the IRS does, actually hands out what they say are refunds, and then turn around and say, No, it's frivolous.

A.    And that notice you're referring to is a computer-generated notice.  The frivolous-return notice is generated by a person looking at the tax return.

Q.    Again, is an erroneous refund the actual fault of the person getting the refund?

A.    Those notices can go out at different times from different areas.

Q.    Okay.  You just said they go out different times for different areas.  I just mentioned three different areas of Fresno, Austin and Philadelphia.  Which is it?  If you get notices from all three of those, do they go out to different places before they actually notify the taxpayer?

A.    Would have to look at your notices you're referring to, because different areas handle different parts of the tax return.

Q.    Thank you.  Okay.

        So they do go out to different offices and letters of response then do go to the taxpayer?

A.    Depends on where you, the taxpayer, mails your tax return.

Q.    Okay.  Fresno, and they hand it to Ogden and Philadelphia, and then we get notices back from them.  Does that happen?

A.    I see no direction that they ever sent anything to Philadelphia, just to Ogden.

Q.    Okay.  But you have no first-hand knowledge, actually, of what happened with -- you have no first-hand experience with

what happened with tax returns that I filed, only that they

actually happen all in the same -- they happen within a couple

of weeks of each other.  In other words, they were all done at

once and submitted, correct?

A.   Date stamps show where the tax returns went.  If they're

received in Fresno, and they sent to Ogden, there's a date

stamp that shows it was received in Ogden.

Q.   Okay.

          In the letter rogatory that went with the coupon that

said "Void" across the face of it, and the coupon was simply to

set-off, settle and discharge of public exactions, did you

notice that in the body of the letter rogatory, which you

probably did not read, that it was requesting that this coupon

go to the data integrity board, and it was requesting to simply

set-off, settlement, discharge a public exaction -- did you

notice that -- did you actually read the body of the letter

rogatory that went along with the coupon?  Did you read any of

it?

A.   The custodian of the record, I take the document in its

entirety, copy that, produce an entirely true copy of what was

filed.

Q.   But you didn't read it?

A.   My responsibility is not to read the document.

Q.   Well, actually, the prosecution of the case was asking you

as a witness to read the documents or have familiarity with the

documents before you came in here, didn't it?

A.   I was asked to read parts of documents to get them into the record.

Q.   And you are paid to be here by the United States of America, our mythical plaintiff, yes?

A.   Yes.

Q.   Okay.

        Anything else?  All right.

        Thank you, ma'am.

        THE COURT:  Okay.  Thank you, ma'am.

        You may step down.  Thank you for being here.

        Call the next witness.

        MS. MAKAREWICZ:  Your Honor, the government calls Elvin Jusino to the stand, please.

        DEFENDANT SEAN DAVID MORTON:  Again, Your Honor, I take objection to the -- the witness.  Take exception to it that has no firsthand knowledge of the case, and no firsthand knowledge of the actual files.

        THE CLERK:  Please step forward and stand behind the court reporter.

        Please raise your right hand.

        (Witness sworn.)

        THE WITNESS:  I do.

        THE CLERK:  Please be seated.

        State your full name and spell it for the record.

THE WITNESS:  Elvin Jusino, E-l-v-i-n, J-u-s-i-n-o.

**ELVIN JUSINO; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:**

**DIRECT EXAMINATION**

BY MS. MAKAREWICZ:

Q.   Mr. Jusino, I see that you have exhibit books in front of you.  You may fold those up and put them to your left on the shelf; we won't be needing them.

Mr. Jusino, where do you work?

A.   I work for JPMorgan Chase based out of New York City.

Q.   And what is your job title?

A.   I am a vice president and tax manager for JPMorgan Chase.

Q.   How long have you been in that occupation?

A.   I've been in that role for 16 years.

Q.   What are your job duties?

A.   I'm responsible for making certain that tax reporting is done for the firm as a whole, for filing information to the Internal Revenue Service, and also sending out statements to customers.

Q.   Are you familiar with Chase's product that offers -- excuse me.

Are you familiar with Chase's recordkeeping documents?

A.   Yes, I am.

Q.   Does it have a name?

A.   We use an application called "Taxport."

Q.   Are you familiar with that system?

A.   Yes, I am.

Q.   How familiar?

A.   I initiated the system about 13 years ago.

Q.   In connection with this case, were you asked to search that database or application with respect to the defendants for 2005 through 2008?

A.   Yes, I was.

Q.   And did you perform that search?

A.   Yes, I did.

Q.   Can you explain how.

A.   I took the information provided, looking at the individual's Social Security number and account numbers, and searched through each of the relevant tax years.

Q.   Have you examined Chase's records with respect to the defendants and the alleged issuance of OID income for 2005 through 2008?

        DEFENDANT SEAN DAVID MORTON:  Again, objection.  Take exception.  It's hearsay.

        THE COURT:  Overruled.

        DEFENDANT SEAN DAVID MORTON:  No original documents.

        THE COURT:  The testimony isn't complete, but at this time the objection is overruled.

        DEFENDANT SEAN DAVID MORTON:  Sorry.

///

BY MR. HUGHES:

Q.   Did you perform that search, sir?

A.   Yes, I did.

Q.   I'd like to turn to Exhibit 4, page four, please.  It would be on the screen in front of you.

     Prior to today, have you seen this document?

A.   Yes, I have.

Q.   What does it purport to be?

A.   It looks to be a tax statement, a generic one issued from the IRS.

Q.   I'd like to draw your attention to that one.  Can you explain --

     THE COURT:  It's been identified by an exhibit number?

     MS. MAKAREWICZ:  Yes, Your Honor, Exhibit 4, page four.

Q.   Can you explain what is normally reported in Exhibit 4-4, box one?

A.   That's generally the amount of income that is earned by a customer.

     DEFENDANT SEAN DAVID MORTON:  Objection.  The word "normally" is leading, and again has nothing to do with this case, Judge.

     THE COURT:  Overruled.

///

BY MS. MAKAREWICZ:

Q.   In 2006, based on your search of Chase's records, did Sean David Morton earn OID in the amount as stated in box one?

A.   No, he did not.

Q.   Can you turn your attention to box four.

     What is normally reported in this box?

A.   That's backup withholding, or federal income tax withheld.

Q.   Based on your search of Chase's records, did Chase withhold any federal taxes in the amount as stated in box four of this exhibit?

A.   No, we did not.

Q.   If you turn to page six, please.

     Prior to today, have you seen this document?

A.   Yes, I have.

Q.   And based on your records -- based on your search of Chase's records, did -- was there any record that Mr. Morton earned OID income as stated in box one?

A.   No, there wasn't.

Q.   How about withholding?

     DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor, these aren't signed documents, these are not originals. Anybody could have tricked this up with Photoshop.

     THE COURT:  Overruled.

     Let me ask you this:  This form we're looking at, is this the kind of form that Chase uses generally?

THE WITNESS:  No, it is not.

THE COURT:  I see.

DEFENDANT SEAN DAVID MORTON:  Thank you.

THE COURT:  You didn't ask that question.

In other words, when Chase creates -- this is a 1099-OID, is it in this format?

THE WITNESS:  It does not look like this, Your Honor.

THE COURT:  How, if at all, does it differ from the format Chase uses?

THE WITNESS:  It's a completely different format and style that we use to issue 1099s to customers.

THE COURT:  Okay.

BY MS. MAKAREWICZ:

Q.   Based on your research, sir, did Chase Bank withhold the amount as stated in box four for Sean David Morton in 2006?

A.   No, we did not.

Q.   Exhibit 12, page seven in evidence.

Mr. Jusino, as best as you can, based on your records, did Chase Bank or did Mr. Morton earn OID income in the amount as stated on box one for 2006?

THE COURT:  Can you turn that around a little bit.

MS. MAKAREWICZ:  Unfortunately.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. It's speculation of the witness is what she's asking for.

THE COURT:  Overruled.

BY MS. MAKAREWICZ:

Q.   Based on your records, Mr. Jusino, did Mr. Morton earn original issue discount in the amount as stated in box one in 2006?

A.   No, he did not.

Q.   How about the withholding?  Did Chase Bank withhold federal income tax in the amount of $9,176 for 2006 from Mr. Morton?

A.   No, we did not.

        THE COURT:  Your answers are based on what research or information?

        THE WITNESS:  We researched our system of records for our clients which we use for reporting for the Internal Revenue Service.

        THE COURT:  Did you do that?

        THE WITNESS:  Yes, I did.

        THE COURT:  In this case?

        THE WITNESS:  Yes, I did.

        THE COURT:  I see.

        DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor, he continues to use the word "we."  So he is intimating that he has no personal firsthand knowledge.

        THE COURT:  Is there an objection?

        DEFENDANT SEAN DAVID MORTON:  There's an objection, yes.  I object to the fact that it's not him that did this,

which is also hearsay.  He's using the word "we."  So is it the

royal "we"?  Is it a gang of people?  Who is it that actually

did this?  Is it -- my question is that this -- the witness is

engaging in hearsay using the "we" or the royal "we," when it

was not an action that was performed by himself.

          THE COURT:  The objection is overruled.

          DEFENDANT SEAN DAVID MORTON:  Of course.

BY MS. MAKAREWICZ:

Q.   Can we turn to page eight.

          Based on your search, Mr. Jusino, of Chase's records,

did Mr. Morton earn original issue discount income in the

amount as stated in box one?

A.   No, he did not.

Q.   Did Chase withhold the amount as stated in box four on

behalf of Mr. Morton in 2006?

A.   No, we did not.

Q.   Exhibit 18-4, in evidence.

          Mr. Jusino, prior to today, have you examined this

document?

A.   Yes, I have.

Q.   And I'd like to represent -- can we go back to 18-2,

please.

          With respect to 2006, can we go back to the

Schedule B.

          With respect to Chase Bank for 2006, did Mr. Morton

earn OID --

THE COURT:  Now you're arguing.  You're -- and would you please stop your laughing, Mr. Morton.  It's just not appropriate.

DEFENDANT SEAN DAVID MORTON:  Sorry, Judge.

THE COURT:  Yes.

MS. MAKAREWICZ:  I'll rephrase, Your Honor.

THE COURT:  You don't have to rephrase it.  This is not a document he has any contact with.  Isn't this one of the tax forms?

MS. MAKAREWICZ:  Yes, Your Honor.

THE COURT:  So you're trying to correlate what he said about the 1099 to this document, correct?  Isn't that what you're doing?

MS. MAKAREWICZ:  Yes.

THE COURT:  It's argument.  Save it.

DEFENDANT SEAN DAVID MORTON:  Thank you, Judge.

BY MS. MAKAREWICZ:

Q.   Mr. Jusino, did Chase Bank have any withholding from Mr. Morton for 2006?

A.   No, we did not.

Q.   Does Chase Bank have any record of Mr. Morton earning OID income in 2006?

A.   No, we do not.

Q.   How about 2007?

A.    No, we do not.

Q.    Same for withholding?

A.    That is correct.

Q.    What about 2005?

A.    No, we do not.

Q.    Any withholding?

A.    No withholding.

Q.    2008?

A.    We did not.

          THE COURT:  How did you -- did you use that system
that you say you created in --

          THE WITNESS:  Yes, Your Honor.

          THE COURT:  What was the name of that system?

          THE WITNESS:  TaxPort.

          THE COURT:  So can you tell us how you accessed that
to come to give your answers as you just did?

          THE WITNESS:  I would put in the information, the Tax
Identification Number, and the form itself, the application
itself with the -- breaks it down by form type.  And so I would
look at OIDs in the OID database, and put in his Social
Security number, as well as his account number to research that
information, and I came up with no matches.

BY MS. MAKAREWICZ:

Q.    Can we turn to Exhibit 5, page eight, please.

          Based on your examination of Chase's records, did

Mr. Morton earn original issue discount as stated in box one for 2007?

A.   No, he did not.

Q.   Did Chase withhold the amount as stated in box four?

A.   No, we did not.

Q.   Exhibit nine, page 19, please.

     Based on your examination, did Mr. Morton earn OID income in the amount as stated in box one?

A.   No, he did not.

Q.   Did Chase withhold in the amount as stated in box four?

A.   No, he did not.

Q.   Exhibit 14, page 11.

     Based on your search, did Mr. Morton earn OID income as stated in box one in 2007?

A.   No, he did not.

Q.   Did Chase withhold the amount as stated in box four?

A.   No, we did not.

Q.   Page 12 of this exhibit.

     Mr. Jusino, based on your records, did Mr. Morton earn OID in the amount as stated in box one?

A.   No, he did not.

Q.   Did Chase withhold as stated in box four?

A.   No, we did not.

Q.   Exhibit 10, page four, please.

     Oh.   Pardon me.   Exhibit 6, page four.

Did you search your records with respect to defendant Melissa Morton?

A.    Yes, I did.

Q.    Can you explain the relationship between Providian Bank and Chase Bank.

A.    Providian Bank, as far as I understand it, was taken over as part of the Washington Mutual Savings merger, which then became part of JPMorgan Chase.

Q.    When you searched your company's books and records for Melissa Morton, did you search under her Social Security number?

A.    Yes, I did.

Q.    Did you search under the accounts listed?

A.    Yes, I did.

Q.    And did you come back with any results?

A.    I did not find anything under any OID category.

MR. BRODY:  Objection, foundation, Your Honor.

THE COURT:  Overruled.

BY MS. MAKAREWICZ:

Q.    Based on your search of Chase's records, did you find any records with respect to the payment of OID income to Melissa Morton in the amount as stated in box one?

A.    No, I did not.

Q.    How about withholding?

A.    I did not find that as well.

          MR. BRODY:  Same objection --

          THE COURT:  Overruled.

BY MS. MAKAREWICZ:

Q.   Exhibit 13, page seven, please.

          Based -- have you seen this document before?

A.   Yes, I have.

Q.   Based on your search of the records, did you find anything
with respect to issuance of Melissa -- to Melissa Morton any
OID income as stated in box one?

A.   I did not find anything.

Q.   How about the withholding in box four?

A.   I did not find anything for that either.

          MR. BRODY:  Same objection as to foundation, Your
Honor.

          THE COURT:  Overruled.

          MR. BRODY:  Could I make a standing objection as to
the results of his search?

          THE COURT:  May be better -- standing objections
sometimes are confusing.  I don't mind if you make objection.

          MR. BRODY:  Thank you, Your Honor.

BY MS. MAKAREWICZ:

Q.   Exhibit 17, page five, please.

          Have you seen this document before, sir?

A.   Are you referring to the OID document?

Q.   Yes, sir.

A.   Yes, I have.

Q.   According to your bank's records, did you find any record of Providian or Washington Mutual issuing this 1099?

A.   I did not.

Q.   Any record of your bank regarding any earning OID interest for Melissa Morton in 2007?

A.   There was no record for her.

          MR. BRODY:  Objection as to those answers, Your Honor.  Foundation.

          THE COURT:  Well, you know, this form -- what exhibit number is this?

          MS. MAKAREWICZ:  17-5.

          THE COURT:  This has the payor's name.  This is -- this doesn't have the Chase name on it, does it?

          What -- why -- are you familiar with this document?

          Do you know who Providian National Bank is?

          THE WITNESS:  Providian National Bank is, based on my research, was taken over by Washington Mutual Bank, and Washington Mutual Bank was then taken over by JPMorgan Chase.

          THE COURT:  So I'm not -- do you have an objection?

          MR. BRODY:  I'm objecting as to foundation for that answer, Your Honor, and also foundation for --

          THE COURT:  But I thought this witness was called to testify -- of course, it's for the jury to accept or reject ultimately -- but the purpose of his being called was to say

that he made a search of the Chase records.

How does this Providian National Bank relate to Chase records?

THE WITNESS:  The records ultimately ended up in Chase's records based on the successive mergers of the banking --

THE COURT:  I see.  So Providian merged into Chase?

THE WITNESS:  In between Washington Mutual merged with Providian, and ultimately --

THE COURT:  Were you a vice president when that happened?

THE WITNESS:  Yes, I was.

THE COURT:  What year was that?

THE WITNESS:  2008.

THE COURT:  2008.

THE WITNESS:  Yes, sir.

THE COURT:  The date of -- this document had a date?

DEFENDANT SEAN DAVID MORTON:  2007.

THE COURT:  2007.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. He wasn't even there when the -- the document is dated.

THE COURT:  Just one moment.

So was this Providian record that came into Chase's custody after the merger?

THE WITNESS:  Yes, sir.

THE COURT:  So this document was created by Providian then.

THE WITNESS:  That is correct, Your Honor.

MS. MAKAREWICZ:  No.

THE COURT:  I'm asking him.  The lawyers are not witnesses.

So who created this document?

THE WITNESS:  So the record would have been part of Providian.

THE COURT:  Providian.

THE WITNESS:  Yes, Your Honor.

THE COURT:  It was in your files at the time you were asked to make the search?

THE WITNESS:  I was not able to locate this particular record in our files.

THE COURT:  So what, then, what do you know about this record?  How can you authenticate this record?

THE WITNESS:  I can't authenticate it from the respect of Providian National.  I can only authenticate the records for the clients that came over to JPMorgan Chase.

THE COURT:  "The clients" meaning whom?

THE WITNESS:  The account records themselves.  So their Providian account records would have come over into JPMorgan Chase through mergers.

THE COURT:  But those account records were created by

Providian.

THE WITNESS:  That is correct, Your Honor.

THE COURT:  Okay.  I'll sustain the objection at this point.

DEFENDANT SEAN DAVID MORTON:  Objection again, Your Honor, this --

THE COURT:  I sustained the objection.

DEFENDANT SEAN DAVID MORTON:  I'm sorry.  Well, I had a different one, but...

THE COURT:  Okay.

BY MS. MAKAREWICZ:

Q.   According to your search, was Melissa Morton issued any OID income for 2007?

A.   I have no record of that in my search.

Q.   How about --

THE COURT:  2007 from Chase?

MS. MAKAREWICZ:  From Providian.

THE COURT:  Well, is there an objection?

MR. BRODY:  Objection, Your Honor, foundation.

THE COURT:  Sustained.

MS. MAKAREWICZ:  I have nothing further, Your Honor.

MR. BRODY:  I apologize, Your Honor.  I believe that this record was previously moved into evidence; however, I'm going to move to strike any portion of this record referring to -- any portion of this exhibit referring to Providian.

THE COURT:  I'll grant that motion.

MS. MAKAREWICZ:  Your Honor, may I respond, please?

THE COURT:  Not at this time.  We'll do that at a recess.  If there's more to be heard about this, I'll hear it then.  Okay.

Did you have some questions, Mr. Morton?

DEFENDANT SEAN DAVID MORTON:  Well, Steven?

MR. BRODY:  Do you have any questions?

DEFENDANT SEAN DAVID MORTON:  I have a few.

THE COURT:  Do you want to ask them first?

DEFENDANT SEAN DAVID MORTON:  Yes, please.  Thank you, Judge.

**CROSS-EXAMINATION**

BY DEFENDANT SEAN DAVID MORTON:

Q.   Were you part of all these banks when everything collapsed in 2008, sir?

A.   I was part of JPMorgan Chase.

Q.   Oh.  Okay.

This might be a really fundamental question here, but I think the jury would really like to know, when a bank has assets, so if I put my money in a bank, sir, if I put $10,000 in the bank, how many of those $10,000 -- if I put $1 in the bank, how much of that money under the fractional reserve banking that we so love, how much of that money actually stays in the bank?  Out of that $1, how much does the bank have to

hold on to?  Out of a hundred cents, how much is actually in the bank if you claim that you are -- if you have $1 million in assets, how much actual assets do you have in the bank?

A.   That's not something that I would -- I don't work in that role, sir.

Q.   You're a banker.  You have no fundamental understanding of how your business works?

A.   I work as a tax manager, that is my role.

Q.   Do you not understand fractional interest banking?

A.   That's not my role, sir.

Q.   So your role, what is called by the prosecution, is to look stuff up on the Internet, or look stuff up in your banking records to which you have no firsthand knowledge?

A.   I look up information based on tax reporting that goes to the Internal Revenue Service, sir.

Q.   Okay.  But you're making determinations on the 1099 acquisitions and abandonment.  Do you have any idea how those work?

A.   Sir, my role is really to --

Q.   So you don't.  Answer the question, you don't.

A.   I get information from our business partners that provide the records to me.

Q.   I asked you a direct question as to whether or not you knew how it worked.  You don't.

A.   No, that's not my role, sir.

Q.   Okay.  Well, okay.

          So you don't know how the banking system actually

works, question?  And you're here reporting on whether or not

the IRS is taking money out for abandonment acquisitions which

is based on -- by the way, is it or is it not based on you put

money in the bank, and does the bank then loan out that money

to people?  Is that not part of the fractional interest banking

system?  Is that not technically considered money the bank

makes when you put $100 in the bank?  That's what I'm asking.

          MS. MAKAREWICZ:  Objection, Your Honor.

          THE COURT:  Give me a legal grounds for the

objection.

          MS. MAKAREWICZ:  It's calling for a hypothetical.

It's also asking for an opinion that he's already said he

doesn't know about.

          THE COURT:  Sustained.

BY DEFENDANT SEAN DAVID MORTON:

Q.   Ask you again, fractional interest banking system --

          THE COURT:  Sustained.

BY DEFENDANT SEAN DAVID MORTON:

Q.   Fractional banking system, you're telling me you don't

know how it works because that -- does it or does it not relate

to the 1099?

          MS. MAKAREWICZ:  Objection, Your Honor.  Asked and

answered.

THE COURT:  Sustained.

DEFENDANT SEAN DAVID MORTON:  This is key to our case, Your Honor.

THE COURT:  Just ask questions, sir.

DEFENDANT SEAN DAVID MORTON:  Okay.

Q.   Wow.  All right.

So, okay.  You've already said -- thank you.  You've answered my question about you don't know how the system works, you're look up other records as far as this, and you have no firsthand knowledge of any of this.

By the way, I just have to ask, are you getting paid by the United States of America or a mythical plaintiff to be here today?

A.   No, I am not.

Q.   You're not being paid by the United States of America, our plaintiff?

A.   No, sir.

Q.   Okay.  Do you have a claim against me?

A.   No, I do not, sir.

Q.   So you have no claim.

DEFENDANT SEAN DAVID MORTON:  Okay.  All right. That's just what I wanted to point out to the jury.

Thank you, Judge.

THE COURT:  Any questions?

MR. BRODY:  No questions, Your Honor.

THE COURT:  Thank you, sir, for being here.

THE WITNESS:  Thank you.

THE COURT:  If you would be good enough to wait until five o'clock in the waiting room.  Thank you.

Next witness.

MR. HUGHES:  Your Honor, at this time the government would like to call Jeffrey Jackson.

THE CLERK:  Please step forward and stand behind the court reporter.

Please raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE CLERK:  Please state your full name and spell it for the record.

THE WITNESS:  Jeffrey Jackson.  Jeffrey, J-e-f-f-r-e-y, Jackson, J-a-c-k-s-o-n.

**JEFFREY JACKSON; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:**

**DIRECT EXAMINATION**

BY MR. HUGHES:

Q.   Good afternoon, Mr. Jackson.

Where do you work?

A.   Bank of America.

Q.   And what is your job title?

A.   Operation analyst.

Q.   How long have you held that position?

A.   Ten years.

Q.   And what are your job duties as an operations analyst?

A.   I act as custodian of records on behalf of the bank.

Q.   And pursuant to your position, are you familiar with the recordkeeping system of Bank of America?

A.   Yes.

Q.   And does Bank of America keep a database of any information returns such as Form 1099s that are issued to its individual clients?

A.   Yes.

Q.   Prior to coming here today, did you initiate a search of that database?

A.   Yes.

Q.   And was the search conducted for any records regarding 1099s issued to Sean David Morton or Melissa Morton?

A.   Yes.

Q.   And for -- did this include the period of 2005 through 2008?

A.   Yes.

Q.   And what were the results of that search?

A.   No records were found.

        MR. BRODY:  Objection, foundation, Your Honor.

        THE COURT:  Well, maybe lay more of a foundation, if you wish, regarding just exactly what he did, so that you can better determine the objection --

BY MR. HUGHES:

Q.   What did that search involve of the database?

A.   Inputting the customer's name and Social Security number into our database for research.  And additionally, reaching out to our 1099 unit to do the search for any tax returns or issuance.

Q.   And this 1099 unit keeps records of any 1099s issued to individual customers?

A.   Correct.

Q.   And that includes for the period of 2005 through 2008?

A.   Correct.

        THE COURT:  You did that yourself?  You made the search yourself?

        THE WITNESS:  I performed the search on the name in the database for account information.  I had to reach out to our 1099 unit for specific of the 1099 as they have access to that particular database.

        THE COURT:  But the database that you researched just included the tax withholding?

        THE WITNESS:  No.  It included the account information of accounts held at the bank as a whole in their names.

        THE COURT:  I see.  Were there accounts at the bank?

        THE WITNESS:  Yes.

        THE COURT:  In both names?

THE WITNESS:  Yes.

THE COURT:  And what was your underlying question about their accounts?

MR. HUGHES:  Whether there was any record of any withholdings on the accounts or any 1099s issued from those accounts.

THE COURT:  There's two questions.  Let's do the first one initially.

Were there any -- the records you looked at would have contained information about withholding for depositor?

THE WITNESS:  In records or my research?

THE COURT:  Well, you said you looked at two sources: One, the computer records of the bank; and then you mentioned something about a 1099 unit, correct?

THE WITNESS:  Correct.

THE COURT:  I'm referring just to the computer research that you did.

THE WITNESS:  My personal research that I have access to was the customer account information.

THE COURT:  And what kind of information is contained in the customer account information?

THE WITNESS:  Social Security number; mailing address; name; type of accounts that a customer would hold.

THE COURT:  What --

THE WITNESS:  Accounts that the customer has at the

bank.

        THE COURT:  Yes.

        Any tax information?

        THE WITNESS:  Not on behalf of the application that I have access to, no.

        THE COURT:  So in order to determine whether the bank issued 1099s, you had to consult with another unit of your bank, correct?

        THE WITNESS:  That is correct.

        THE COURT:  And you instructed -- how did you go about that?  Did you give that unit some instruction?

        THE WITNESS:  Yes.

        THE COURT:  And what instruction did you give them?

        THE WITNESS:  I provided them the Social Security numbers that I had; I provided them the names and the accounts that the bank had with those customers to conduct the search.

        DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. He's stating he has no firsthand knowledge of the facts.

        THE COURT:  Let's complete the examination, then you can better make the objection.

        And so that unit then conducted the search, correct?

        THE WITNESS:  Correct.

        THE COURT:  And then that unit told you what the result was?

        THE WITNESS:  Correct.  They concluded that there

were no documentations.

THE COURT:  I see.

At this juncture, I don't know that there is a foundation, so...

MR. BRODY:  Then can I add, Your Honor, objection. Hearsay and confrontation, as well as foundation.

DEFENDANT SEAN DAVID MORTON:  And objection, failure to state a claim upon which relief can be granted, Judge.

MR. HUGHES:  One moment.

Q.   Prior to coming here today, were you asked to review and authenticate any bank statements?

A.   Yes.

Q.   Could you please turn to the binder in front of you and review Exhibits 31, 32 and 33.

A.   Are you asking about all three, each of these exhibits?

Q.   I'm asking do you -- prior to today, were you asked to review these exhibits?

A.   Yes.

Q.   And what are they?

A.   They are bank statements, copies of checks, and deposits.

Q.   Prior to you coming here today, can you confirm that these documents are true and correct records of Bank of America?

A.   Yes.

Q.   And are copies of these bank records kept in the ordinary course of the Bank of America practice?

A.    Yes.

Q.    Were these records made at or near the time of the
occurrence of the matter set forth in the records by a person
with knowledge of those matters?

A.    Yes.

Q.    And is it the regular practice of Bank of America to make
such a record of these transactions in the ordinary course of
its business?

A.    Yes.

          MR. HUGHES:  Your Honor, at this time, I would move
to admit Exhibits 31, 32 and 33.

          THE COURT:  What are they?

          MR. HUGHES:  These are bank statements, Your Honor.

          THE COURT:  Any objection?

          MR. BRODY:  I'll object to the foundation.  Also as
to speculation with respect to the answer to the question, were
these made at or near the time of the information that's
contained in them.

          THE COURT:  Is that answer based upon your experience
that these records are made at or about the time of the
transaction, sir?

          THE WITNESS:  Yes, Your Honor.

          THE COURT:  Okay.  Objection is overruled.

          (Government's Exhibits 31, 32 and 33 received in
evidence.)

MR. HUGHES:  Can you please turn to Exhibit 154.  It would be in another binder, probably the last one.

Q.   Prior to coming here today, were you asked to review this exhibit?

A.   Yes.

Q.   And what is it?

A.   Bank statements in the name of Sean Morton.

Q.   For what account?  You can just give the last four digits of the account.

A.   Account ending 0181.

Q.   Would this bank record eventually be kept in the ordinary course of Bank of America's practice?

A.   Yes.

Q.   Based on your experience, was this bank statement or the information contained therein generated near the time of the occurrence of the underlying transactions set forth in the bank by a person with knowledge of those matters?

A.   Yes.

Q.   Is it the regular practice of Bank of America to make such a record of these transactions in the ordinary course of its business?

A.   Yes.

MR. HUGHES:  Your Honor, at this time I would like to move to admit Exhibit 154.

THE COURT:  Received.

                (Government's Exhibit 154 received in evidence.)

            MR. HUGHES:  And let's go ahead and publish

Exhibit 31, page two, please.

Q.   Mr. Jackson, what is this document on the screen?

A.   This is a signature card.

Q.   For what account number?

A.   Account ending in 0181.

Q.   Now, when an individual opens a bank account with Bank of

America, are they required to provide a taxpayer identification

number?

A.   Yes.

Q.   Or some type of identification number?

A.   Yes.

Q.   Please circle on the screen where the identification

number is listed.

A.   You moved the page.

            DEFENDANT SEAN DAVID MORTON:  Again, objection, Your

Honor.  Is the prosecution going to introduce a handwriting

expert to testify --

            THE COURT:  Did you make an objection?

            DEFENDANT SEAN DAVID MORTON:  Yes, I made an

objection.

            THE COURT:  Overruled.

            DEFENDANT SEAN DAVID MORTON:  You didn't hear the

objection.  Okay.

    MR. HUGHES:  Let's go to page ten, please.

    THE COURT:  Would you speak up?

    MR. HUGHES:  I'm sorry, Your Honor.

    THE COURT:  I can barely hear you.

    MR. HUGHES:  I'm sorry.

Q. What is this document?

A. It is a copy of a check.

Q. Deposited into what account?

A. Ending in 0181.

    MR. HUGHES:  Let's put up Exhibit 32, page one,
please.

Q. If you could please turn to Exhibit 32 on the screen.

    Prior to coming here today, did you run a search of
your own database that you have access to for any customer
profile information related to this account ending 2304?

A. Yes.

Q. And what were the results of that search?

A. It indicated that this was a co-ownership account.

Q. Owned by who?

A. Pardon me?

Q. Owned by who?

A. Sean Morton and Melissa Thompson.

Q. And let's turn to page three.

    What type of -- what information is shown on this
line -- first line entry dated 5/8?

A.   Incoming wire transfer.

Q.   Does it provide any information as to the account from which this wire transfer was received?

A.   I can't determine the specific account number or where it came from, only the recipient.

Q.   So what information is connotated by this section right here?

          DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. He already said he didn't know.

          THE COURT:  He can answer this question if he knows.

          THE WITNESS:  I'm sorry.  I'll ask you to repeat the question.

          MR. HUGHES:  Certainly.

Q.   I will underline a section in a moment.  I just wanted to know what information, based on your experience, is connotated by that underlined passage.

A.   The originator, meaning the party who requested the wire.

Q.   And what information is shown by the section marked I.D.?

A.   That, I do not know.

          MR. HUGHES:  Please take that down.

Q.   And what information is being shown in this entry right here and this one right here?

          THE COURT:  "Right here" is not going to reflect itself on the record.

///

BY MR. HUGHES:

Q.   Under the entry marked "check No. 164" and "check No. 165."

A.   I'm sorry.  Was there a question?

Q.   Yes.  What information is reflected in those two line items?

A.   The check posted to the account?

Q.   In what amount?

A.   $9,800.

Q.   And the entry marked "check No. 165"?

A.   The same.

Q.   Let's turn to page four of the exhibit.

     Are these the two checks that are referred to in those line items?

A.   Correct.

Q.   Now, when a customer of the bank withdraws more than $10,000 in cash, does the bank fill out any special reports?

A.   Yes.  Generally that is a currency transaction report.

     MR. BRODY:  Objection, relevance.

     THE COURT:  Sustained.

     MR. HUGHES:  Let's publish Exhibit 33.

Q.   What is this document?

A.   A signature card.

Q.   For what account?

A.   Ending in 1158.

Q.    And does this signature card have a taxpayer

identification number listed?

A.    Yes.

Q.    Would you please circle it.

A.    (Witness complies.)

Q.    And in whose name was this account opened?

A.    Melissa A. Thompson.

          MR. HUGHES:  No further questions at this time, Your

Honor.

          THE COURT:  Mr. Brody, do you have any questions?

          MR. BRODY:  No questions for this witness.  Thank

you, Your Honor.

          THE COURT:  Mr. Morton, any questions?

          DEFENDANT SEAN DAVID MORTON:  No questions.

          THE COURT:  Thank you.

          Thank you, sir.  Thank you for being here.  You may

step down.

          Call the next witness.

          MS. MAKAREWICZ:  Your Honor, the government calls

Mark Everson to the stand, please.

          (Witness sworn.)

          THE WITNESS:  I do.

          THE CLERK:  Please be seated.

          Please state your full name and spell it for the

record.

            THE WITNESS:  It's Mark Douglas Everson, M-a-r-k,

D-o-u-g-l-a-s, E-v-e-r-s-o-n.

**MARK EVERSON; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:**

**DIRECT EXAMINATION**

BY MS. MAKAREWICZ:

Q.    Good afternoon.

A.    Hello.

Q.    Where are you employed?

A.    Internal Revenue Service.

Q.    How long have you been employed with the IRS?

A.    Nineteen years.

Q.    What kind of jobs did you have with the IRS?

A.    I was customer service representative in the tax law

section, and now I'm an information technology specialist.

Q.    In your position as an information technology specialist,

what are your specific job responsibilities?

A.    My responsibility is to provide lead to my co-workers who

manage phone calls, emails, and also monitor the FIRE system.

Q.    What is the FIRE system?

A.    The FIRE system stands for Filing Information Returns

Electronically.  It receives information returns from all over

the world.

Q.    What is an information return?

A.    Information return is a tax document that certain types of

payments by financial institutions have to be reported or other

businesses have a need to report information on the information return.

Q.   Is a W-2 a type of information return?

A.   It is a type of information return.

Q.   Is a Form 1099-OID an information return?

A.   Yes, ma'am, it is.

Q.   Can you explain to the members of the jury what a form 1099-OID is.

A.   Yes.  A 1099-OID is a type of interest that is used on a debt instrument and reports that value at redemption value.  It is referred to as a type of interest.

Q.   What does an individual need to do with the IRS --

        THE COURT:  The jury might want to better understand that.  Can you explain that?

        THE WITNESS:  Sure.

        THE COURT:  In other words, if you can by way of an example.  In other words, how is that kind of interest income generated?

        THE WITNESS:  Sure.

        The one that comes to mind right now is like for cities who have municipal bonds, they may be having a building built or some kind of a public, so they would sell a debt instrument that a person --

        THE COURT:  A debt, a bond?  Municipal bond?

        THE WITNESS:  Yeah, municipal bond.

They would buy that debt instrument at a certain discount value, and then at redemption value that would be more than what they bought it at. But there is a form of interest that has to be reported on a yearly basis.

THE COURT: So I'm asking the question because I don't pretend to know, but if someone bought a municipal bond, let's say, for a thousand dollars face value, and they bought it at a discount at 90 cents on the dollar, so they paid $900 for a bond that had a face value of a thousand dollars.

THE WITNESS: That's correct.

THE COURT: Would the difference between what the purchaser bought the bond for and the face value of the bonds be income?

THE WITNESS: That would be income, that's correct.

THE COURT: That is income in the year that you buy it?

THE WITNESS: It's spread sometime after 15, 20, 25 years, depends on the debt instrument.

THE COURT: It depends upon the length of the debt instrument?

THE WITNESS: That's correct.

THE COURT: So if it were a ten-year instrument, would -- in my example, would that $100 be spread over ten years?

THE WITNESS: That would be correct, and then the

interest of that over the years, that's correct.

THE COURT:  So it would be pro rata to the duration of the bond?

THE WITNESS:  For the duration of the bond, yes.

THE COURT:  Bond had one year, the taxable on that one year?

THE WITNESS:  That's correct.

THE COURT:  Okay.

MS. MAKAREWICZ:  Thank you.

Q.   What does an individual need to do in order to be able to submit information through the IRS's FIRE system?

A.   The application is called the Form 4419.  It is an application that is submitted to us in order to be able to transmit data.

Q.   When somebody completes that form, what does the IRS do?

A.   We would assign them a transmitter control code.

Q.   What does the -- is there an acronym, I'm sure?

A.   There is.  TCC.

Q.   And what does the TCC allow them to do?

A.   The TCC will allow them to come on through our system into that TCC number and the tax I.D. number, and then upload files to us electronically.

Q.   Are there any special requirements to obtain a TCC?

A.   No, as long as the name and TIN matches on the form and they sign, it's assigned.

Q.   You said "TIN"?

A.   TIN.

Q.   What does that mean?

A.   Taxpayer identification number.

Q.   Thank you.

        Turning this case for tax years 2006, 2007, and 2008, were information returns filed in the defendants' names?

A.   Yes, they were.

Q.   How do you know this?

A.   I did a search.

        MR. BRODY:  Objection, Your Honor, vague as to "the defendants'."

        THE COURT:  Objection is sustained.

BY MS. MAKAREWICZ:

Q.   For tax years 2006, '7 and '8, were information returns filed in the defendant Sean David Morton's name?

A.   Yes, it was.

Q.   Were information returns filed in defendant Melissa Morton's name?

        MR. BRODY:  Objection, foundation, hearsay and confrontation, Your Honor.

        THE COURT:  You're testifying about your accessing the computer system you just described.

        THE WITNESS:  Yes, sir.

        THE COURT:  Is that -- did you do that yourself?

THE WITNESS:  Yes, sir.

THE COURT:  And how -- for how many years have you been working with this computer system?

THE WITNESS:  Eleven years.

THE COURT:  I see.  All right.

Objection is overruled.

BY MS. MAKAREWICZ:

Q.   There's binders in front of you, Mr. Everson.  Please take a look at Exhibit 22.  It's in volume I.

A.   Volume I?

Q.   Yes, sir.

A.   Yes, I see that.

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It is a spreadsheet of the files that were submitted on behalf of Sean Morton.

Q.   Did you prepare it?

A.   Yes, I did.

Q.   Is the spreadsheet also with respect to defendant Melissa Morton?

A.   Yes, it is.

Q.   Where did the information come from, from which was the basis of this chart?

A.   This data came from a transmitter who was submitting files

on their behalf.

Q.   Does this chart summarize voluminous records that you examined in the FIRE system?

A.   Yes, it does.

      MS. MAKAREWICZ:  At this time we'd like to move Exhibit 22 into evidence, Your Honor.

      MR. BRODY:  Objection, hearsay, confrontation and foundation, Your Honor.

      THE COURT:  Overruled on those grounds.

      MS. MAKAREWICZ:  May I publish, Your Honor?

      DEFENDANT SEAN DAVID MORTON:  Objection, failure to state a claim, Your Honor.

      THE COURT:  Overruled.

      MS. MAKAREWICZ:  May I publish, Your Honor, Exhibit 22?

      THE COURT:  Yes.

      (Government's Exhibit 22 received in evidence.)

BY MS. MAKAREWICZ:

Q.   Can you tell the jury what is on this chart and how it relates to the defendants.

A.   This chart reflects the file name that was transmitted from the FIRE system, the date it was received, the tax year that was in the file.  It provides the payer name and their TIN number.  It also provides the payee's name and TIN number.  B pay one reflects the amount of original issued discount, or

interest on that document, and box four refers to federal income tax withheld.

THE COURT:  Is this chart purporting to be a summary of some of the other exhibits that we've already seen?

MS. MAKAREWICZ:  No, Your Honor.

THE COURT:  This is different?

MS. MAKAREWICZ:  This is different.

THE COURT:  Okay.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. What is it?

THE COURT:  We're getting to that.

BY MS. MAKAREWICZ:

Q.  Can I draw your attention -- let's use the first line item to walk the court and the jury through what this chart means, Mr. Everson.

A.  First column is a control number.  That's the internal number; it's assigned by our system.  The next column is the filing year in which we received this file, which was in 2009. The next column is a file name original 39E63.0141.  That's the number of the file that was sent to us.  The received date was March 6, 2009.  Again, the tax year that was contained within the file was 2006.

The next column shows the Bank of America payer tax identification number, their EIN number, and then the next column shows the TIN number of the payee, in this case Sean

Morton.  And then box one reflects the $826,937.49, withholding
of $744,243.74.

THE COURT:  Isn't that information something that
we've already seen in a previous exhibit?

MS. MAKAREWICZ:  No, it isn't, Your Honor.

THE COURT:  It isn't?

MS. MAKAREWICZ:  No.

THE COURT:  Okay.  I misunderstood.

BY MS. MAKAREWICZ:

Q.  I'd like to direct your attention to the third column.
Can you identify for the court what TCC number was used to
transmit these information returns to the IRS?

A.  Yes.  The TCC number was 39E, as in "Edward," 63.

Q.  Does that TCC number belong to Bank of America?

A.  It does not.

Q.  Chase Bank?

A.  It does not.

Q.  Capital One?

A.  It does not.

Q.  American Express Centurion Services?

A.  It does not.

Q.  Providian National Bank?

A.  No.

Q.  Washington Mutual?

A.  No.

Q.    Who does that TCC number belong to?

A.    That TCC number belongs to a Garrett Adams.

Q.    Is he related to Brandon Adams?

A.    Yes, he is, to my knowledge.

          MR. BRODY:  Objection.

          THE COURT:  I mean, you asked him a question.  You
keep objecting foundation, and I don't want to --

          MR. BRODY:  I didn't want to interrupt the answer.

          THE COURT:  Okay.  I say you -- I just knew that you
wanted to object.  That's a good reason on your part.

          MR. BRODY:  Thank you.

          THE COURT:  Okay.  Go ahead.

BY MS. MAKAREWICZ:

Q.    Based on reviewing all the files in the FIRE system, was
there anything unusual about the amounts transmitted on those
files on these TCC numbers?

A.    Yes.  The amount of the interest in box one as related to
box four is very, very unusual.

Q.    How so?

A.    Typically backup withholding is 28 percent.  If someone
does not provide their tax identification number or name, then
28 percent can be withheld.  This is for more than 28 percent.

          MR. BRODY:  I would object as to relevance, Your
Honor, and foundation.

          THE COURT:  Well, I'll allow his answer to stand.

On what is your answer based?  What is the relationship between the amount withheld and the -- and what was the other item?

THE WITNESS:  Interest.

THE COURT:  Interest.

THE WITNESS:  In box one, that's correct.

THE COURT:  What do you base that answer?

THE WITNESS:  Again, it's based upon the instructions as far as backup withholding, and the allowed amount within the code is 20 percent.

THE COURT:  Okay.

BY MS. MAKAREWICZ:

Q.  Mr. Everson, did any of the banks listed in this column transmit the information returns on behalf of Sean Morton for 2006, '07 or '08 to the IRS?

A.  No.

Q.  Did any of the banks listed in that same column transmit the OID for the information return on behalf of defendant Melissa Morton?

A.  No.

MS. MAKAREWICZ:  No further questions, Your Honor.

THE COURT:  Cross-examination.  Do you have anything?

It's a little after 5:00.  I don't know.  I told you the trial would end every day at five o'clock.

It sounds like this witness is from out of the city.

MS. MAKAREWICZ:  He is, Your Honor.

THE COURT:  So I don't want to rush things, but if you have some examination that is going to take some time, we may have to put it over until tomorrow.  Otherwise, if we can wrap him up today, let's try.

MR. BRODY:  I think we can wrap it up very quickly, Your Honor.

THE COURT:  Okay.

## CROSS-EXAMINATION

BY MR. BRODY:

Q.   Okay.  Just to clarify, where it says file name "o-r-i-g" there, you said that that indicates that a particular person transmitted the return?

A.   That's correct.

Q.   But the ends of those numbers there are different:  41, 41, 42, and so on down the road.  Does that mean a different person transmitted those returns?

A.   No.  It's the same transmitter, just different files for that particular payee and search.

Q.   Okay.  Thank you.

And all the way down the list then, to the very last one, those documents were transmitted by Garrett Adams; is that correct?

A.   That is correct.

Q.   And you said he is related to Brandon Adams?

A.   That is correct.

Q.   How do you know that?

A.   Because some of the work that I've done, some of the inquiries we've made, I've learned that they were related.

Q.   And what sort of inquiries were you making?

A.   We get questions from various special agents throughout the country, and I've been aware and watching and monitoring the files transmitted by Garrett Adams and Brandon Adams.

Q.   Why were you watching them?

A.   Because of the amount of withholdings and the type of documents they're sending to us.

Q.   That struck you as suspicious?

A.   Yes.

Q.   It struck you as suspicious why?

A.   Because of the withholding, and typically Bank of America would send a file, let's say, 10-, 20-, 100,000 records.  These files have two or three records in them.

Q.   Now, you did some investigation into Brandon Adams; is that correct?

A.   I did on Garrett Adams for this case, sir.

Q.   On Garrett Adams.

        And approximately how many returns would you say he transmitted which were suspect in the sense that they had bizarre OID withholding numbers?

A.   All the 1099-OID files he transmitted were questionable.

Q.   About how many of those were there?

A.   I do not remember.  It was quite a few numbers, though.

Q.   But it was more than ten?

A.   Oh, yes, more than ten.

Q.   More than a hundred?

A.   Probably close to 200 files.  We know at least 538 for one year, because that was found in file 38 down there at the bottom.  So, you know, quite a few files.

Q.   538 different returns?

A.   Different files.

Q.   Different files?

A.   Right.

Q.   Meaning?

A.   One file could have one record; one file could have ten records.  So 538 different times he uploaded files, at least in the tax year 2009.

Q.   Just for tax year 2009?  For filing the 2009, excuse me.

A.   That's correct.

Q.   Filing.  Okay.

     Now, when you say "number of files," that could be a handful of files for one individual, or are we talking each file is an individual?

A.   Each file is an individual file.

Q.   So upwards of 500 separate individual tax returns for tax year 2009?

A.   They're not tax returns, they're information returns.

Q.   Pardon me.

     With respect to upwards of 500 individuals?

A.   Five hundred different files with different individuals, correct.

     MR. BRODY:  Thank, Mr. Everson.

### CROSS-EXAMINATION

BY DEFENDANT SEAN DAVID MORTON:

Q.   Quick question for you, sir, so we can get out of here since it's been a long day for everybody.

     Garrett Adams and Brandon Adams, were you familiar that they were running a really large organization called "Creditors in Commerce"?

A.   I was not.  I just knew they were transmitting to FIRE.

Q.   Okay.

     But for large group of people?

A.   I had no idea.

Q.   You just said that they were large group of accounts that going through it.

A.   Well, monitoring a large number of files coming through, that's right.

Q.   Which from different people?

A.   That's correct.

Q.   Okay.

     And how many people were getting paid out of the

1099-OID?  Because obviously there were people getting paid,

walking around with checks from the IRS.

        MS. MAKAREWICZ:  Objection, Your Honor --

BY DEFENDANT SEAN DAVID MORTON:

Q.   Do you have any idea how many people got paid from the

1099-OID process that were computer -- erroneous on your watch,

sir?

        THE COURT:  What's the legal basis?

        MS. MAKAREWICZ:  I don't believe that the witness has

testified as to the payments of any of the 1099-OIDs.  I

believe that the witness has only testified --

        THE COURT:  So what is the legal objection?

        MS. MAKAREWICZ:  Outside the scope of his direct,

Your Honor.  He's only the FIRE system manager.

        THE COURT:  The question had a number of parts in it.

        Can you ask the question again?

BY DEFENDANT SEAN DAVID MORTON:

Q.   Yeah.  The question was:  Through -- as the FIRE system

manager, could you tell how many people got paid out of the

1099-OID process?

A.   No.

Q.   No information on that, even though all of this is year --

A.   My limited expertise would be with the FIRE system.  We

have no connection with the refunds.

Q.   I see.  But you're directly connecting and saying Garrett

Adams, Brandon Adams dealt with hundreds of files, but you have
no information as to who got paid or how many people got paid
out of that process?

A.   No, sir, I would not.

          DEFENDANT SEAN DAVID MORTON:  Okay.  That's it.
Thank you, Judge.

          THE COURT:  Thank you, sir, for being here.

          Okay.  I think we've concluded the testimony for
today.  I expect things to move a little more quickly tomorrow.
We had a jury selection, opening statements today, and we'll
start promptly at nine o'clock tomorrow with more witnesses.

          Again, the admonition:  Please don't talk about the
case to each other until you have the case for decision.  Don't
access any Internet site or anything else.  The only evidence
that matters is what you hear today.

          We can't start until you're all here.  In other
words, if one person gets stuck in traffic, we have to wait,
because we need all of you together.  So knowing how difficult
it is with traffic, would you all anticipate some bad traffic
tomorrow and try and be here at a little before 9:00.  I'll
make the same effort, and maybe we can get a prompt start.
Thank you.  Have a pleasant evening.

                    (Recess)

     (Proceedings held outside the presence of the jury:)

          THE COURT:  Where do we stand now in terms of --

we're on the government's case.  I see a lot of bank witnesses.

Are they going to be testifying in sort of the format that we've already heard?

MS. MAKAREWICZ:  With respect to the 1099-OID, Your Honor, we have two more banks who will testify with the same similarity.  Then we have -- we have the Chapter 7 trustee; we have -- forgive me; we have a revenue officer who received the correspondence; we have the search warrant; we have banks testifying who received the 514s, and then we have --

THE COURT:  Banks who -- "514s" meaning what?

MS. MAKAREWICZ:  The bonds, Your Honor, the banks who received the bonds.

THE COURT:  And they received the bonds as what?  In what way?

MS. MAKAREWICZ:  As payoff for the debt that the people who were issued --

THE COURT:  You mean the third parties?

MS. MAKAREWICZ:  Yes.  The commercial credit, or the commercial creditors.

THE COURT:  The --

MS. MAKAREWICZ:  Institution.

THE COURT:  Yes.

And how are you going to attempt to link those bonds to the defendants?

MS. MAKAREWICZ:  The bonds at issue, copies were

found at the defendants' house with the search warrant.

THE COURT:  Oh, I see.

And I saw something about fees that you contend the defendants received for creating the bonds.

MS. MAKAREWICZ:  Yes.

THE COURT:  And are there payments to the defendants from these third parties for the bonds?

MS. MAKAREWICZ:  Yes.

THE COURT:  Each of the defendants?

MS. MAKAREWICZ:  Yes.

The latter bank witnesses, we don't anticipate those to go very long, Your Honor.

THE COURT:  There's someone named William Kerr on the list.  Who is he?

MS. MAKAREWICZ:  Yes.  He is the expert, the bank examiner that the government has to examine the bonds, and will testify as to what is legitimate and what is fraudulent on the bonds.

THE COURT:  And he won't testify in those terms. He'll say that the bonds are not issued by whoever --

MS. MAKAREWICZ:  Yes.

THE COURT:  -- because of whatever reasons he gives.

MS. MAKAREWICZ:  Yes.

THE COURT:  With regard to Kerr, I'll ask you, Mr. Brody, first, and then Mr. Morton, do you have any

objection to him?

MR. BRODY:  No, I have no objection to his testimony, but I plan to cross-examine him.

THE COURT:  Of course.  Of course.

What about you, Mr. Morton?

DEFENDANT SEAN DAVID MORTON:  Is the government planning on actually introducing any of the original documents, any original documents as far as the bond goes?  If the banks have them, are they going to introduce them?

THE COURT:  I see.

DEFENDANT SEAN DAVID MORTON:  Because my contention is, sir, and my belief system, whether it's true or not in regards to this, under the Uniform Commercial Code, UCC, all the way through 508, et cetera, et cetera, each one of these banks was sent information of if you don't like it, give it back.  It had a legal letter of advice on it that came with it that said, If for any reason this document doesn't make you happy, please send it back to us, and none of them did.

THE COURT:  You'll have a chance, if you wish, and you certainly are not obliged to, in fact, you have a constitutional right not to testify.  But if you intend to, you can explain your reasons and why you didn't intend to defraud anybody.

DEFENDANT SEAN DAVID MORTON:  I'm just curious if they're going to present any original evidence in the case.

THE COURT:  We'll see.

Now, I with regard to the Provident situation, the reason I sustained that objection was because the merger occurred before the bank got that record, and he can't -- the Chase witness couldn't possibly describe how Provident knew -- how Provident created the record or could say that there's an absence of a record.

Yes?

MS. MAKAREWICZ:  May I respond?

THE COURT:  Yes.

MS. MAKAREWICZ:  I think there was a confusion because the Provident record was not created by Provident. Those Providian records were attached to the defendant Melissa Morton's tax return.

THE COURT:  So if they were, wouldn't Provident have to say they didn't create this record?  You're asking the Chase person to say that Provident didn't create a record.

MS. MAKAREWICZ:  I'm asking the Chase representative if after the merger which merged all of the information -- I don't have to ask the Chase witness about who made the document.  I'd like to -- and I believe I asked the witness as to if they had any record of that income or interest being withheld.  I know that the defendants made the record --

THE COURT:  I know, but the time that the withholding allegedly occurred was prior to the merger, wasn't it?

MS. MAKAREWICZ:  Yes.

THE COURT:  So this witness can't testify to how Providian would or wouldn't record that.

MS. MAKAREWICZ:  Okay.

THE COURT:  I mean, that's just --

MR. BRODY:  I'm sorry, Your Honor.  Yes, I think, you know, the government was trying to ask if Providian ever withheld any interest on an OID form, and I think the Court is correct that this witness isn't qualified to answer that question.  And, therefore, I think the relevance of the Providian 1099-OID documents is in question and should be stricken.

THE COURT:  Well, I'm not so sure about that.

How does the -- is it called "Providian"?

MR. BRODY:  Providian.

THE COURT:  How does the Providian document assist the government in its contention without the testimony of the Chase witness?

MS. MAKAREWICZ:  The Providian document was attached to the defendants' returns.

THE COURT:  But how will you argue that there was no -- that it's false?

MS. MAKAREWICZ:  We had testimony by Ms. Morgan and we had testimony by Mr. Everson that Providian did not transmit that information to the Internal Revenue Service.

THE COURT:  I see.  Okay.  Well, that's an argument.
I mean, it's certainly something the government can argument.

MR. BRODY:  I'll submit on that.

MS. MAKAREWICZ:  Thank you, Your Honor.

MR. BRODY:  Could I raise one other issue?

THE COURT:  Yes.

MR. BRODY:  The government, I think, has at this
point, through the Bank of America representative, conclusively
established that the Mortons were the owners of the Heaven &
Earth account.  That was the government's rationale for
introducing the bankruptcy statements.  I think at this point,
I'm asking the court for a ruling that the bankruptcy hearing,
reference to the bankruptcy hearing and any of those statements
cannot be --

THE COURT:  What is the most relevant part of the
trustee's questioning of the Mortons?

MS. MAKAREWICZ:  It's several folders, it's not just
Heaven & Earth, Your Honor.

The defendants made statements at the meeting of
creditors, after being sworn in, that they do not have any bank
accounts.  We know that to be false.

THE COURT:  But that's a false statement regarding
the bankruptcy, not regarding the issues in this case.

DEFENDANT SEAN DAVID MORTON:  That is also a case
that's already been ruled on --

THE COURT:  Just a moment.

MS. MAKAREWICZ:  Your Honor --

THE COURT:  Basically to show that they're not honest.

MS. MAKAREWICZ:  It goes also as to their true faith belief.  There's another part of the bankruptcy that talks about the 1099 tax returns.  Mr. Morton can't explain it in the bankruptcy, and Mrs. Morton denies filing any tax returns. That is a very important point to the government to establish Mrs. Morton's state of mind as well as Mr. Morton's state of mind and the good-faith belief that they had --

THE COURT:  What was the question asked in the bankruptcy about their tax returns?

MS. MAKAREWICZ:  The trustee asked Mr. Morton initially to describe the refund.  They put on their schedules, Your Honor, that they were entitled to a $4.5 million refund. The trustee asked Mr. and Mrs. Morton, What is that about? Mr. Morton couldn't explain the 1099-OID scheme.  Mrs. Morton denied filing the returns at issue, Your Honor.

THE COURT:  But am I correct that on their schedule -- is that the bankruptcy schedule?

MS. MAKAREWICZ:  The petition, yes.

THE COURT:  The petition.

-- the Mortons are including an anticipated asset?

MS. MAKAREWICZ:  Yes.

THE COURT:  Now, that doesn't show dishonesty.  In other words, they're in bankruptcy, and they're telling the trustee that they're expecting to get $4.5 million.

MS. MAKAREWICZ:  But they can't explain why, and, Your Honor, that only goes to Mr. Morton.  Mrs. Morton denies filing the 1099 returns and denies filing any returns from 1999 onward.

MR. BRODY:  Your Honor --

THE COURT:  I think it is subject to a prejudice that's outweighed by any relevance.

I'm going to sustain the objection.

MR. BRODY:  Thank you, Your Honor.

DEFENDANT SEAN DAVID MORTON:  Thanks, Judge.

MS. MAKAREWICZ:  Is that to all the testimony, Your Honor?

THE COURT:  Yes, yes.

MS. MAKAREWICZ:  Thank you.

(Proceedings concluded at 5:25 p.m.)

- - - - -

C E R T I F I C A T E


        I hereby certify that pursuant to Section 753,

Title 18, United States Code, the foregoing is a true and

correct transcript of the stenographically reported proceedings

held in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the Judicial

Conference of the United States.


  Date:  May 25, 2017


                    /S/_____

                      Deborah K. Gackle
                      CSR No. 7106