here that is legitimate and common law, and the burden of proof
is now on the plaintiff to prove that they have standing to
commence this trial.

Now, I think you, you folks, are the people of
California; you folks have the real power, and you're the wise
protectors of our liberties, common law and due process, which
requires the right to face your accuser face to face to prove
standing; and you know in your hearts what the plaintiff needs
to prove to you to meet the burden of proof.

Now, I require -- just on and for the record, I
require the use of this venue as a court of record in which to
have my claim heard.  I have a claim, and I'd like to talk
about it, because I am harmed, and I have a claim here that I
will either submit to the court now, because I'm harmed under
the Ninth Amendment where my property and my life and my
liberties are being threatened.  So with that, I'd like to once
again open a court of record as I have a claim.  I am harmed
under the Ninth Amendment.

And I can present this claim to the court now, or I'm
going to -- I have to go get a file stamp for another case to
actually open a claim here under, once again, common law.
Thank you.

Anything else, Your Honor?  Open a claim?

THE COURT:  Call the first witness.

MR. HUGHES:  Your Honor, the government would call

Exhibit A

Kristy Morgan.

THE CLERK:  The witness would please step forward, stand behind the court reporter.

Raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE COURT:  Please be seated.

MR. HUGHES:  Your Honor, I'm sorry to interrupt.  If I may -- and if I haven't previously moved its admission -- could I move to exclude any witnesses?  I'm not sure if there are witnesses here --

THE COURT:  All right.  There is a motion to exclude.

If there are any potential witnesses in the courtroom, they should go to the witness room until called.

THE CLERK:  Please state your name and spell it for the record.

THE WITNESS:  Kristy Morgan, K-r-i-s-t-y, M-o-r-g-a-n.

DEFENDANT SEAN DAVID MORTON:  I object to this witness, Your Honor, and take exception.  Unless she has a claim or firsthand knowledge of this particular case, I object to her testimony.

THE COURT:  Objection is overruled.  Okay.

///

///

Exhibit A

**<u>KRISTY MORGAN; GOVERNMENT'S WITNESS, SWORN, TESTIFIED</u>:**

**<u>DIRECT EXAMINATION</u>**

BY MR. HUGHES:

Q.   Ms. Morgan, what do you do for a living?

A.   I work for the Internal Revenue Service in Ogden, Utah.

Q.   And what position do you hold with the Internal Revenue

Service?

A.   I'm the court witness coordinator in Ogden.

Q.   And what are your responsibilities as a court witness

coordinator?

A.   My main responsibility is to assist the special agents and

the attorneys in preparation for trial.  I secure tax returns

and documents that are maintained in the normal course of

business.  I certify those returns, then testify on behalf of

the Commissioner as a custodian of record regarding those

specific documents.

Q.   And before working as a court witness coordinator, did you

hold another position with the IRS?

A.   Yes.

Q.   What was that position?

A.   Before coming to criminal investigations, I -- for 18

years I worked in the examination function.  That's where

audits are conducted.  The first eight years I was a report

writing technician; the following ten years I was the civil

penalty coordinator in the frivolous return program.

Exhibit A

Q.   And have you previously held positions with the IRS that IRS involved reading IRS transcripts?

A.   Yes.

Q.   Have you worked -- as part of your work at the IRS, have you had any experience reviewing federal income tax returns?

A.   Yes.

Q.   Through all of your roles at the IRS, have you become familiar with the IRS recordkeeping system?

A.   Yes, I have.

Q.   Are you familiar with the different tax forms that are submitted to the IRS by taxpayers?

A.   Yes.

Q.   Does this include the Form 1040 and the Form 843?

A.   It does.

Q.   And does this include the various information returns like the Form 1099-INT and 1099-OID?

A.   Yes, it does.

Q.   Now, could you tell us, what is an information return?

A.   An information return is required to be filed as far as from, for instance, an employer or a financial institution. They report that information to the IRS where the IRS will keep that information for comparison on a tax return for compliance situations.

Q.   Does the IRS maintain a computer system that tracks and stores records and tax returns pertaining to each taxpayer as

Exhibit A

part of its regularly conducted activities?

A.    Yes.

Q.    Thank you.

          And does the system go by the acronym IDRS?

A.    Yes, it does.

Q.    And are the entries made into the IDRS system made at or near the time of submission of the various returns by the individuals?

A.    Yes.

Q.    Can you retrieve information contained in IDRS about a particular taxpayer?

A.    Yes, I can.

Q.    What type of information do you need to enter into IDRS to retrieve that data?

A.    The data is all kept by Social Security number or Employee Identification Number and year.  So I would need a Social Security number and a year to do a search.

Q.    Apart from retrieving information from the database, can you also secure copies or originals of any paper tax returns filed by a taxpayer?

A.    Yes.

Q.    How are you able to retrieve actual original tax returns?

A.    The original tax returns all have what's called a "document locator number."  That's a unique number assigned just to that return.  I would order that document locator

Exhibit A

number to receive from files or electronically the data file.

Q.   Now, does the IRS sometimes send items of correspondence

out to taxpayers?

A.   Yes.

Q.   Does the IRS sometimes receive correspondence from

taxpayers?

A.   Yes.

Q.   Does the IRS keep a record of that information?

A.   Yes, we do.

Q.   How is that information stored?

A.   The correspondence would be actually stored by scanning in

that information, and it's kept in account management system

where it can be retrieved.

Q.   You should have a set of binders in front of you.

          Would you please take the binders, including

Exhibits 1, 2 and 153, and review those exhibits, and let me

know when you've had a chance to review them.

          MR. HUGHES:  Just one moment, Your Honor.

          THE WITNESS:  Also 153?

          MR. HUGHES:  Yes, that's correct.

          THE WITNESS:  Yes.

BY MR. HUGHES:

Q.   Now, what are those documents?

A.   Exhibit 1 is actually a printout from the IDRS computer;

two is also printouts; and 3 -- or 153 is also printouts of

Exhibit A

accounts.

Q.   Do these IDRS printouts relate to the defendants, Sean

David Morton and Melissa Morton?

A.   That's correct.

Q.   Have you verified that the information contained in these

transcript printouts are a true and accurate copy of the

records contained on the IDRS system regarding Sean David

Morton and Melissa Morton?

A.   That is correct, yes.

        DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor.

        Did she actually see original documents?

        THE COURT:  What is the --

        DEFENDANT SEAN DAVID MORTON:  The objection:  I take

exception to her answer because she never saw original

documents or original signatures or anything actually original.

        THE COURT:  Objection is overruled.

        You may continue.

        MR. HUGHES:  Your Honor, at this time I would like to

move to admit Exhibits 1, 2 and 153.

        MR. BRODY:  I would object, Your Honor.

        THE COURT:  On what ground?

        MR. BRODY:  Foundation and hearsay.

        THE COURT:  Overruled.

        Received.

        (Government's Exhibits 1, 2 and 153 received in

Exhibit A

evidence.)

BY MR. HUGHES:

Q.   Ms. Morton, prior to coming here today, have you reviewed the documents labeled Exhibits 4, 5, and Exhibits 7 through 21?

A.   Yes.

Q.   In your review, do those documents contain certified IRS records related to some of the types of evidence we were just talking about?

A.   Yes, they are.

Q.   Does this include income tax returns?

A.   Yes.

Q.   Form 843 refund requests?

A.   Correct.

Q.   And correspondence between the defendants and the United States?

A.   Yes.

Q.   Are all of these documents, documents that the IRS keeps in the ordinary course of its operations?

A.   Yes, we do.

Q.   Do all of these exhibits have a blue cover sheet with a gold seal indicating that they are certified records or some certifying seal on the front page of the document?

A.   Yes, they are.

Q.   And is it a regular practice of the IRS to make certified records like these?

Exhibit A

A.   Yes, it is.

          MR. HUGHES:  Your Honor, at this time I'd like to move to admit Exhibits 1, 2, 4, 5, 7 through 21, and -- excuse me, Your Honor -- Exhibits 1, 2 and 153 have already been admitted but Exhibits 4, 5 and 7 through 21.

          THE COURT:  Received.

          (Government's Exhibits 4, 5 and 7 through 21 received in evidence.)

          DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. take exception.  They're not original documents.

          THE COURT:  Objection is overruled.

BY MR. HUGHES:

Q.   Now, Ms. Morgan, before we look at those documents, for those of us don't regularly prepare income tax returns, would you tell us in the most basic terms how it is our income tax is determined for any given year?

A.   Basically, on the 1040, you're going to enter your income, which usually you have a W-2, that income amount.  You also would have your standard deduction and exemptions that you can subtract out to come up with your taxable income.  There is a chart where you would use that to actually compute your tax.

          You would enter any payments that have been made on the tax return.  That would include withholding or estimated tax payments.  And then the difference between what you paid and what your tax is would either revise -- get you a refund or

Exhibit A

you would have a tax owed, depending on how much you paid in to the IRS.

Q.   Let's take a very simple example and say I make a thousand dollars from my employer, and leaving aside deductions and credits and all that, what is my tax liability going to be if my tax rate is, say, 20 percent?

A.   Your liability would be $200.

Q.   And how would the IRS usually get that $200?

A.   If you have an employer, they're going to take withholding to apply to your tax.  If you're your own boss, then you would be paying in estimated payments to cover that tax.

          DEFENDANT SEAN DAVID MORTON:  Objection.  Take exception, Your Honor, because, again, it does not relate to this case.

          THE COURT:  Overruled.

BY MR. HUGHES:

Q.   Now, how would the IRS usually get the $200 tax bill? Would I pay it at the end of the year, write a check, or is there another method that I'm usually -- that you should pay to the IRS?

A.   The withholding is taken out either monthly or every time you get paid.  The quarterly payments, estimated payments, are made every four months.  So there would be a time or the year where you were actually paying for that tax debt.

Q.   Now, we previously discussed a scenario in which I earned

Exhibit A

a thousand dollars in income and $200 in withholdings.  What if I earned $10,000 in income and had $2,000 in withholdings, and the tax rate is 20 percent?

       Do I need to write another check or no?

A.   No.  It would be that your bill would be satisfied; you paid just exactly enough.

       MR. BRODY:  Your Honor, I'd like to object that this is expert testimony, and it wasn't noticed.

       DEFENDANT SEAN DAVID MORTON:  I agree.

       THE COURT:  I don't think it's -- objection is overruled.

       DEFENDANT SEAN DAVID MORTON:  I object also because it was not -- discovery was not provided to me, and, of course, that would mean that she was not on that list.

       THE COURT:  Objection is overruled.

       She can continue.

       MR. HUGHES:  Thank you, Your Honor.

Q.   At the end of year I'm actually doing my taxes or having someone else prepare my taxes, how do I know how much my employer actually paid me and how much they withheld on my behalf?

A.   That would be from your employer, would be the W-2 that they issue to you.  Also sending that to the Internal Revenue Service.

Q.   The employer actually sends a copy of this form to me?

Exhibit A

A.   No.  They sends you a copy and the -- actual, another copy is sent to Social Security, so you get actual credit for that, and Social Security shares that information with the IRS.  So all parties know about the income.

Q.   And what information is contained on the W-2?

A.   That would be your gross wages; your federal withholding; Social Security and Medicare tax would also be included in that.

Q.   And what if I earn money beyond just my salary?  What if I earn money from interest from bank accounts, is that taxable too?

A.   That would be, yes.

Q.   And is that interest income reported to me on a different form?

A.   Yes.  The bank and financial institutions use a 1099-INT, stands for interest.

Q.   And what information is contained on that form?

A.   That would be the amount of interest that was paid on your savings and checking account or your investment.  And there could be withholding, but usually in -- the banks do not withhold on interest income.

Q.   And besides to the individual taxpayers, who does the bank send those forms to?

A.   They're required to send a copy to you so that you're aware of how much interest you made so you can report that on

Exhibit A

your tax return.

Q.   Are you familiar with the term "original issue discount," or OID?

A.   Yes, I am.

Q.   And what does that mean?

A.   That basically is another form of a 1099 that the financial institution will issue to you.  An example would be if you buy a bond at a reduced price, say the bond is worth $100, you only pay 80, then the original issue amount is reduced.  As the income is earned over a period of time until they're mature, you would be required to pay interest, report that on your income tax return, for the 1099-OID information.

Q.   Ms. Morgan, could you please turn in the binders in front of you to Exhibit 7, and let me know when you've got there.

A.   I have that.

Q.   Okay.  And what is this document?

A.   This is a certified copy of a Form 1040, 2005 tax period, for Sean D. Morton.

Q.   And let's go ahead and publish page three.

        Now, Ms. Morgan, could you please point out where, on this document, the income is reported.

A.   All the income is reported in this area.  And according to this document, the income is on line 8a, which is taxable interest.

        MR. HUGHES:  Let's go ahead and blow that up.

Exhibit A

Q.   The line 21 -- or line 22, I'm sorry, what information is shown here?

A.   That would be the total amount of income that you received in the year.

Q.   All right.

        MR. HUGHES:   Let's bring this down and go to the next page.

        If you could please blow up the section marked "Payments."

Q.   Ms. Morgan, where in this section is the total amount of federal income tax withheld recorded?

A.   The total amount of federal income tax is on line 64.   The amount on this return shows $219,807.

Q.   The refund section, and what information is shown in this section?

A.   This on line 73a is showing the amount that's being requested as a refund, which is $136,077.   It also shows the account where a deposit is being requested to be made of that $136,000.   They're identifying it's a checking account, giving us the routing and the bank account number for the deposit.

        MR. HUGHES:   Let's go ahead and publish page five.

Q.   Ms. Morgan, what information is shown on this schedule?

A.   This Schedule B is giving us some idea of where the interest income was paid from.   So it's identifying the Bank of America, the account number, and the amount of interest that

Exhibit A

was reported to them.  In turn, you can match that up on line

8a with the entry there, if you can see that they are the same.

Q.   Now, was a Form 1099 included with this return as a

supplement to the return?

A.   Yes, there was.

        MR. HUGHES:  Let's go ahead and publish page two.

Q.   Is this that 1099?

A.   Yes, it is.

Q.   And does this form identify the amount of OID income paid?

A.   Yes.  That's in box 1, showing $244,230.29.

Q.   And does it identify the amount of withholdings?

A.   Box 4 is showing the withholding amount $219,800.

Q.   And does it identify the specific account number to which

this relates?

A.   Yes, it does.  In the bottom left-hand side there's

account number listed.

Q.   Go ahead and circle that number.

        Was this the same number listed on Mr. Morton's

return for the payment of any refund?

A.   That is correct.  It's the same account number.

Q.   Can a taxpayer earn OID income on a checking account?

A.   No.

Q.   And are individuals permitted to prepare 1099s on behalf

of the banks?

A.   No, absolutely not.

Exhibit A

Q.   Now, Ms. Morgan --

         MR. HUGHES:  You can bring this down and bring back page three.  Scroll down.  Front page.

Q.   Ms. Morgan, were you able to check the amount of withholdings reported here against the information included in the IDRS database?

A.   Yes.

Q.   And based on your review of the IDRS database, did Mr. Morton have any income tax withholdings for the 2005 year?

A.   There was no withholding for this account, no.

Q.   Did Mr. Morton make any estimated tax payments for 2005?

A.   No, there was no estimated tax payments made either.

         MR. HUGHES:  Bring this down here.  Let's bring up Exhibit 4, page eight.

Q.   Ms. Morton, what is this document?

A.   This was the Form 1040, 2006 tax period, for Sean David Morton.

Q.   And approximately when was this submitted to the IRS?

A.   Actually received at the IRS in Fresno March 18th, 2009.

Q.   And how do you know that?

A.   There is a date stamp at the bottom of the return that identifies when a tax return is received.

Q.   And how much income is being reported on this tax return?

A.   Line 8a is showing interest, taxable interest, of $2,809,921.

Exhibit A

MR. HUGHES:  And let's go to the next page.

Q.   Did this return report whether any payments were made to the government for this tax year?

A.   There is information in the payment section, yes.

Q.   What does that information show?

A.   It shows on line 64, there was federal income tax withheld of $2,528,929.

Q.   Does the tax return provide any information as to whether this amount was paid by the defendant Sean David Morton or withheld by third parties?

A.   It's showing that it was entered as withholding on line 64.

Q.   And does this return request a refund?

A.   It does.

MR. HUGHES:  Let's go to the refund section.

THE WITNESS:  The refund is listed on line 74a.  The request is for $1,560,634.

BY MR. HUGHES:

Q.   And does this refund request that the refund be deposited into a specific bank account?

A.   Yes, it does.

Q.   Is that this account number right here?

A.   Yes, account number, and it is a checking account.

Q.   Is this a different account number than what was submitted with Mr. Morton's 2005 return?

Exhibit A

A.    Yes, it is a different account.

     MR. HUGHES:  Take that down.

Q.    Now, Ms. Morgan, prior to coming here today, did you

attempt to verify using the IDRS database whether there were

any withholdings on behalf of Mr. Morton for the 2006 tax year?

A.    Yes, I did.

Q.    And were there any income tax withholdings for Mr. Morton

for 2006?

A.    No withholding in 2006 for Mr. Morton.

Q.    Did Mr. Morton -- is there any record of any estimated tax

payments made by Mr. Morton for 2006?

A.    There were no estimated tax payments made either.

     MR. HUGHES:  Let's go ahead and bring up Exhibit 5,

page three.

Q.    Ms. Morgan, what is this document?

A.    This is a 2007 Form 1040 for Sean David Morton.

Q.    And when was this return submitted to the IRS?

A.    This one was also received in Fresno, California,

March 18, 2009.

Q.    How much income is reported on this return?

A.    Total income on line 22 is $3,161,533.

     MR. HUGHES:  Go to the next page.

Q.    Line 63, what tax liability is reported on this return?

A.    This is showing a total tax owed of $1,090,767.

Q.    Does it show whether any payments were made against this

Exhibit A

liability?

A.   Yes, there is entries in the payment section, line 64, showing federal withholding of $2,845,361.

Q.   Does this return request a refund?

A.   It does.

Q.   What amount?

A.   The requested refund shows on line 74a, $1,754,594.

Q.   Does this return -- actually, let's go to page four, please.

        Now, what information is being shown here?

A.   This is the Schedule B that is supporting the interest income.  It's listing several accounts from Bank of America, couple of accounts from Chase Bank, and an additional at the bottom, another Bank of America account, totaling the same amount that is on line 8a.

Q.   Was a Form 1099 included with this return for each of these accounts?

A.   Yes, there was a 1099 included.

Q.   Do these 1099s report withholdings to the Internal Revenue Service?

A.   Yes, they do.

Q.   Have you compared the withholdings reported on these 1099s to the withholdings reported on this tax return?

A.   Yes.

Q.   Are they the same?

Exhibit A

A.   No.

Q.   They're not?  I believe they are.  I believe -- are these

not the same withholdings reported on the second page of the

tax return?

A.   The 1099s that are attached match what the entry is, but

reported to the Internal Revenue Service does not match.

Q.   Okay.  So let me rephrase my question, because there may

have been a little bit of confusion.

          Do the withholdings reported on those 1099s match

this number right here, line 64 of federal income tax withheld?

A.   Yes, they match the entry on the tax return.

Q.   Okay.  Now, have you had the opportunity to review the

IDRS database for information regarding Mr. Morton's 2007 tax

year?

A.   Yes.

Q.   And based on that review, is there any record of the

withholdings reported on this return being made on Mr. Morton's

behalf?

A.   No, there's no record of any withholding.

Q.   Is there any record of any payments made by Mr. Morton or

any other individual on his behalf for this tax year?

A.   No, no payments at all.

Q.   Now, let's turn to Exhibit 6, please -- actually don't

bring that up yet.

          Would you please turn to Exhibit 6, and let me know

Exhibit A

when you've had chance to review it.

A.   Yes.

Q.   What is this document?

A.   This is a copy of the 2007 individual income return for Melissa A. Morton.

Q.   Have you verified that this is a true and correct copy of the 2000 return -- 2007 return submitted by Mrs. Morton for the 2007 tax return?

A.   Yes.

Q.   How did you verify that this is a copy of that return?

A.   Verified it by the information that is in our IDRS system, receive dates, document locator number.

Q.   And where is the document locator number?

A.   This is at the top of the page, starts with 89.  That's the number that uniquely identifies this tax return.

          MR. HUGHES:  Your Honor at this time I'd like to move to admit Exhibit 6 into evidence.

          THE COURT:  Received.

          (Government's Exhibit 6 received in evidence.)

          DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. Not the original again.  Hearsay.

          THE COURT:  Overruled.

          MR. HUGHES:  Let's go ahead and publish page one of Exhibit 6.

Q.   When was this return submitted to the IRS?

Exhibit A

A.    It shows a received date, bottom left-hand corner of the return, of March 18, 2009, Fresno Service Center.

Q.    How much income is reported on this return?

A.    The total amount of income is $14,817.

        MR. HUGHES:  Let's go to the second page.

Q.    How much of a tax liability is being reported?

A.    Your tax liability is on line 63, showing $1,030.

Q.    Federal income tax withholdings?

A.    That was on line 64, withholding reported on this return is $13,335.

Q.    And can you please just identify where the amount of the refund is shown.

A.    Refunds amount request is on line 74a, the request is for $12,305.

Q.    And did Melissa Morton include an information return with this tax return supporting the interest and withholding amounts included there?

A.    There is the 1099-OID and the supporting Schedule B, yes.

Q.    Have you checked that the withholdings reported on that 1099 match the withholdings reported right here on line 64 of the return?

A.    Yes, they do match.

        THE COURT:  Keep your voice up a little bit.

        MR. HUGHES:  Yes, Your Honor.  Excuse me.

Q.    Now, prior to coming here today, did you review the IDRS

Exhibit A

records regarding Melissa Morton?

A.    Yes, I did.

Q.    And does the IRS have any record of receiving the withholdings listed on this return?

A.    No, there's no record of any withholdings in 2007.

Q.    Is there any records on estimated tax payments made by Melissa Morton?

A.    There is no record of any payments.

Q.    Let's go to Exhibit 10, please.

        Now, Ms. Morton, based on your review of the IRS records, did Mr. Morton file a return for his 2008 taxable year?

A.    There is a return that was submitted to the IRS.

Q.    And were you able to secure a copy of this return?

A.    No, we were not able to receive that.

Q.    So does the IRS have any record of what was reported on Mr. Morton's 2008 federal tax return?

A.    Yes, we do.

Q.    What is that record?

A.    The record again on our IDRS system, and it showed line items that were actually entered into the system and account transcripts.

Q.    And what is the document here labeled as Exhibit 10 on the screen?

A.    This is a copy of the 2008 tax return, 1040, for Sean

Exhibit A

David Morton.

Q.   When was this version submitted?

A.   This actually was received February 26, 2010, according to the tax return.

Q.   And have you compared the information on this return to the information included in the IDRS database to confirm that the numbers reported here are the same numbers reported on Mr. Morton's original 2008 tax return?

A.   Yes, I did.

     MR. HUGHES:  Would you go to the next page, please.

Q.   Have you identified any other features of this return that lead you to believe that this is the same return submitted by Mr. Morton in or around sometime in April 2009?

A.   The total tax amount was verified, the entry on the withholding amount was verified, and the amount of requested refund also verified.

     DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. She already testified that they lost the original form.

     THE COURT:  Objection is overruled.

BY MR. HUGHES:

Q.   How about this area right here?

A.   This is the signature for this tax return under penalties of perjury that this tax return is true and correct.

Q.   What is the date of this return?

A.   The date of the signature is March 13, 2009.

Exhibit A

Q.   Okay.

          MR. HUGHES:   Let's go back to page one.

Q.   How much income is reported on this return?

A.   The income amount, total income, on line 22 is actually
showing at $842,520.

          MR. HUGHES:   Take it down.   Let's go to the next
page.

Q.   What is the total tax liability being reported on this
document?

A.   Tax computed on line 61 is $278,762.

Q.   And what are the total withholdings reported on this
document?

A.   Line 62 is showing the federal income tax withheld,
$758,268.

Q.   And is a refund requested on this return?

A.   Yes.

Q.   What is the amount of the refund?

A.   Line 73a is showing the requested refund, $479,506.

Q.   Now, prior to coming here today, did you review the IDRS
records for any record of any withholdings made on behalf of
Sean David Morton for the 2008 taxable year?

A.   Yes, I did.

Q.   And in the IDRS records, are there any withholding -- or
any record of any withholdings on behalf of Sean David Morton
from the 2008 -- let me finish.   I talk softly.

Exhibit A

Are there any records of any withholdings made on behalf of Sean David Morton for the 2008 tax year?

A.   There's no withholding for 2008.

Q.   Are there any records of any estimated tax payments made for the 2008 tax year?

A.   No estimated tax payments were made.

Q.   Now, did the IRS actually issue a refund in response to this return?

A.   Yes.

MR. HUGHES:  Let's pull up Exhibit 153, please.

Q.   Ms. Morgan, what is this document?

A.   This is what we refer to as an IMFOLT.  It's an individual master file transcript.  This is for the account of Sean David Morton.  It's for the 2008 tax period.

Q.   And does this transcript identify the refund issued to Mr. Morton?

A.   Yes.  Towards the bottom of the page, the transaction code is an 846.

Q.   Just go ahead and circle that.

A.   This is the amount of the refund that was issued, $480,322.55.

Q.   And why was this refund issued?

A.   There was a request made by the tax return, the return was filed, requested refund was made -- was actually sent to the IRS, return was processed.

Exhibit A

Q.   What type of IRS employee would have reviewed this return?

A.   Basically, the first line employees that come in -- where tax returns come into the center where they are just reviewing the face of the document.  They have no computer to look at. They're looking to make sure that the simple entries on the return mathematically verify, and it's sent to processing.

Q.   Now, would that employee have any means of verifying the accuracy of the withholdings reported on the return?

A.   Not at that point, no.

Q.   Now, did the IRS issue a refund for Mr. Morton's 2005, 2006 or 2007 tax returns?

A.   No.  No refunds were issued.

Q.   Did it issue a refund for Ms. Morton's 2007 tax year?

A.   No.

Q.   Why not?

A.   They were returns that were pulled out of the system because of the face of the document was basically incorrect.

Q.   If a tax return is determined to be frivolous by the IRS, does that trigger a particular action by the IRS?

A.   Yes.  That's where the system will actually pull those returns out, send them to the area to be reviewed, it's called a second look, and those people that work in the frivolous filer department would look at these returns to see if they should be processed or not.

Q.   If the IRS determines that a return is frivolous, will it

Exhibit A

assess a frivolous filing penalty?

A.    Yes, there is a penalty for filing a frivolous tax return.

Q.    And prior to issuing the frivolous filing penalty, will the IRS issue a taxpayer a written warning of any kind?

A.    Yes.  There are letters that go out specifically stating the return is frivolous, gives them an opportunity to correct that filing and avoid the penalty, also gives them information on how to file and where to file.

Q.    Now, were frivolous filing penalties assessed against Sean David Morton for the years 2005 through 2007?

A.    Yes, there were penalties assessed.

Q.    And were frivolous filing penalties assessed against Melissa Morton for her 2007 tax year?

A.    Yes.

Q.    Prior to assessing these penalties, would the IRS have issued a written warning to the taxpayers?

A.    Yes, absolutely.

Q.    Would you please turn to Exhibit 146, and let me know when you've had a chance to review that document.

A.    I have that.

Q.    And what is this document?

A.    This is the letter 3176C.  It's a letter that, in turn, informs the taxpayer of the consequences of filing a frivolous tax return.

Q.    Who is this letter issued to?

Exhibit A

A.    This was issued to Sean Morton.

Q.    For what tax period?

A.    The tax period is for 2005.

Q.    And when was it issued?

A.    The letter date is March 17th, 2010.

        MR. HUGHES:  Your Honor, at this time I'd like to

move into evidence Exhibit 146.

        THE COURT:  Received.

        (Government's Exhibit 146 received in evidence.)

        MR. HUGHES:  Let's go ahead and publish Exhibit 146.

Q.    You mentioned, Ms. Morgan, that on this letter, it

identifies the consequences of any frivolous filing.  Could you

please just circle the passage to which you're referring to.

A.    The very first part of the letter basically identifies

that it's to inform them of the potential consequence of the

position they've taken and offers them the opportunity to

correct that.

        MR. HUGHES:  Take this down, please.

Q.    Does it include any information as to why the IRS is

issuing the letter?

A.    Yes, it does.

Q.    Could you please identify that section.

A.    Section -- next section where it says, "Based on Internal

Revenue Code Section 6702, the argument is frivolous," and

they've determined that they could be having a penalty assessed

Exhibit A

based on 6702.

      MR. HUGHES:   Take it down.

Q.   Based on your review of the IDRS system, did the

defendants file a return after this letter was issued?

A.   Yes, they did.

Q.   If you could please turn to Exhibit 11.

A.   I have that.

Q.   And what is this document?

A.   This is a certified copy of the Form 1040 for 2005, filed

by Sean D. Morton.

      MR. HUGHES:   And let's turn to Exhibit 11, page --

perfect.

Q.   Was this return submitted subsequent to the letter that we

just looked at?

A.   Yes, it was.

Q.   And is the income amount reported on this return any

different from the income amount recorded on the previous 2005

return we've seen?

A.   As far as the income amount, and if you'll tell me the

exhibit, I'll compare them real quick.

Q.   Sure.  Let's put -- be Exhibit 7.

A.   Exhibit 7.  The initial filing?

Q.   Let's put them on the split screen.

A.   The income has increased on line 8a.

Q.   So how much income is being reported on this new version

Exhibit A

of the return?

A.   The new version of the return is showing $324,684.

        MR. HUGHES:  Let's go to -- scroll down one page.

Q.   Did Mr. Morton change the withholdings reported on this new return submitted to the IRS?

A.   Yes, there's a different amount of withholding.

Q.   Did he increase the amount of his claimed withholdings?

A.   Yes, he did.

Q.   What is the new amount of withholdings reported?

A.   The federal income tax withheld on the second filing is $292,215.

        MR. HUGHES:  Take it down.

Q.   And did Mr. Morton increase the amount of the claimed refund submitted with this return?

A.   Yes, he did.

Q.   What was the amount of that refund?

A.   The amount of refund now is $180,326.

Q.   Did the IRS issue a refund in response to this return?

A.   No.

        MR. HUGHES:  Let's go to Exhibit 12.

        THE WITNESS:  I have that.

BY MR. HUGHES:

Q.   Is the same amount of income reported on this return as the previous version in Mr. Morton's 2006 return submitted in 2009?

Exhibit A

A.   The first page of the document shows the same amount of income.

          MR. HUGHES:  Let's go to the second page, please.

Q.   What about the withholdings tax and claimed refunds in these amounts -- or on this return?

A.   These amounts are different.  What Mr. Morton did is attach the 2005 second page to the 2006 filing.

Q.   Thank you.

          Now, did the IRS issue a refund in response to this return?

A.   No.

          MR. HUGHES:  Let's go to Exhibit 9, please.

          THE WITNESS:  Exhibit 9, I have that.

BY MR. HUGHES:

Q.   What is this document?

A.   This was the 2007 Form 1040 for Sean David Morton.

Q.   When was this document submitted?

A.   This document shows a receipt date of September 7, 2010.

Q.   Are the income withholdings and claimed refund amount in this return identical to the amounts listed in the previous version of Mr. Morton's 2007 return?

A.   Yes, they are.

          MR. HUGHES:  Let's go to the second page.

Q.   What about the method of refund payment?  Is this the same as what was listed in his initial returns?

Exhibit A

A.   No.   Initially there was a bank account listed for a direct deposit.  This shows no bank account.

Q.   So what would the consequence of that be?

A.   The IRS, if processing and issuing a refund, it would go directly to the address of record as a paper check and not a direct deposit.

Q.   Did the IRS actually issue a refund in response to this return?

A.   No.

         MR. HUGHES:  Let's go to Exhibit 13, please.  Publish page four.

Q.   What is this document?

A.   This is the 2007 1040 for Melissa A. Morton.

Q.   And have you compared the income withholdings and tax refund amount listed in this return to the income withholdings and refund amount listed with the initial refund submitted by Mrs. Morton?

A.   Yes, I did.

Q.   Do those numbers match?

A.   They are the same, yes.

Q.   Did the IRS issue a refund in response to this return?

A.   No.

Q.   Now, Ms. Morgan, when a taxpayer does not respond to the initial notice of frivolous filing submitted by the IRS, do they submit any other type of notice or any other notice?

Exhibit A

A.    They do.  If there's no response and additional filings,

the IRS will send another notice stating their position.

Q.    Does that notice have a different name?

A.    It is a CP72.

Q.    What is the difference between that notice and the initial

notice sent out by the IRS?

A.    The second notice has stronger language, more explaining

the possibilities of criminal prosecution in that notice.

Q.    Would you please turn to -- actually, based on your review

of the IDRS system, did the IRS issue a CP72 notice to

defendant Sean David Morton for his 2007 taxable year?

A.    Yes.

Q.    And did it issue one to Sean David Morton for his 2006

taxable year?

A.    Yes.

Q.    Did it issue a CP72 notice to Melissa Morton for her 2007

taxable year?

A.    Yes.

Q.    Would you please turn to Exhibit 147, and let me know when

you've had a chance to review that document.

A.    I have that.

Q.    What is this document?

A.    This is a copy of the CP72 sent to Sean David Morton.

Q.    And what tax period does it relate to?

A.    It covers the actual tax period -- let me see here --

Exhibit A

Form 1040 for 2007.

Q.   And when was it issued?

A.   The date of the notice is November 1st, 2010.

        MR. HUGHES:  Your Honor, at this time I'd like to
move Exhibit 147 into evidence.

        THE COURT:  Received.

        (Government's Exhibit 147 received in evidence.)

        MR. HUGHES:  And let's publish page one of
Exhibit 147.

Q.   Ms. Morgan, you mentioned that this notice provides notice
regarding potential criminal prosecution.  Would you please go
ahead and just outline where in this notice that passage is.

A.   It's contained in the third paragraph.

Q.   Just go ahead and read that first line of that.

A.   "Please be advised that people who violate the tax laws
may be subject to federal criminal prosecution and
imprisonment."

        Then it gives information of where you can do
research on the Internet regarding the letter that you just
received.

Q.   In this final entry, *The Truth About Frivolous Tax
Arguments*.  Are you familiar with that publication?

A.   I am.

Q.   Are you familiar with the information contained on that
publication on the date this letter was issued?

Exhibit A

A.   Yes.

Q.   What is it -- what is the nature of *The Truth About Frivolous Tax Arguments?*

A.   It lists different tax arguments.  It also gives the IRS's position why they're frivolous, and why you should not be filing tax returns with those types of positions.

Q.   Does this include the 1099-OID refund program?

A.   It does.

     THE COURT:  I don't know what that means, "1099-OID program"?  What is what?  I'm not asking you to explain, but I don't know what that means as far as the evidence is concerned so far.

BY MR. HUGHES:

Q.   Ms. Morgan, does the -- does it include information on the program that promotes the use of the 1099-OID form to claim refunds?

A.   Yes, it does.

Q.   Thank you.

     Would you please take a look at Exhibit 148.

     THE COURT:  I still don't understand.  I mean, are you saying that 1099-OIDs can never be used to claim refunds?

     THE WITNESS:  I can basically explain --

     THE COURT:  I don't want you to explain more than is relevant to the question, but when the question relates to "OID program," is it that an OID 1099 cannot be used for a payment

Exhibit A

or is it something -- or is it the nature of the OID?

THE WITNESS:  It's what's on the face of that document, how it's actually submitted to the IRS.

THE COURT:  When you say the face of the document --

THE WITNESS:  Right.  The information is incorrect --

THE COURT:  I see.  So when you say "OID program," you're not saying that an OID 1099 can't be used as a form of payment on taxes, you're saying that the OID 1099 has to be correct in its content.

THE WITNESS:  Correct, yes.

THE COURT:  I see.  Okay.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. So the witness -- okay.  The witness is saying that she has no information as to whether or not the information on the face of the document was true or not.  Speculation.  All of this is hearsay.  She's looking at other documents.  She had no direct interaction with the documents when they came in.  This whole thing should be thrown out.

THE COURT:  Let me make it clear that this witness is called by the government.  It seems to just describe documents and procedures of the IRS.  She's not here to tell the jury about the correctness of the information.

Correct?

MR. HUGHES:  That is correct, Your Honor.

THE COURT:  She's not saying that.  There may be

Exhibit A

other witnesses who may attempt to do that, and you can reserve your objection to them.

DEFENDANT SEAN DAVID MORTON:  Okay.  Again, I object. She has no firsthand knowledge.

THE COURT:  On that basis, the objection is overruled.

DEFENDANT SEAN DAVID MORTON:  It's hearsay.

THE COURT:  Proceed.

BY MR. HUGHES:

Q.  Would you please look at Exhibit 148, and let me know when you've had a chance to review that exhibit.

A.  Yes.

Q.  What is this exhibit?

A.  This is a CP72 issued to Melissa A. Morton for the 2007 tax period.

Q.  And what is the date of that notice?

A.  The notice issue date is November 29, 2010.

MR. HUGHES:  Your Honor, I'd like to move to admit Exhibit 48.

THE COURT:  Received.

(Government's Exhibit 48 received in evidence.)

MR. HUGHES:  Let's put up Exhibit 148 and 147 next to each other.

Q.  Now, could you go ahead and circle the date that was listed there on the notice listed to Melissa Morton.

Exhibit A

A.   That date is November 29, 2010.

Q.   Based on your review of the IDRS system, did the
defendants file tax returns with the IRS after these notices
were issued?

A.   Yes.

Q.   Can you please turn to Exhibit 16.

A.   I have that.

Q.   What is this document?

A.   This is the 2005 individual income tax return for Sean D.
Morton.

        MR. HUGHES:  Let's go ahead and publish.  Page four.

Q.   Now, did you compare this document to the previous version
of Mr. Morton's 2005 return submitted to the IRS?

A.   I did.

Q.   And is there any change to the income reported on this
return?

A.   Yes.  This return is showing zero income.

        MR. HUGHES:  Could you please go to the next page.

Q.   And did Mr. Morton also eliminate his claimed
withholdings?

A.   No.  No, the withholdings are still on the tax return.

        MR. HUGHES:  Could you go ahead and blow up the
refund part.

Q.   So how much of a refund is being requested now on this
return?

Exhibit A

A.   The requested refund is $244,230.

      MR. HUGHES:  Take that down.

Q.   So is there any tax liability reported on this return?

A.   No.  They are showing liability as zero.

Q.   But there's still withholdings?

A.   Correct.

      MR. HUGHES:  Now, let's go to page eight, please.

Q.   What is this document?

A.   This shows as a coupon for set-off, settlement, and closure.

Q.   Was this document included with Mr. Morton's 2005 return?

A.   Yes, part of the attachments.

Q.   Did the IRS process this document as a payment, or attempt to process it?

A.   No.

      MR. HUGHES:  Now, let's go to page 16, please.

      And blow up that first part of the paragraph.

Q.   And could you just read the first sentence of this paragraph, please.

A.   "The undersigned humbly requests that the IRS return the overpayment amount of $234,230.29 to Sean David Morton based on the updated and enclosed 2005 tax year 1040 records."

Q.   And just the next sentence as well, please.

A.   "The undersigned humbly requests the IRS forward the full amount of the overpayment based on the updated records with all

Exhibit A

speed to the address of record."

Q.   And the third?

A.   "The total amount of asset funds tendered to the IRS on the enclosed security from the asset account of the undersigned is $732,230, which greatly exceeds by three times the amount of the funds the IRS is liable to return to Sean David Morton for the overpayment of 2005."

Q.   Is this document included with Mr. Morton's 2005 return?

A.   Yes.

Q.   And could you please turn to Exhibit 15.

A.   I have that.

Q.   What is this document?

A.   This is the 2006 1040 for Sean David Morton.

Q.   And do we have any record of when it was received by the IRS?

A.   There is a stamp on the tax return showing it's received November 26, 2010.

Q.   And did Mr. Morton make any changes to the reported income on this return --

A.   Yes.

Q.   -- from his previously filed returns?

A.   Yes, he did.

Q.   What was that change?

A.   The income amount is now zero.

Q.   And could you go to the next page, please.

Exhibit A

Did Mr. Morton make any changes to the reported tax amount?

A.   The tax on the return is also at zero; that is a change.

Q.   And did Mr. Morton also eliminate his withholdings?

A.   No.

Q.   Did he request a refund?

A.   He did.

Q.   What amount?

A.   Refund request on this return is $2,809,921.18.

Q.   Is this amount larger than the refund requested in his previous returns?

A.   Yes.

Q.   Let's turn to page eight, please.

And is this document included with the 2006 return -- I'm sorry -- the 2007 return submitted -- or the 2006 return submitted by Sean David Morton?

A.   Yes, it's included with the 2006.

Q.   And was it processed as a payment by the IRS?

A.   No.

DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. The last two documents they put in aren't even signed, and they say "Void" all the way across the face of the document, so ...

THE COURT:  You can ask her about that if you wish.

DEFENDANT SEAN DAVID MORTON:  All right.

Okay.  The document --

Exhibit A

THE COURT:  Not now.  When you have a chance to examine her.

Go ahead.

MR. HUGHES:  Let me take this down.

Q.   Can you please turn to page 28.

Is this document marked "Letter of Rogatory and Affidavit in Support" included with the 2006 return submitted by Mr. Morton in November 2010?

A.   Yes, it was.

Q.   And did the IRS actually issue a refund in response to this return?

A.   They did not.

MR. HUGHES:  Let's turn to Exhibit 14, please.

THE COURT:  Are you coming to a head here, or do you have much more to go?

MR. HUGHES:  I have a few more exhibits, Your Honor.

THE COURT:  How many more?

MR. HUGHES:  I would say probably about six more.

THE COURT:  May be a good time to take the afternoon recess.  We've been at it for a couple hours.  So let's take ten minutes or so, and then we'll go on to five o'clock.

(Recess)

MR. BRODY:  Your Honor, before Mr. Hughes resumes, could I just put something on the record?

THE COURT:  Yes.

Exhibit A

MR. BRODY:  I had previously objected to the Government's Exhibit 1, the IDRS document, under hearsay and foundation grounds.  I'd also like to object to confrontation grounds.

THE COURT:  Okay.

MR. BRODY:  Thank you.

BY MR. HUGHES:

Q.  Ms. Morgan, what is this document?

A.  This is the 2007 individual income tax return for Sean David Morton.

Q.  And when was this document received by the IRS?

A.  It shows a received date of November 9, 2010.

Q.  Have you compared this document to the previous versions of Mr. Morton's 2007 tax return?

A.  Yes.

Q.  Is the income withholdings and refund amount reported on this return identical to the previous version of Mr. Morton's return submitted for the 2007 tax year?

A.  Yes.

MR. HUGHES:  Let's go ahead and publish page 20.

Q.  Ms. Morgan, was this document included with Mr. Morton's 2007 tax returns submitted in November of 2010?

A.  Yes, it was.

Q.  Did the IRS attempt to process this document as a payment for the 2007 tax year?

Exhibit A

A.   It did.

Q.   What was the result of that?

A.   The bank returned this check.  It was a bad check, and it was reversed off the account.

          MR. HUGHES:  Let's go to page 30.

          THE COURT:  In terms of that last part of your testimony, was that based upon what you -- you saw on the IRS records?

          THE WITNESS:  Yes.  My review of the account.

          THE COURT:  I see.

          DEFENDANT SEAN DAVID MORTON:  Objection, Your Honor. She's saying it's a check.  It doesn't say check anywhere on it.

          Do you see the check anywhere on that, ma'am?

          That's cross-examination.  I'm sorry.  Anyway, objection.  She is making an observation that is not in evidence and -- there you go.

          THE COURT:  Thank you.

          DEFENDANT SEAN DAVID MORTON:  As you can see.

          THE COURT:  Overruled.

BY MR. HUGHES:

Q.   Was this document submitted in with included with the 2007 return filed by Sean David Morton?

A.   Yes, it was.

Q.   Let's turn to Exhibit 17, please.

Exhibit A

A.   I have that.

Q.   What is this document?

A.   This is the 2007 1040 for Melissa A. Thompson Morton.

Q.   And does this return report any income?

A.   No, it does not.

Q.   Let's go to the second page, please.

     Does this return report any tax due for the 2007 tax year?

A.   No, it does not.

Q.   Does it report any withholdings?

A.   Yes, it does show the withholding.

Q.   In what amount?

A.   The withholding entered on the return, line 64, is $14,816.70.

Q.   Does the return request a refund?

A.   Yes, it does.

Q.   In what amount?

A.   Also in $14,816.70.

     MR. HUGHES:  Let's publish page six, please.

Q.   Was this document included with the 2007 return of Melissa Morton?

A.   Yes, it was included.

Q.   And was it processed by the IRS?

A.   No, it was not.

Q.   Was a refund issued for this return?

Exhibit A

A.   No.

Q.   Was a refund issued in the previous return we just discussed, the 2007 return of Sean David Morton?

A.   No.

        MR. HUGHES:  Let's go to page 13, please.

Q.   Was this document included with the 2007 return of Melissa A. Morton?

A.   Yes, it was.

        MR. HUGHES:  Let's go to Exhibit 18.

        And page six.

Q.   What is this document?

A.   This is a Form 843, Claim for Refund and Request for Abatement, filed by Sean David Morton.

Q.   For what tax period?

A.   The tax period on this is for 2006.

Q.   And when was this filed with the IRS?

A.   The actual signature date on this form is June 21st, 2012.

Q.   And how much of a refund is requested?

A.   The refund amount is $1,560,634.

Q.   Did the IRS issue a refund in response to this claim?

A.   No.

        MR. HUGHES:  Let's turn to Exhibit 19.

Q.   What is this document?

A.   This is also a Form 843, Claim for Refund and Request for Abatement, Melissa A. Morton is the filer.

Exhibit A

Q.   And what is the amount of the refund requested?

A.   Refund amount is $12,727.

Q.   And to what tax period does this relate?

A.   This is for 2007 tax period.

Q.   When was this filed with the Internal Revenue Service?

A.   The signature date is June 21st, 2012.  It's received

June -- July 2nd -- excuse me -- 2012.

Q.   Based on your review of the IDRS records, between 2009 and

2013, were any frivolous filing penalties assessed against Sean

David Morton?

A.   Yes.

Q.   What was the total volume of those penalties?

A.   There were 19 frivolous penalties assessed, for a total

amount of $90,000.

Q.   And were any frivolous filing penalties assessed against

Melissa A. Morton for that period?

A.   Yes.

Q.   What was the total amount of those penalties?

A.   Total penalties were 14 frivolous return penalties, for a

total amount of $70,000.

        MR. HUGHES:  Let's go to Exhibit 20, please.

Q.   What is this document?

A.   This is correspondence that's received at the Internal

Revenue Service from Sean David Morton.

Q.   Does it include any indications to when it was mailed?

Exhibit A

A.   The actual date of the -- where it was placed in the United States mail is on the 2nd day of April 2013.

          MR. BRODY:  Objection, foundation, Your Honor.

          THE COURT:  Well, their hasn't been a specific foundation for this document.

          You did inquire of this witness at the outset how she retrieved documents, correct?

          MR. HUGHES:  Correct, Your Honor.

          THE COURT:  You went through a question and answer with her process.  You haven't repeated that with each document, but let me ask the witness:  Is the process by which these documents had been produced the same procedure throughout, that is, you looked at that -- what was that form again, the basic form?  The -- what was the name of that?

          MR. HUGHES:  IDRS statement.

          THE COURT:  IDRS statement.  And was it from that statement that you keyed into the -- these forms, these documents, these filings?

          THE WITNESS:  Yes.  The basis of all my research is through IDRS.

          THE COURT:  Review again with us how you did that.

          THE WITNESS:  That would be with the Social Security number of the document of the individual filing this.  Then I would go to my sources as far as there is other databases that store correspondence, store tax returns, but --

Exhibit A

THE COURT:  But you would go to the what's called IDRS?  That's the summary document?

THE WITNESS:  That's the master computer for the IRS.

THE COURT:  Is the Social Security number part of that document?

THE WITNESS:  Yes.

THE COURT:  But you would use that document to access notes of the filings related to what, that document or the tax returns?

THE WITNESS:  For that tax period.

THE COURT:  For that tax period.

THE WITNESS:  And correspondence would be identified, and then withhold the correspondence.

THE COURT:  I see.

Are those documents, the hard copies created from that?

THE WITNESS:  Yes.

THE COURT:  I see.

And that's purported to be one of those hard copies; is that right?

THE WITNESS:  Correct.

THE COURT:  And you produced that?

THE WITNESS:  I personally accessed and pulled these prints.

THE COURT:  I see.  Okay.

Exhibit A

```
              Objection --

         MR. BRODY:  The objection is overruled?

         THE COURT:  Yes, objection is overruled.

         MR. BRODY:  Thank you, Your Honor.

BY MR. HUGHES:

Q.   Please turn to page 16 of this document.

         Was this document included with the packet of

documents submitted to the Internal Revenue Service?

A.   Yes.

Q.   The IRS attempted to process this document as a form of

payment?

A.   No.

Q.   And let's turn -- please turn to Exhibit 21.

A.   Yes.

Q.   What is this document?

A.   This is correspondence received at the Internal Revenue

Service from Melissa Ann Thompson.

Q.   Did you receive this document from the IDRS system based

on your review of the records of correspondence between the IRS

and the taxpayers?

A.   That's correct.

Q.   And does this document include any indication as to the

date it was mailed to the IRS?

A.   Yes.  The cover letter states a mailing date of the 2nd

day of April 2013.
```

Exhibit A

Q.   Let's go to page 27 of the document.

Was this document included with the packet of correspondence sent to the IRS?

A.   Yes, it was.

Q.   Was it processed as a payment by the IRS?

A.   No.

Q.   Now, prior to coming here today, did you search the IDRS databases for any record of any payments received by Sean David Morton over the last 20-year period?

A.   Yes, I did.

Q.   Based on your review of the IDRS system, has Mr. Morton made any voluntary payments to the IRS over this time period?

A.   Yes.

Q.   What was the amount of that payment?

A.   There was one payment made, and it was for $1.

MR. HUGHES:  No further questions.

THE COURT:  Okay.  Cross-examination, Mr. Brody.

### CROSS-EXAMINATION

BY MR. BRODY:

Q.   Good afternoon, Ms. Morgan.

A.   Good afternoon.

Q.   This is not the first time you've testified, right?

A.   That's correct.

Q.   About how many times have you testified?

A.   Over 140 times.

Exhibit A

Q.    Now, you've been with the IRS for a long time; is that right?

A.    Around three years.

Q.    Okay.  That's certainly a long time.

         And during that time, you've been working with the tax code in one form or another, correct?

A.    Working at the IRS with specific jobs, yes.

Q.    Okay.  So you're familiar with the tax code?

A.    That's not one of my responsibilities, no.

Q.    Have you had any training in the tax code at all?

A.    No.

Q.    Okay.  Now, we talked about some of the 1040 forms that were submitted supposedly by Melissa Morton and Sean Morton.

         Some people do their own taxes, correct?

A.    Yes.

Q.    And some people receive assistance from other people with their taxes, right?

A.    Correct.

Q.    In part because sometimes it can be very complicated for the average ordinary citizen to manage their taxes, right?

A.    Basically it's the taxpayer's choice of whether they use someone or file their own.

Q.    If there's a problem with an individual's taxes, so, for example, if there's claim of withheld interest on a 1099-OID form, but there is no actual withheld interest, you can audit

Exhibit A

the taxpayer, right?

A.   That could cause an audit, yes.

Q.   Okay.  And you can contact the taxpayer to address the problem, correct?

A.   Yes.

Q.   And there are various ways of contacting the taxpayer.

A.   The Internal Revenue Service uses notices to contact the taxpayer.

Q.   So the IRS sends letters, is what you're saying?

A.   Yes.

Q.   But the 1040 documents that were filed in this case -- well, 1040 documents in general, they have a place for the taxpayer to put their address, correct?

A.   Correct.

Q.   And they have a place for the taxpayer to put their phone number, right?

A.   I believe so, yes.

Q.   And, in fact, in the exhibits that we've been discussing in this particular case, for example, Government's Exhibit 6, Melissa Morton's 2007 1040, there was a phone number on that form; is that correct?

A.   I can check.

Q.   Would you have a look.  Thank you.

A.   Yes, there is a phone number.

Q.   Okay.  But it's not the custom and practice of the IRS to

Exhibit A

actually call that phone number.

A.    That's correct, we do not call.

Q.    Even if there is a problem with the return.

A.    Correct.  It will be a letter or notice that's sent.

Q.    And that's true even if the person is claiming millions of dollars that they're not entitled to, correct?

A.    Correct.

Q.    Until the taxpayer receives a notice, that's the only way they have to know that there is a problem with the return, right?

A.    That would mean they're put on notice with that receipt of that notice, yes.

Q.    Okay.  And it may be an individual person at the IRS who finds a problem with a return, correct?

A.    Yes, people that work in processing.

Q.    And that might be, for example, one of those first line people, I think you referred to them as, who first review the document, correct?

A.    Yes, they receive training.

Q.    Okay.  And if they see a problem, they might pass the document on to someone else to ask for some kind of confirmation?

A.    That's correct.

Q.    So, for example, if, as we've seen in these particular terms, somebody claims a refund based on a withholding, is that

Exhibit A

document going to be checked by a human being to make sure that there was no withholding or that there was actually a withholding?

A.   I'm not following your question.

Q.   I'm sorry.  That was bad.  I'll rephrase the question.

If the document, if the 1040 claims a refund based on a 1099-OID document, will somebody go and check to see if a bank filed a 1099-OID document?

A.   That could be part of the process, yes.

Q.   But not always, right?

A.   Depends on the amount of the withholding compared to the amount of income.

Q.   And is that a check that has to be done manually or is there some sort of automated system that will automatically tell you there is a discrepancy?

A.   That would be something that would be looked at by actual human eyes.  That would be a referral to the frivolous return program.

Q.   Okay.  So there's no actual computer system in place that automatically checks a return for a problem like that?

A.   Not at the beginning of processing, no.

Q.   Okay.

Now, we've seen the, in this particular case, a request for a refund by Sean David Morton was actually issued, right?

Exhibit A

A.   Correct.

Q.   And that is true in spite of the fact that there was no federal tax withheld for his particular -- in that particular year for him?

A.   That's correct.

Q.   And that's something that presumably is quite common, correct?

A.   No, not necessarily, no.  Sometimes refunds do get paid out that shouldn't get paid out.

Q.   How often would you say refunds get paid out that shouldn't be?

A.   I don't know have any facts on how that happens or when that happens.

Q.   You couldn't say what percentage of the time or how many times in 2007?

A.   No.

Q.   Could you say how many times 1099-OID-based returns were submitted in 2007?

A.   How many were received?

Q.   How many were received.

A.   No, I don't have those stats.

Q.   Now, you talked about the so-called frivolous filing letters that were sent out to both Melissa and Sean Morton, right?

A.   Correct.

Exhibit A

Q.   And your conclusion that they were sent out is based on your review of the IRS records right?

A.   Yes, it is documented that they're mailed.

Q.   You have no personal knowledge of whether or not they were received, correct?

A.   Correct.

Q.   Okay.

Now, the word "frivolous" has a technical meaning at the IRS, right?

A.   Yes.

Q.   It doesn't just mean funny or silly or something like that, right?

A.   That's correct.

Q.   It doesn't mean that we might necessarily think of as the lay definition for frivolous?

A.   That's correct.

Q.   You also refer to a document called "*The Truth About Frivolous Tax Filings*"?

A.   Yes.

Q.   And that's a document that's referenced in the letters that were sent to the Mortons, correct?

A.   Correct.

Q.   In effect, the letters said here's a place to look to do some research on frivolous tax filings.

A.   Correct.

Exhibit A

Q.   And that's a document that's pretty substantial, isn't it?

A.   Yes.  It's on IRS.gov, and it's available to anyone that wants to look at it.

Q.   And it's some 70 pages long, correct?

A.   Correct.

Q.   And it can include case law, right?

A.   Yes.

Q.   And by "case law," I mean actual references to cases like *United States v. Cheek* or *United States v. Schiff* or something like that, right?

A.   Correct.

Q.   And it includes cases at the district court level?

A.   That, I don't know.

Q.   And cases at the appellate court level?

A.   I know there is case law that is in that frivolous return program referral, and that's all I know.

Q.   You're not familiar with the difference between district court case law and appellate court case law?

A.   That's correct, I'm not.

Q.   And this document includes analysis of conflicting case law, right?

A.   That, I wouldn't know.

Q.   So you don't know whether or not it includes some cases which say one thing and some cases which contradict them?

A.   No.

Exhibit A

Q.   And you haven't read those cases, correct?

A.   That's correct.

Q.   You haven't actually gone and downloaded the entire case and read the entire opinion of the court, right?

A.   That's correct.

Q.   You haven't analyzed the holdings in any of those cases?

A.   That's correct.

Q.   You're not a lawyer; is that right?

A.   That's correct.

Q.   Okay.

        So you probably don't read case law in your spare time?

A.   That's correct.  We have attorneys at the IRS that handle that for us.

Q.   Okay.

        And presumably the same is true, you don't read case law when you're preparing your own taxes right?

A.   I follow the instructions from the 1040.

Q.   Okay.

        Now, have you had any training by the IRS as to what constitutes a frivolous filing or is your training -- I'm sorry, I'll stop there.

        Have you had any training from the IRS?

A.   Yes.

Q.   Okay.  And what did that training consist of?

Exhibit A

A.   That was a course that went in and showed the different identified arguments that are identified by our area counsel, which is IRS.  Give us examples of those types of tax returns, and instructions on if we found one of those in processing, or in our work, what we would do with it.

Q.   And so there are attorneys at the IRS who, for example, give you trainings, correct?

A.   The attorneys write the opinions on whether the return is frivolous or not.  The training is done by our training people that actually create different training manuals for employees.

Q.   If you had a question about what -- anything that's in the document, you can consult with those people, right?

A.   Correct.

Q.   You could go and ask them a question?

A.   Yes.

Q.   And if you had a very complex legal question, you would probably then have access to an IRS attorney, correct?

A.   Yes, you could write for an opinion.

Q.   Okay.

        Now, have you ever had a disagreement with the IRS about what constitutes a frivolous argument?

A.   Personally?  Me?

Q.   Yes.

A.   No.  That is a determination made by our counsel.

Q.   Okay.  So you've never said to the IRS or one of their

Exhibit A

trainers, Hey, I understand you think this is frivolous, but based on what I'm seeing, I don't think it is, correct?

A.    That's correct.

Q.    Okay.  And you agree, however, it's possible the IRS can be wrong about the law, right?

A.    I don't know.

Q.    You don't know if the IRS could ever be wrong about the law?

A.    I don't actually research that.  That's not what I'm here for.

Q.    So you're not familiar with any cases in which a court has ruled against the IRS, for example?

A.    That's correct, I am not.

Q.    I understand.

      The frivolous filing letters don't tell the taxpayer exactly what's wrong with their return, right?

A.    They state that it's a frivolous position, gives the date of the filing.

Q.    Understood.

      But it doesn't say, for example, The problem with this return is that you claimed a refund on an OID document, but there is no corresponding document from the bank, right?

A.    That's correct, it doesn't go into that detail.

Q.    It just directs you to one of these publications from the IRS, right?

Exhibit A

A.   It gives you that information.  It also gives you a phone number to call if you have questions.

Q.   Okay.

You personally have never met Melissa Morton, correct?

A.   That's right.

Q.   You've never met Sean Morton?

A.   That's correct.

Q.   You have no personal knowledge of who may have helped them prepare their taxes; isn't that right?

A.   That's correct.

Q.   And you have no personal knowledge of where they may have obtained the 1099-OID forms that we've seen from the government?

A.   The forms are available on IRS.gov.  So anyone can pull those.

Q.   Anybody can download those forms?

A.   Correct.

Q.   It's not just available to banking institutions?

A.   That's correct.

Q.   Even though, I think you said, am I correct, that banking institutions are the ones that can file them?

A.   That's their responsibility, yes.

Q.   Individuals aren't supposed to file 1099-OIDs?

A.   Correct.  They would not have the information that the

Exhibit A

bank has.

Q.   Okay.  But that document is available on the web,
nonetheless?

A.   It is.

Q.   Okay.

        Obviously, when you look at the returns that were
filed by Melissa Morton, you can't tell on what theory that
she's claiming the refund, right?

A.   Oh, I would look at the face of the document as far as is
it correct or not.  That's all I can look at.

Q.   As to the coupon for settlement, set-off and closure,
there were a couple of coupons for settlement, set-off and
closure that we looked at, you can't tell from the face of that
document who may have actually printed it out, right?

A.   That's correct.

Q.   You don't know if somebody assisted Melissa Morton in
preparing that document?

A.   I just know it's included in the filing.

Q.   Okay.

        And as to the Discharging Bond and Indemnity, I think
that was Government's Exhibit 21, you said that the IRS didn't
try to cash that bond; is that correct?

A.   The record shows that it was not attempted to post to the
account.

Q.   And do we know why it wasn't?

Exhibit A

A.   I don't know why, no.

          MR. BRODY:  No further questions.

          Thank you, Your Honor.

          THE COURT:  Mr. Morton.

### CROSS-EXAMINATION

BY DEFENDANT SEAN DAVID MORTON:

Q.   Good afternoon, Ms. Morgan.

A.   Good afternoon.

Q.   Are you familiar with Maureen Green at the Ogden, Utah

IRS?

A.   Maureen Green?

Q.   Yes.

A.   Yes.

Q.   Is that you?

A.   No.

Q.   Does the IRS use aliases in their work with the public?

A.   No.

Q.   Are you familiar with IRS Agent Ted Hansen?

A.   No, I don't know.

Q.   Are you familiar that he is using an assumed name and is

now appearing in this court; so you have no familiarity with

Ted Hansen?

          MR. HUGHES:  Objection, Your Honor.

          THE COURT:  Give me a legal ground for the objection.

          MR. HUGHES:  Facts not in evidence.

Exhibit A

THE COURT:  I can't hear what you're saying.

MR. HUGHES:  Outside the scope of direct.

THE COURT:  Overruled.

BY DEFENDANT SEAN DAVID MORTON:

Q.   What's the statute of limitations on all this stuff?  Does it just go on forever?

A.   I'm not here to discuss that.  I'm as a custodian bringing the records in and explaining them for you.

Q.   Okay.

So one of the records that you brought in, you brought in a coupon for set-off, settlement and discharge, that said "Void" all the way across from it.  What made you assume it was a check?

A.   It's part of the return information that was submitted to the IRS.

Q.   That said it was a check?

A.   That's the information that I have.

Q.   Okay.  So you claim the IRS tried to cash the check.  What bank did they cash the check at?  If it's a coupon, what bank did this get cashed at?

A.   I have no information about which one you're speaking to.

Q.   You saw a series of coupons that they produced as evidence that you said the IRS tried to cash, but you have -- do you have any evidence of that?

A.   There was one that they attempted to post.  Yes, I seen

Exhibit A

that on the account.

Q.   Even though there's nowhere the word "check" was on the coupon?

A.   There was an attempt to post that, and it rejected.

Q.   Where?

A.   When you say "Where," I don't know --

Q.   What bank did they try to cash it at?  These were questions the judge asked actually in the preliminary way back when, and we said -- the judge himself said it, looked like a prank.

THE COURT:  I didn't say anything like that.

DEFENDANT SEAN DAVID MORTON:  Don't mean to misquote me.

THE COURT:  Don't misquote me, Mr. Morton.  Please be mindful of that as you proceed.

DEFENDANT SEAN DAVID MORTON:  Okay.

Q.   What is the difference between -- you say the IRS issues liens.  What's the difference between a notice of lien and a lien?

A.   I'm not understanding the question.

Q.   They issue what you claimed were fines or public exactions for frivolous filings?

A.   Well, there's penalties assessed.

Q.   Okay.  But they're called -- what is the difference between a lien, and is actually processed by a court and signed

Exhibit A

by a judge, and enforced by court actions under the Constitution, and what you issue or -- I'm sorry -- what the IRS issues which is called a notice of lien?  What is the difference between a notice and a lien?  You should know this -- I'm sorry.

A.   I don't know that.  As a custodian, I only bring in the records of what they show.

Q.   Okay.

You claim that the 1099-OIDs are available on the IRS website?

A.   That's right.

Q.   Okay.

Have you looked recently?

A.   Yes, I have.

Q.   To see that the 1099-OIDs are available to the public?

A.   I have pulled them, yes.

Q.   When was the last time that you saw, available to the public, when was the last time you saw a 1099-OID on the IRS website?

A.   I pulled a 1099-OID from IRS.gov before I came here.

Q.   Okay.  Was this your special code or whatever, because they do not seem to be -- are they still available to the public, as you claim?

A.   That, I don't know.  I can tell you what I pulled from IRS.gov.

Exhibit A

Q.   But with your special clearances as an IRS, somebody paid by the United States of America, our imaginary plaintiff that pays everybody else in this courtroom, but with your codes, to be able to do that as an expert for the United States of America?

A.   We access IRS.gov just through the Internet.

Q.   Okay.

     So you don't know the difference between a lien by a court and a notice of lien that the IRS hands out to people?

A.   That's correct.  That's not what my reasonable responsibility is here.

Q.   Okay.

     When you said the IRS tried to cash the check or the coupon, were you aware that then, after supposedly cashing that check or coupon, is it in your evidence that that shows that the IRS then fined me $5 million, as now I owe them that which was the value of the coupon that was submitted?

A.   That record you'd have to show me.

Q.   Okay.

     What happened to the -- if there are bonds submitted to the IRS, what happened to them, if you -- what happens to the bonds?  Are they sent back?  Do they dishonor them if the U.S. Treasury says they're supposed to be, are they returned so the people can know that the bonds were no good or couldn't be actually monetized by them?

Exhibit A

A.   You're talking specifically to the actual check that was --

Q.   No.  It's nowhere on this it says check.  Does it say anywhere on here it says check?

A.   You're asking me regarding the posting of the account to the $5 million that was returned by the bank; is that correct?

Q.   Which bank?  Do you have any evidence it was actually sent to a bank?

A.   There was an attempting to post, and it was rejected back.

Q.   To whom?

A.   To the IRS as a bad payment.

Q.   But the IRS is not a bank, so I'm asking you about a bank if it's a coupon that was never meant to be cashed at a bank, and you're saying it was cashed by a bank and returned, like it bounced or something?

A.   I'm telling you what the record shows.  The record shows there was an attempt to post and it was rejected.

Q.   Post to who and where?  What bank?

A.   Posting to your account, not necessarily does it show the bank.

Q.   Do you know or not, ma'am?

A.   The record shows that there was a posting attempted and it rejected.

Q.   To who?  We have no evidence as to who, or to how, or to what bank, yes?

Exhibit A

A.   The account wouldn't have shown that.  It would show it was a bad check.

Q.   Thank you.

Again, using the word "check."  Is the word "check" anywhere on that piece of evidence that you saw, anywhere?

A.   That is my termination for posting money to the account.

Q.   Okay.  All right.

Now, is there a difference in the tax liability to religious organizations?  Are they liable to pay taxes to the IRS as religious educational organizations?

A.   I wouldn't know that.

Q.   You wouldn't.  Okay.  Because you were saying that -- well, you made the statement that I had paid $1 in taxes over the course of the, what, last 20 years, I guess?

A.   The records show there was a dollar payment made, yes.

Q.   Okay.

Does the record also show that I ran the Prophecy Research Institute which is a religious education organization for 20-plus years?

A.   That was not information that I was researching, no.

Q.   Okay.

So would somebody who's running a religious education organization, 501(c)(3), be liable for the taxes that a regular person would pay that doesn't have such an organization?

A.   Again, I don't know.

Exhibit A

Q.    Okay.

        In the evidence that they presented, again, the one other thing that I was interested of, the Marlea Ramsey who was the notary on the packet that was sent by myself.  As an example, Marlea Ramsey was a third party to this that was presenting this to an IRS agent, showing that there was –– but not showing that there was any response from them.  That was her as a third-party intervener –– strike that.  Withdraw that question.

        Does it appear to be that the '05, '06, '07 and '08 1099-OIDs –– by the way, you did not mention that in your research is there something called a 1099-A that goes along with the 1099-OID?

A.    There is a Form 1099-A.

Q.    What does the "A" stand for?

A.    Aquisition.

Q.    Or?

A.    Abandonment of property.

Q.    Thank you.  Okay.

        So which one is it?  Is it abandonment or acquisition?

A.    That would be –– the person filing that document would be needing to know that.

Q.    So what is being abandoned in this case?

A.    I don't remember any 1099-A's that we spoke to.

Exhibit A

Q.   So the essential document is the 1099-A that was submitted

with a 1099-OID, you didn't see, you can't remember?

A.   That's correct.

Q.   Oh.

     What's abandoned in the 1099-A as far as the banks

are concerned?

A.   That, I don't know.

Q.   Wow.  Okay.

     All right.  Just a few more questions here.

     I'm not sure how to put this in a question other

than -- what would your opinion, in your expert opinion, if you

received a -- if you received a letter from the Internal

Revenue Service that said, We're processing your refund, but we

would like -- you did not do the mathematics correctly, and we

would like to give you $500 more as part of your refund.  What

would your response be?

A.   That you should read the entire notice.

Q.   Okay.

     But the notice said -- if the notice was to say, You

did the math wrong, we'd like to give you another $500, and

we'll give it to you if you don't respond, what would your

response be?  Would you acquiesce to that, say that's fine?

A.   The notice also states if you owe no other liability.

Q.   Okay.  All right.

     Now, if the Internal Revenue Service says you --

Exhibit A

again, says, We'd like to give you $500 more, you say fine, and

then they give you a refund, doesn't that show that the

Internal Revenue Service has actually audited the refund

somehow, or does something with it to say you've done the math

at least, to be able to put this together that would give you

the impression that your 1099, whatever the IRS refund, would

be legitimate?

A.   That, all I can tell you is that refunds sometimes go out

erroneously.  That does not tell me -- I don't know what any

taxpayer thinks when they get their refund.

Q.   Is the erroneous refund the fault of the taxpayer?

A.   For filing a claim to the IRS?

Q.   No, that isn't my question.

         Is an erroneous refund, a result of a computer error,

the fault of the taxpayer?

A.   When we receive a tax return --

Q.   You're not answering my question.

         Is it the fault of the taxpayer, an erroneous refund?

A.   Let me finish my answer, please.

         When we receive a tax return, we trust that the

filing is true and correct, and we process those tax returns

based on the filing of the tax return.

Q.   And if they say, We'd like to give you more money, doesn't

that point that they've audited it somehow, or at least done

the math?

Exhibit A

A.   There's not an audit.  They have been reviewed based on the face of the document that's filed, the information that is at hand.

Q.   Is there anyone at the IRS in these documents that you've gone through that has a claim against myself?

A.   That, I wouldn't know.

Q.   Okay.  And let me see if I can wrap this up here.

So last but not least here, the -- did you notice that the '05, '06, '07, '08, that all those returns were done in a very brief period of time, that they were all done within a few days of each other in March of 2009?

A.   Yes.

Q.   Did you notice that on the dates?

A.   We noticed the received -- I noticed the received dates.

Q.   So they were all basically processed pretty much at the same time?

A.   Not necessarily, no.  They were received the same time.

Q.   Okay.

Would these -- would documents which you're all processing at the same time, do they go out to different -- even though they're submitted to one IRS office, say, in Fresno, aren't they then transported to other IRS offices like Austin and Philadelphia for them to be double-checked somehow?

A.   Not necessarily, no.

Q.   But it's -- you say "Not necessarily," and I'm asking you

Exhibit A

does it happen?

A.   If Fresno receives a document that they're suspecting is frivolous, it goes to Ogden.  But based on the fact that it's frivolous, the Ogden frivolous filer department --

Q.   If they're saying it's good, and they want it double-checked, would it -- or can it go to Austin and Philadelphia?

A.   No.

Q.   Okay.  All right.

        If three offices then say to a taxpayer that We owe you "X" amount of money, and they send that to the taxpayer, and then at the same day they a get a frivolous notice from Mean Mo Green, or Maureen Green, who you say you know or don't know as a real person --

A.   I do.

Q.   Is she a real person?

A.   Yes, she is.

Q.   Is that her real name?

A.   It is.

Q.   Okay.

        Maureen Green in Ogden, Utah, then says, All of this is frivolous, ha, ha, ha.

        Is that something else that the IRS does, actually hands out what they say are refunds, and then turn around and say, No, it's frivolous.

Exhibit A

A.   And that notice you're referring to is a computer-generated notice.  The frivolous-return notice is generated by a person looking at the tax return.

Q.   Again, is an erroneous refund the actual fault of the person getting the refund?

A.   Those notices can go out at different times from different areas.

Q.   Okay.  You just said they go out different times for different areas.  I just mentioned three different areas of Fresno, Austin and Philadelphia.  Which is it?  If you get notices from all three of those, do they go out to different places before they actually notify the taxpayer?

A.   Would have to look at your notices you're referring to, because different areas handle different parts of the tax return.

Q.   Thank you.  Okay.

        So they do go out to different offices and letters of response then do go to the taxpayer?

A.   Depends on where you, the taxpayer, mails your tax return.

Q.   Okay.  Fresno, and they hand it to Ogden and Philadelphia, and then we get notices back from them.  Does that happen?

A.   I see no direction that they ever sent anything to Philadelphia, just to Ogden.

Q.   Okay.  But you have no first-hand knowledge, actually, of what happened with -- you have no first-hand experience with

Exhibit A

what happened with tax returns that I filed, only that they actually happen all in the same -- they happen within a couple of weeks of each other.  In other words, they were all done at once and submitted, correct?

A.   Date stamps show where the tax returns went.  If they're received in Fresno, and they sent to Ogden, there's a date stamp that shows it was received in Ogden.

Q.   Okay.

In the letter rogatory that went with the coupon that said "Void" across the face of it, and the coupon was simply to set-off, settle and discharge of public exactions, did you notice that in the body of the letter rogatory, which you probably did not read, that it was requesting that this coupon go to the data integrity board, and it was requesting to simply set-off, settlement, discharge a public exaction -- did you notice that -- did you actually read the body of the letter rogatory that went along with the coupon?  Did you read any of it?

A.   The custodian of the record, I take the document in its entirety, copy that, produce an entirely true copy of what was filed.

Q.   But you didn't read it?

A.   My responsibility is not to read the document.

Q.   Well, actually, the prosecution of the case was asking you as a witness to read the documents or have familiarity with the

Exhibit A

documents before you came in here, didn't it?

A.   I was asked to read parts of documents to get them into the record.

Q.   And you are paid to be here by the United States of America, our mythical plaintiff, yes?

A.   Yes.

Q.   Okay.

Anything else?  All right.

Thank you, ma'am.

THE COURT:  Okay.  Thank you, ma'am.

You may step down.  Thank you for being here.

Call the next witness.

MS. MAKAREWICZ:  Your Honor, the government calls Elvin Jusino to the stand, please.

DEFENDANT SEAN DAVID MORTON:  Again, Your Honor, I take objection to the -- the witness.  Take exception to it that has no firsthand knowledge of the case, and no firsthand knowledge of the actual files.

THE CLERK:  Please step forward and stand behind the court reporter.

Please raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE CLERK:  Please be seated.

State your full name and spell it for the record.

Exhibit A